# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| JILLIAN IZZIO and HEATHER ZOELLER, on behalf of themselves and all others similarly situated, <br><br><div align="center">Plaintiffs,</div><br> v. <br><br> CENTURY GOLF PARTNERS MANAGEMENT, L.P., <br><br><div align="center">Defendant.</div> | Case No.: 3:14-cv-03194-P |

## COMPENDIUM OF DECLARATIONS AND STATEMENTS IN SUPPORT OF PLAINTIFFS' MOTION FOR CERTIFICATION OF THE SETTLEMENT CLASSES, APPROVAL OF THE ENHANCED SETTLEMENT, AND AWARD OF ATTORNEYS' FEES AND EXPENSES

| Document | Title | Page Number |
|---|---|---|
| Tab A | Declaration of Innessa Melamed Huot in Support of Plaintiffs' Motion for Certification of the Settlement Classes, Approval of the Enhanced Settlement, and Award of Attorneys' Fees and Expenses | 1 |
| Exhibit 1 | Enhanced Settlement Agreement and Release | 9 |
| Exhibit 2 | Transcript Excerpts from Final Approval Hearing before Honorable Judge Jorge A. Solis, March 16, 2018 | 27 |
| Exhibit 3 | Brierwood Banquet Contract prior to approximately October 2013 | 33 |
| Exhibit 4 | Fox Valley Banquet Contract prior to approximately October 2013 | 42 |
| Exhibit 5 | Harbor Links Banquet Contract prior to approximately October 2012 | 46 |
| Exhibit 6 | Tan Tara Banquet Contract during the relevant period | 50 |
| Exhibit 7 | Brierwood Banquet Contract after approximately October 2013 | 54 |
| Exhibit 8 | Fox Valley Banquet Contract after approximately October 2013 | 58 |
| Exhibit 9 | Harbor Links Banquet Contract after approximately October 2012 | 62 |
| Exhibit 10 | Defendant's Response to Plaintiffs' Second Set of Interrogatories | 67 |
| Exhibit 11 | Unpublished Order in *Owens, et al. v. FreshDirect LLC, et al.*, Civil Action No. 14-cv-1909 (VEC) (GWG) (S.D.N.Y. Oct. 30, 2015) | 82 |
| Exhibit 12 | Unpublished Decision in *Ahmed v. Morgan's Hotel Group Management, LLC, et. al.*, Index. No. 153841/2015 (1st Dep't Apr. 19, 2018). | 90 |
| Exhibit 13 | Chart with a breakdown of costs and expenses incurred by Faruqi & Faurqi, LLP | 94 |
| Exhibit 14 | Firm Resume of Faruqi & Faruqi, LLP | 96 |
| Tab B | Supplemental Declaration of Brian Devery Regarding Updated Calculations | 127 |
| Tab C | Declaration of Adolfo Pena in Support of the Motion for Certification of the Settlement Classes and Final Approval of the Proposed Settlement | 131 |

| Document | Title | Page Number |
|---|---|---|
| Tab D | Declaration of Alan Duran in Support of the Motion for Certification of the Settlement Classes and Final Approval of the Proposed Settlement | 134 |
| Tab E | Declaration of Allen Gonzalez in Support of the Motion for Certification of the Settlement Classes and Final Approval of the Proposed Settlement | 137 |
| Tab F | Declaration of Awedryn Gonzalez in Support of the Motion for Certification of the Settlement Classes and Final Approval of the Proposed Settlement | 140 |
| Tab G | Declaration of Carol Rodriguez in Support of the Motion for Certification of the Settlement Classes and Final Approval of the Proposed Settlement | 143 |
| Tab H | Declaration of Cesar Alonzo in Support of Approval of Settlement of Collective and Class Action | 146 |
| Tab I | Declaration of Evalina DeLeon in Support of the Motion for Certification of the Settlement Classes and Final Approval of the Proposed Settlement | 149 |
| Tab J | Declaration of Gregory Scarazzini in Support of the Motion for Certification of the Settlement Classes and Final Approval of the Proposed Settlement | 152 |
| Tab K | Declaration of Ingrid Rodriguez in Support of the Motion for Certification of the Settlement Classes and Final Approval of the Proposed Settlement | 155 |
| Tab L | Declaration of Jaclyn Kiernan in Support of the Motion for Certification of the Settlement Classes and Final Approval of the Proposed Settlement | 158 |
| Tab M | Declaration of Jacqueline Cavero in Support of the Motion for Certification of the Settlement Classes and Final Approval of the Proposed Settlement | 161 |
| Tab N | Declaration of Karen Lopez in Support of the Motion for Certification of the Settlement Classes and Final Approval of the Proposed Settlement | 164 |
| Tab O | Declaration of Maria Pilar Diaz Inglesias in Support of the Motion for Certification of the Settlement Classes and Final Approval of the Proposed Settlement | 167 |

| Document | Title | Page Number |
|---|---|---|
| Tab P | Declaration of Mercedes Romero in Support of the Motion for Certification of the Settlement Classes and Final Approval of the Proposed Settlement | 170 |
| Tab Q | Declaration of Michael Espinal in Support of the Motion for Certification of the Settlement Classes and Final Approval of the Proposed Settlement | 173 |
| Tab R | Declaration of Ramon Mejia Mendez in Support of the Motion for Certification of the Settlement Classes and Final Approval of the Proposed Settlement | 176 |
| Tab S | Declaration of Rocio Cabrera Ortiz in Support of the Motion for Certification of the Settlement Classes and Final Approval of the Proposed Settlement | 179 |
| Tab T | Declaration of Ryan Somerville in Support of the Motion for Certification of the Settlement Classes and Final Approval of the Proposed Settlement | 182 |
| Tab U | Declaration of Shirley Lopez in Support of the Motion for Certification of the Settlement Classes and Final Approval of the Proposed Settlement | 185 |
| Tab V | Declaration of Tania Duran in Support of the Motion for Certification of the Settlement Classes and Final Approval of the Proposed Settlement | 188 |
| Tab W | Declaration of Walter Alonzo in Support of the Motion for Certification of the Settlement Classes and Final Approval of the Proposed Settlement | 191 |
| Tab X | Declaration of Wilson Portilla in Support of the Motion for Certification of the Settlement Classes and Final Approval of the Proposed Settlement | 194 |

# TAB A

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| JILLIAN IZZIO and HEATHER ZOELLER, on behalf of themselves and all others similarly situated, <br><br>                      Plaintiffs, <br><br>    v. <br><br> CENTURY GOLF PARTNERS MANAGEMENT, L.P., <br><br>                    Defendant. | Case No.: 3:14-cv-03194-P <br><br><br> **DECLARATION OF INNESSA M. HUOT** |

I, INNESSA M. HUOT, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.　　I am a partner at the law firm of Faruqi and Faruqi, LLP.  I submit this declaration in support of Plaintiffs' Motion for Certification of the Settlement Classes, Approval of the Enhanced Settlement, and Award of Attorneys' Fees and Expenses.  I have personal knowledge of the matters set forth herein based upon my active participation in all material aspects of this litigation.

2.　　During the pendency of this action, Defendant produced voluminous records pertaining to its pay practices, service charges, and tipping policies at Brierwood Country Club ("Brierwood"), Fox Valley Club ("Fox Valley"), Tan Tara Golf Club ("Tan Tara"), and Harbor Links Golf Club ("Harbor Links") (collectively, the "Four Golf Clubs").

3.　　Specifically, Defendant produced:

- Payroll and employment policies, including the Employee Handbook, that were uniformly used at all Four Golf Clubs, including Harbor Links;

- Sworn interrogatory responses regarding Defendant's policies and practices regarding the collection and retention of service charges at the Four Golf Clubs, including Harbor Links;

- Sample banquet contracts and other advertising, promotional and banquet materials presented by Defendant to customers for each of the Four Golf Clubs, including Harbor Links, along with sworn interrogatory responses which described the time period when the service charge language in the sample contracts was used uniformly in banquet event contracts at each of the Four Golf Clubs during the relevant time period;

- Personnel files for the named plaintiffs, and

- Profit and loss statements for the relevant time period, which reflected the service charges and tips collected, as well as information regarding how to calculate the service charges for each of the Four Golf Clubs, including Harbor Links.

4.     In addition, Plaintiffs Diane Gulla, Daniel Howard, Derik Kane, Michael Overdorf, and Sara Owczarzak produced over 150 pages of documents and interrogatory responses to Defendant, which further described Defendant's pay practices, service charges, and tipping policies.

5.     These documents allowed counsel for Plaintiffs and the putative class ("Plaintiffs' Counsel") to evaluate the strengths and weaknesses of their claims and Defendant's exposure.

6.     Plaintiffs' Counsel expended significant time and effort analyzing the data, including building sophisticated spreadsheets calculating the service charges collected by Defendant, unpaid wages and tips for hundreds of employees over several years at each of the Four Golf Clubs, and engaged in back and forth discussions with Defendant and its counsel to better understand the data.

7.     As of this date, Plaintiffs' Counsel also interviewed over 40 banquet employees, including employees at Harbor Links.

8.     Based on Plaintiffs' Counsel's detailed analysis of Defendant's records, Plaintiffs determined that at the Four Golf Clubs, Defendant collected a total of $1,759,696.37 in service charges prior to January 1, 2011.  After the January 1, 2011 adoption of the new laws and

regulations, Defendant collected an additional $1,380,766.80 in service charges at three facilities, for a total of $3,140,463.17.

9.      A detailed chart of Class Counsel's calculations is set forth below:

| | Service Charges Collected August 20, 2007 – January 1, 2011 | Service Charges Collected January 1, 2011 until Contract Language Changed at Each Club | Total |
|---|---|---|---|
| | [When it was Plaintiffs' burden to prove Defendant affirmatively lead customers to believe a service charge was a gratuity] | [When rebuttable presumption applied that service charge was gratuity, and before Defendant's banquet contracts included a disclaimer that the service charge was not a gratuity] | |
| Harbor Links | $642,851.40 | $468,117.20 | $1,110,968.60 |
| Brierwood | $591,726.66 | $519,401.80 | $1,111,128.46 |
| Fox Valley | $525,118.31 | $393,247.80 | $918,366.11 |
| Tan Tara | N/A | N/A | N/A |
| Total | $1,759,696.37 | $1,380,766.80 | $3,140,463.17 |

10.     Discovery revealed that Tan Tara remitted service charges its banquet staff members.

11.     Discovery and investigation also revealed that the claims of the Settlement Class members of Tan Tara are common to the claims of the Settlement Class members of the other three golf clubs with respect to uniform allowance and maintenance, overtime and spread of hours claims.

12.     Based on a detailed analysis of Defendant's records, Plaintiffs have determined that of the total amount of service charges collected, 35.38% were collected at Harbor Links.

13.     Plaintiffs have devoted considerable time and effort in prosecuting the class claims and assisting in the settlement of this action. Plaintiffs have actively participated in discovery, have attended and testified at the final approval hearing in Dallas, Texas, and have attended the

Court-ordered mediation before the Honorable Jeff Kaplan (Ret.) on October 20, 2017.

14.     The settlement includes a $39,000 total Service Award to the eight Named Plaintiffs, to be distributed as follows: Diane Gulla, who filed the first case in New York State court in 2013 and has been active in every step in the litigation, is proposed to receive $10,000; the four plaintiffs who joined Ms. Gulla when she filed her amended complaint and participated in the litigation including discovery are proposed to receive $5,000 each; and the three plaintiffs in the *Izzio* and *Ashby* Actions, who filed later, are proposed to receive $3,000 each.

15.     At the October 20, 2017 mediation, and in the subsequent discussions thereafter, the parties went to great lengths to satisfy the demands of the Objectors. The parties took significant steps to increase the monetary settlement to be awarded to the Objectors and Harbor Links employees. However, the parties were ultimately unable to obtain their consent to the settlement.

16.     In order to facilitate final settlement of this action, Defendant increased its contribution to the Maximum Gross Settlement Amount by $225,000 (an increase of nearly 20%).

17.     Also to facilitate the settlement, Plaintiffs' Counsel agreed to reduce their total fees, which were previously based on a 33 1/3% contingency (*see* ECF No. 41 at 6), by eight percent. Indeed, in connection with the instant motion, Plaintiffs request Court approval of an award of attorneys' fees totaling twenty-five percent (25%) of the Maximum Gross Settlement Amount, or $356,250.00, plus their litigation costs and expenses.

18.     Plaintiffs' Counsel expended a total of 1,605.7 billable hours in connection with this litigation, 574.6 hours of which were incurred subsequent to the March 16, 2016 hearing during which the Court granted Plaintiffs' initial motion for final approval. *See* ECF No. 46.

19.     The hours recorded by Plaintiffs' Counsel are based on contemporaneous time

records.  The calculation of lodestar is based on Plaintiffs' Counsel's current, not historical, hourly rates.

20.    In reviewing Plaintiffs' Counsel's time records, I have deleted time entries that were duplicative and reduced entries which seemed to be excessive for the tasks undertaken.

21.    No allowances were made for the time spent by Plaintiffs' Counsel in the preparation of this settlement approval brief and supporting papers.

22.    My firm's practice is mostly contingent, so we are accustomed to extended waits for payment, if any, and incurring out of pocket expenses which may or may not be reimbursed.

23.    When multiplied by the ordinary hourly rate of each professional this results in a lodestar of $831,695.

24.    Thus, Plaintiffs' Counsel's request for $356,250 in attorneys' fees in fees and expenses is approximately 0.43 times the "lodestar."

25.    Plaintiffs' actual litigation costs and expenses total $45,522.76.  However, Plaintiffs' Counsel seeks only $45,000.00 for litigation costs and expenses.

26.    These costs and expenses were incidental and necessary to the representation of the putative class.

27.    These expenses included the filing fee, postage, travel, working meals, printing, Plaintiffs' share of the mediator's fee, and electronic research. I have attached a chart with a breakdown of the costs and expenses incurred by my firm to this declaration as Exhibit 13.

28.    In addition, the costs of notice and claims administration, including issuing checks, will be $42,308.79.   Plaintiffs ask the Court to approve this expense as well.

29.    Attached hereto as Exhibit 1 is a true and correct copy of the fully executed Addendum to Settlement Agreement and Release, which sets forth the terms of the parties'

enhanced $1.425 settlement (the "Enhanced Settlement").

30.     Attached hereto as Exhibit 2 is a true and correct copy of relevant excerpts of the transcript of the proceedings before the Honorable Judge Jorge A. Solis, held on March 16, 2016.

31.     Attached hereto as Exhibit 3 is a true and correct copy of a sample banquet contract from Brierwood, which is representative of all of Brierwood's banquet contracts during the relevant period, prior to approximately October 2013.

32.     Attached hereto as Exhibit 4 is a true and correct copy of a sample banquet contract from Fox Valley, which is representative of all of Fox Valley's banquet contracts during the relevant period, prior to approximately October 2013.

33.     Attached hereto as Exhibit 5 is a true and correct copy of a banquet contract from Harbor Links, dated August 7, 2009, with the customer's personal information redacted, which is representative of all of Harbor Links's banquet contracts during the relevant period, prior to approximately October 2012.

34.     Attached hereto as Exhibit 6 is a true and correct copy of a sample banquet contract from Tan Tara, which is representative of all of Tan Tara's banquet contracts during the relevant period.

35.     Attached hereto as Exhibit 7 is a true and correct copy of a banquet contract from Brierwood, dated October 9, 2013, with the customer's personal information redacted, which is representative of all of Brierwood's banquet contracts after approximately October 2013.

36.     Attached hereto as Exhibit 8 is a true and correct copy of a banquet contract from Fox Valley, dated October 9, 2013, with the customer's personal information redacted, which is representative of all of Fox Valley's banquet contracts after approximately October 2013.

37.     Attached hereto as Exhibit 9 is a true and correct copy of a banquet contract from

Harbor Links, dated May 30, 2014, with the customer's personal information redacted, which is representative of all of Harbor Links's banquet contracts after approximately October 2012.

38.   Attached hereto as Exhibit 10 is a true and correct copy of Defendant's Response to Plaintiffs' Second Set of Interrogatories.

39.   Attached hereto as Exhibit 11 is a true and correct copy of an "Order Granting Plaintiffs' Motion for Certification of the Settlement Class, Final Approval of the Class Action Settlement, Approval of the FLSA Settlement, and Approval of Attorneys' Fees, Reimbursement of Expenses, and Service Payments" in *Owens, et al. v. FreshDirect LLC, et al.*, Civil Action No. 14-cv-1909 (VEC) (GWG) (S.D.N.Y. Oct. 30, 2015).

40.   Attached hereto as Exhibit 12 is a true and correct copy of a decision by the New York State Appellate Division, First Judicial Department in *Ahmed v. Morgan's Hotel Group Management, LLC, et. al.,* Index. No. 153841/2015 (1st Dep't Apr. 19, 2018).

41.   Attached hereto as Exhibit 13 is a chart with a breakdown of the costs and expenses incurred by my firm.

42.   Attached hereto as Exhibit 14 is true and correct copy of my firm resume.

43.   I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on this 1st day of May, 2018.

_____
Innessa Melamed Huot

# EXHIBIT 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS - DALLAS DIVISION

| | |
|---|---|
| JILLIAN IZZIO, *et al.*, | |
| Plaintiffs, | Case No. 3:14-CV-03194 |
| -against- | |
| CENTURY GOLF PARTNERS MANAGEMENT, L.P., | |
| Defendant. | |

NEW YORK STATE SUPREME COURT
COUNTY OF NIAGARA

| | |
|---|---|
| DIANE LAW, *et al.*, | |
| Plaintiffs, | Index No. E150883/2013 |
| -against- | |
| CGPM/WMC OPERATING, LLC, dba ARNOLD PALMER GOLF MANAGEMENT, | |
| Defendant. | |

## ADDENDUM TO SETTLEMENT AGREEMENT AND RELEASE

WHEREAS, LAW PLAINTIFFS, IZZIO PLAINTIFFS and PLAINTIFF ASHBY (on behalf of themselves, and all members of the SETTLEMENT CLASSES), and DEFENDANTS (the "PARTIES")[1] entered into a SETTLEMENT AGREEMENT, effective March 5, 2015, attached and incorporated by this reference as Exhibit A, in the matters of *Izzio et al. v. Century Golf Partners Management, L.P.,* Case No. 14-cv-3194, pending in the United States District Court Northern District of Texas-Dallas Division, *Law et al. v. CGPM/WMC Operating LLC, d/b/a Arnold Palmer Golf Management,* Index No. E150883/2013, pending in New York State Supreme Court, County of Niagara, and *Ashby et al. v. Century Golf Partners Management, L.P., d/b/a Arnold Palmer Golf Management,* No. 14-cv-00759, then pending in the United States District Court for the Western District of New York;

WHEREAS, after engaging in further negotiations, participating in good faith in Court-ordered mediation, and with the assistance of the Court-appointed mediator, the PARTIES wish to amend the terms of the SETTLEMENT AGREEMENT by entering into this Addendum to

---

[1] After entering into the SETTLEMENT AGREEMENT, Plaintiff Diane Law requested to be excluded from the SETTLEMENT AGREEMENT and, consequently, is not a party to this ADDENDUM.

Settlement Agreement and Release ("ADDENDUM");

WHEREAS, in accordance with Section XXI of the SETTLEMENT AGREEMENT, any modification to the SETTLEMENT AGREEMENT must be in writing and signed by duly authorized representatives of the PARTIES;

**IT IS THEREFORE STIPULATED AND AGREED THAT:**

1.     All definitions from the SETTLEMENT AGREEMENT are incorporated herein, unless otherwise modified herein.

2.     The PARTIES hereby amend the SETTLEMENT AGREEMENT in the manner set forth below.  Deletions are struck through (~~example~~) and additions are bold and underlined (**example**):

(a)     Section II, BB shall be revised as follows:

"MAXIMUM GROSS SETTLEMENT AMOUNT" is ~~One Million, Two Hundred Thousand U.S. Dollars ($1,200,000.00)~~ **One Million, Four-Hundred and Twenty Five Thousand U.S. Dollars ($1,425,000.00)**.  The MAXIMUM GROSS SETTLEMENT AMOUNT represents the maximum amount that DEFENDANTS would pay pursuant to this SETTLEMENT AGREEMENT if every member of the SETTLEMENT CLASSES participated in the settlement and received a SETTLEMENT PAYMENT, inclusive of SETTLEMENT PAYMENTS, PLAINTIFFS' COUNSEL'S FEES, COSTS AND EXPENSES, SERVICE PAYMENTS and SETTLEMENT EXPENSES.  In addition to the MAXIMUM GROSS SETTLEMENT AMOUNT, DEFENDANTS shall be responsible for paying all employer-paid payroll taxes including FUTA and the employer's share of FICA and state unemployment, as required by law with respect to settlement payments to AUTHORIZED CLAIMANTS.  AUTHORIZED CLAIMANTS will be responsible for their own tax obligations.

(b)     Section II, I shall be revised as follows:

"PLAINTIFFS' CLASS COUNSEL'S FEES, COSTS AND EXPENSES" means the total amount of PLAINTIFFS' CLASS COUNSEL'S attorneys' fees, costs, and expenses approved by the COURT upon application by CLASS COUNSEL.  PLAINTIFFS' CLASS COUNSEL'S attorneys' fees will not exceed ~~thirty-three percent (33%)~~ **twenty-five percent (25%)** of the MAXIMUM GROSS SETTLEMENT AMOUNT.  In addition to attorneys' fees, PLAINTIFFS' CLASS COUNSEL will be entitled to recover reasonable costs and expenses.  PLAINTIFFS' CLASS COUNSEL'S attorneys' fees, costs, and expenses are included in the MAXIMUM GROSS SETTLEMENT AMOUNT.

(c)     Section VII, A shall be revised as follows:

Application for Fees.  CLASS COUNSEL may make an application to the COURT for an award of attorneys' fees in an amount not to exceed ~~thirty-three percent (33%)~~ **twenty-five percent (25%)** of the MAXIMUM GROSS SETTLEMENT AMOUNT.  In addition to attorneys' fees, CLASS COUNSEL may make an application to the COURT for reimbursement of reasonable and necessary costs and expenses to be paid from the MAXIMUM GROSS SETTLEMENT

2

AMOUNT. Such application shall be filed in connection with final approval of this SETTLEMENT AGREEMENT.

3. Within ten (10) calendar days from the signing of this ADDENDUM, the CLAIMS ADMINISTRATOR shall re-calculate the potential SETTLEMENT PAYMENTS for each member of the SETTLEMENT CLASSES pursuant to the formula set forth in Section VI, C, 1 and VI, C, 2 of the SETTLEMENT AGREEMENT. The total of all SETTLEMENT PAYMENTS shall not exceed the REVISED MAXIMUM GROSS SETTLEMENT AMOUNT.

4. The CLAIMS ADMINISTRATOR shall provide its calculations to CLASS COUNSEL and Counsel for DEFENDANTS. CLASS COUNSEL and Counsel for DEFENDANTS shall have five (5) business days to review, verify, and comment on the calculations provided by the CLAIMS ADMINISTRATOR. The CLAIMS ADMINISTRATOR shall review any comments received from CLASS COUNSEL and Counsel for DEFENDANTS and shall finalize the potential revised SETTLEMENT PAYMENT calculations within five (5) business days thereafter. Any disputes shall be resolved by CLASS COUNSEL.

5. Within five (5) business days after the CLAIMS ADMINISTRATOR finalizes the revised SETTLEMENT PAYMENTS, the CLAIMS ADMINSTRATOR shall certify jointly to CLASS COUNSEL and DEFENDANTS' Counsel the total SETTLEMENT PAYMENT due to each AUTHORIZED CLAIMANT, and provide that information to CLASS COUNSEL and DEFENDANTS' Counsel on an encrypted CD or encrypted removable drive.

6. Within ten (10) business days of receiving the CLAIMS ADMINISTRATORS' certification, the parties will submit the SETTLEMENT AGREEMENT and ADDENDUM to the Court and request a FINAL APPROVAL HEARING for the Court to approve, in final, the SETTLEMENT AGREEMENT as modified by this ADDENDUM, and make such other final rulings as are contemplated by the SETTLEMENT AGREEMENT. The date of the FINAL APPROVAL HEARING shall be set by the Court. Notice of such hearing need not be provided to members of the SETTLEMENT CLASSES, other than those who are OBJECTORS or who have OPT-OUT, as the only modification to the SETTLEMENT AGREEMENT is that the SETTLEMENT PAYMENT increased.

7. All other terms and conditions of the SETTLEMENT AGREEMENT shall remain unchanged.

8. The PARTIES hereto agree that the terms and conditions of this ADDENDUM are the result of arms-length negotiations among the PARTIES, facilitated by the Court-appointed mediator, and that this ADDENDUM shall not be construed in favor of or against any PARTY by reason of the extent to which any PARTY or his, her or its Counsel participated in the drafting of this ADDENDUM.

9. This ADDENDUM shall be subject to and governed by the laws of the State of New York and subject to the continuing jurisdiction of the United States District Court for the Northern District of Texas, Dallas Division.

10. This ADDENDUM shall be binding upon and inure to the benefit of the PARTIES and his, her or its respective agents, heirs, beneficiaries, devisees, legatees, executors, administrators,

trustees, conservators, guardians, estates, personal representatives, exclusive bargaining agents, successors-in-interest, and assigns.

11.     No rights hereunder may be waived or modified except in a writing signed by duly authorized representatives of the PARTIES.

12.     The SETTLEMENT AGREEMENT, as modified by this ADDENDUM, sets forth the entire agreement between the PARTIES.

13.     This ADDENDUM may be executed in counterparts, and when each party has signed and delivered at least one such counterpart, each counterpart shall be deemed an original, and, when taken together with other signed counterparts, shall constitute a modification to the SETTLEMENT AGREEMENT, which shall be binding upon and effective as to all PARTIES.

[*Remainder of Page Intentionally Left Blank – Signature Pages Follow*]

4

IN WITNESS WHEREOF, the undersigned have duly executed this ADDENDUM on:

**REPRESENTATIVE PLAINTIFFS ON BEHALF OF THEMSELVES AND ALL MEMBERS OF THE SETTLEMENT CLASSES:**

Date: _4/11/2018_

_Diane Gulla_

**DIANE GULLA**

Date: _____

_____

**DANIEL HOWARD**

Date: _____

_____

**DERIK KANE**

Date: _____

_____

**MICHAEL OVERDORF**

Date: _____

_____

**SARA OWCZARAK**

Date: _____

_____

**JILLIAN IZZIO**

**DEFENDANT CGPM/WMC OPERATING, LLC:**

Date: _____

By: _____

Name: Jack Marquardt

Title: Vice President and Treasurer of CGPM/WMC Operating, LLC

**DEFENDANT CENTURY GOLF PARTNERS MANAGEMENT, LP**

Date: _____

By: _____

Name: Jack Marquardt

Title: Vice President and Treasurer of Century Golf Partners GP, LLC

**APPROVED AS TO FORM:**

**DEFENDANTS' COUNSEL:**

Date: _____

_____
Craig R. Benson. Esq.
LITTLER MENDELSON, P.C.
900 Third Avenue
New York, NY 10022
(212) 583-2682
cbenson@littler.com

5

IN WITNESS WHEREOF, the undersigned have duly executed this ADDENDUM on:

**REPRESENTATIVE PLAINTIFFS ON BEHALF OF THEMSELVES AND ALL MEMBERS OF THE SETTLEMENT CLASSES:**

Date: _____

_____
**DIANE GULLA**

Date: _____

_____
**DANIEL HOWARD**

Date: ___4/2/2018_____

_____
**DERIK KANE**

Date: _____

_____
**MICHAEL OVERDORF**

Date: _____

_____
**SARA OWCZARAK**

Date: _____

_____
**JILLIAN IZZIO**

**DEFENDANT CGPM/WMC OPERATING, LLC:**

Date: _____

By:_____

Name: Jack Marquardt

Title: Vice President and Treasurer of CGPM/WMC Operating, LLC

**DEFENDANT CENTURY GOLF PARTNERS MANAGEMENT, LP**

Date:_____

By: _____

Name: Jack Marquardt

Title: Vice President and Treasurer of Century Golf Partners GP, LLC

**APPROVED AS TO FORM:**

**DEFENDANTS' COUNSEL:**

Date: _____

_____
Craig R. Benson. Esq.
LITTLER MENDELSON, P.C.
900 Third Avenue
New York, NY 10022
(212) 583-2682
cbenson@littler.com

5

IN WITNESS WHEREOF, the undersigned have duly executed this ADDENDUM on:

**REPRESENTATIVE PLAINTIFFS ON BEHALF OF THEMSELVES AND ALL MEMBERS OF THE SETTLEMENT CLASSES:**

Date: _____

_____
**DIANE GULLA**

Date: _____

_____
**DANIEL HOWARD**

Date: 4/3/2018

*Deik Kne*
_____
**DERIK KANE**

Date: _____

_____
**MICHAEL OVERDORF**

Date: _____

_____
**SARA OWCZARAK**

Date: _____

_____
**JILLIAN IZZIO**

**DEFENDANT CGPM/WMC OPERATING, LLC:**

Date: _____

By:_____

Name: Jack Marquardt

Title: Vice President and Treasurer of CGPM/WMC Operating, LLC

**DEFENDANT CENTURY GOLF PARTNERS MANAGEMENT, LP**

Date:_____

By: _____

Name: Jack Marquardt

Title: Vice President and Treasurer of Century Golf Partners GP, LLC

**APPROVED AS TO FORM:**

**DEFENDANTS' COUNSEL:**

Date: _____

_____
Craig R. Benson. Esq.
LITTLER MENDELSON, P.C.
900 Third Avenue
New York, NY 10022
(212) 583-2682
cbenson@littler.com

5

IN WITNESS WHEREOF, the undersigned have duly executed this ADDENDUM on:

**REPRESENTATIVE PLAINTIFFS ON BEHALF OF THEMSELVES AND ALL MEMBERS OF THE SETTLEMENT CLASSES:**

**DEFENDANT CGPM/WMC OPERATING, LLC:**

Date: _____

Date: _____

By: _____

Name: Jack Marquardt

**DIANE GULLA**

Title: Vice President and Treasurer of CGPM/WMC Operating, LLC

Date: _____

**DEFENDANT CENTURY GOLF PARTNERS MANAGEMENT, LP**

**DANIEL HOWARD**

Date: _____

Date: _____

By: _____

Name: Jack Marquardt

**DERIK KANE**

Title: Vice President and Treasurer of Century Golf Partners GP, LLC

Date: _____

**APPROVED AS TO FORM:**

**DEFENDANTS' COUNSEL:**

**MICHAEL OVERDORE**

Date: 4/4/18

Date: _____

Craig R. Benson. Esq.

**SARA OWCZARAK**

LITTLER MENDELSON, P.C.
900 Third Avenue

Date: _____

New York, NY 10022
(212) 583-2682
cbenson@littler.com

**JILLIAN IZZIO**

5

IN WITNESS WHEREOF, the undersigned have duly executed this ADDENDUM on:

**REPRESENTATIVE PLAINTIFFS ON BEHALF OF THEMSELVES AND ALL MEMBERS OF THE SETTLEMENT CLASSES:**

Date: _____

_____

**DIANE GULLA**

Date: _____

_____

**DANIEL HOWARD**

Date: _____

_____

**DERIK KANE**

Date: _____

_____

**MICHAEL OVERDORF**

Date: 4/3/18

_____

**SARA OWCZARAK**

Date: _____

_____

**JILLIAN IZZIO**

**DEFENDANT CGPM/WMC OPERATING, LLC:**

Date: _____

By:_____

Name: Jack Marquardt

Title: Vice President and Treasurer of CGPM/WMC Operating, LLC

**DEFENDANT CENTURY GOLF PARTNERS MANAGEMENT, LP**

Date:_____

By: _____

Name: Jack Marquardt

Title: Vice President and Treasurer of Century Golf Partners GP, LLC

**APPROVED AS TO FORM:**

**DEFENDANTS' COUNSEL:**

Date: _____

_____

Craig R. Benson. Esq.
LITTLER MENDELSON, P.C.
900 Third Avenue
New York, NY 10022
(212) 583-2682
cbenson@littler.com

5

18

IN WITNESS WHEREOF, the undersigned have duly executed this ADDENDUM on:

**REPRESENTATIVE PLAINTIFFS ON BEHALF OF THEMSELVES AND ALL MEMBERS OF THE SETTLEMENT CLASSES:**

Date: _____

_____

**DIANE GULLA**

Date: _____

_____

**DANIEL HOWARD**

Date: _____

_____

**DERIK KANE**

Date: _____

_____

**MICHAEL OVERDORF**

Date: _____

_____

**SARA OWCZARAK**

Date: _____

_____

**JILLIAN IZZIO**

4/13/2018

**DEFENDANT CGPM/WMC OPERATING, LLC:**

Date: _____

By:_____

Name: Jack Marquardt

Title: Vice President and Treasurer of CGPM/WMC Operating, LLC

**DEFENDANT CENTURY GOLF PARTNERS MANAGEMENT, LP**

Date:_____

By: _____

Name: Jack Marquardt

Title: Vice President and Treasurer of Century Golf Partners GP, LLC

**APPROVED AS TO FORM:**

**DEFENDANTS' COUNSEL:**

Date: _____

_____

Craig R. Benson. Esq.
LITTLER MENDELSON, P.C.
900 Third Avenue
New York, NY 10022
(212) 583-2682
cbenson@littler.com

5

Date: 4/5/18

_____

**HEATHER ZOELLER**

Date: _____


_____

**KARA ASHBY**

**APPROVED AS TO FORM:**

**CLASS COUNSEL:**

Date: _____


_____

Kenneth M. Stillman, Esq.
Law Office of Kenneth M. Stillman
12700 Park Central Drive, Suite 1900
Dallas, Texas 75251
(214) 522-0633
Kstill53@gmail.com

Date: _____


_____

Adam Gonnelli, Esq.
The Sultzer Law Group
280 Highway 35, Suite 304
Red Bank, NJ 07701
(732) 741-4290
Gonnellia@thesultzerlawgroup.com

Date: _____


_____

Innessa Melamed Huot, Esq.
Faruqi & Faruqi, LLP
685 Third Avenue, 26th Floor
New York, New York 10017
(212) 983-9330
ihuot@faruqilaw.com

6

Date: _____


**HEATHER ZOELLER**

Date: 4/6/18

**KARA ASHBY**

**APPROVED AS TO FORM:**

**CLASS COUNSEL:**

Date: _____


Kenneth M. Stillman, Esq.
Law Office of Kenneth M. Stillman
12700 Park Central Drive, Suite 1900
Dallas, Texas 75251
(214) 522-0633
Kstill53@gmail.com

Date: _____


Adam Gonnelli, Esq.
The Sultzer Law Group
280 Highway 35, Suite 304
Red Bank, NJ 07701
(732) 741-4290
Gonnellia@thesultzerlawgroup.com

Date: _____


Innessa Melamed Huot, Esq.
Faruqi & Faruqi, LLP
685 Third Avenue, 26th Floor
New York, New York 10017
(212) 983-9330
ihuot@faruqilaw.com

6

Scanned by CamScanner

IN WITNESS WHEREOF, the undersigned have duly executed this ADDENDUM on:

**REPRESENTATIVE PLAINTIFFS ON BEHALF OF THEMSELVES AND ALL MEMBERS OF THE SETTLEMENT CLASSES:**

Date: _____

_____

**DIANE GULLA**

Date: _____

_____

**DANIEL HOWARD**

Date: _____

_____

**DERIK KANE**

Date: _____

_____

**MICHAEL OVERDORF**

Date: _____

_____

**SARA OWCZARAK**

Date: _____

_____

**JILLIAN IZZIO**

**DEFENDANT CGPM/WMC OPERATING, LLC:**

Date: March 21, 2018

By: Jack Marquardt

Name: Jack Marquardt

Title: Vice President and Treasurer of CGPM/WMC Operating, LLC

**DEFENDANT CENTURY GOLF PARTNERS MANAGEMENT, LP**

Date: March 21, 2018

By: Jack Marquardt

Name: Jack Marquardt

Title: Vice President and Treasurer of Century Golf Partners GP, LLC

**APPROVED AS TO FORM:**

**DEFENDANTS' COUNSEL:**

Date: 3/26/18

_____

Craig R. Benson. Esq.
LITTLER MENDELSON, P.C.
900 Third Avenue
New York, NY 10022
(212) 583-2682
cbenson@littler.com

5

Date: _____

_____
**HEATHER ZOELLER**

Date: _____

_____
**KARA ASHBY**

**APPROVED AS TO FORM:**

**CLASS COUNSEL:**

Date: _____

_____
Kenneth M. Stillman, Esq.
Law Office of Kenneth M. Stillman
12700 Park Central Drive, Suite 1900
Dallas, Texas 75251
(214) 522-0633
Kstill53@gmail.com

Date: _____

_____
Adam Gonnelli, Esq.
The Sultzer Law Group
280 Highway 35, Suite 304
Red Bank, NJ 07701
(732) 741-4290
Gonnellia@thesultzerlawgroup.com

Date: _____

_____
Innessa Mclamed Huot, Esq.
Faruqi & Faruqi, LLP
685 Third Avenue, 26th Floor
New York, New York 10017
(212) 983-9330
ihuot@faruqilaw.com

6

Date: _____

_____

**HEATHER ZOELLER**

Date: _____

_____

**KARA ASHBY**

**APPROVED AS TO FORM:**

**CLASS COUNSEL:**

Date: _____

_____
Kenneth M. Stillman, Esq.
Law Office of Kenneth M. Stillman
12700 Park Central Drive, Suite 1900
Dallas, Texas 75251
(214) 522-0633
Kstill53@gmail.com

Date: ___05/01/2018_____

_____
Adam Gonnelli, Esq.
The Sultzer Law Group
280 Highway 35, Suite 304
Red Bank, NJ 07701
(732) 741-4290
Gonnellia@thesultzerlawgroup.com

Date: _____

_____
Innessa Melamed Huot, Esq.
Faruqi & Faruqi, LLP
685 Third Avenue, 26th Floor
New York, New York 10017
(212) 983-9330
ihuot@faruqilaw.com

6

Date: _____


_____
**HEATHER ZOELLER**

Date: _____


_____
**KARA ASHBY**

**APPROVED AS TO FORM:**

<u>**CLASS COUNSEL**</u>**:**

Date: _____


_____
Kenneth M. Stillman, Esq.
Law Office of Kenneth M. Stillman
12700 Park Central Drive, Suite 1900
Dallas, Texas 75251
(214) 522-0633
Kstill53@gmail.com

Date: _____


_____
Adam Gonnelli, Esq.
The Sultzer Law Group
280 Highway 35, Suite 304
Red Bank, NJ 07701
(732) 741-4290
Gonnellia@thesultzerlawgroup.com

Date: __05/01/2018_____


_____
Innessa Melamed Huot, Esq.
Faruqi & Faruqi, LLP
685 Third Avenue, 26th Floor
New York, New York 10017
(212) 983-9330
ihuot@faruqilaw.com

Date: _____ 5/1/18

_____

P. Andrew Vona, Esq.
Muscato, DiMillo & Vona, LLP
107 East Avenue
Lockport, NY 14094
(716) 434-9177
Contact@mdvlaw.com

7

# EXHIBIT 2

Case 3:14-cv-03194-M   Document 54   Filed 05/09/16   Page 1 of 53   PageID 790
Case 3:14-cv-03194-M   Document 111   Filed 05/01/18   Page 32 of 200   PageID 1233
Linda J. Langford, CSR, RDR, CRR

Page 1

1                    IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN  DISTRICT OF TEXAS
2                          DALLAS  DIVISION
3    JILLIAN IZZIO, et al.,          )          CIVIL ACTION NO.
                    Plaintiffs    )          3:14-CV-3194-P
4                                    )
     VS.                             )          DALLAS, TEXAS
5                                    )
     CENTURY GOLF PARTNERS           )
6    MANAGEMENT, L.P.,               )
                    Defendant    )          MARCH 16, 2016
7
8
                      TRANSCRIPT OF PROCEEDINGS
9         BEFORE THE HONORABLE JUDGE JORGE A. SOLIS
                 UNITED STATES DISTRICT JUDGE
10
11
12   APPEARANCES:
13   For the Plaintiffs:        MR. ADAM GONNELLI
                                MR. KENNETH STILLMAN
14                              Faruqi & Faruqi, LLP
                                685 Third Avenue
15                              New York, New York 10017
                                (212) 983-9330
16
17   For the Defendant:         MS. SHERRY L. TRAVERS
                                MR. RUSSELL R. ZIMMERER
18                              Littler Mendelson, P.C.
                                2001 Ross Avenue, Suite 1500
19                              Dallas, Texas  75201-2931
                                (214) 880-8100
20
21   For the Harbor Links       MR. J. NELSON THOMAS
     Objectors:                 MS. SARAH CRESSMAN
22                              Thomas & Solomon, LLP
                                693 East Avenue
23                              Rochester, New York  14607
                                (585) 272-0540
24
25

16-10446.799

fe838fa6-b6bf-4815-bcaa-03781845f312

Case 3:14-cv-03194-M   Document 54   Filed 05/09/16   Page 2 of 53   PageID 791
Case 3:14-cv-03194-M   Document 111   Filed 05/01/18   Page 33 of 200   PageID 1234
Linda J. Langford, CSR, RDR, CRR

1    APPEARANCES CONTINUED:

2    Court Reporter:              Linda J. Langford, CSR, RDR, CRR

                                 U.S. District Court Reporter

3                                Chambers of Judge David C. Godbey

                                 1100 Commerce Street, Rm. 1504

4                                Dallas, Texas   75242

                                 (214) 748-8068

5

6    Proceedings reported by mechanical stenography, transcript

7    produced by computer.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

16-10446.800

fe838fa6-b6bf-4815-bcaa-03781845f312

Linda J. Langford, CSR, RDR, CRR

Page 47

1    firm that filed ten months late that wants to take its

2    case and go with it.

3         In any case, thank you, Your Honor.

4              THE COURT:  Ms. Travers, anything else?

5              MS. TRAVERS:  Nothing further, Your Honor.

6              THE COURT:  All right.  Well, we'll be in recess

7    for a few minutes.  Let me go over what you have stated

8    here today.  And I have read your briefs before this, but

9    let me -- let me consider what you have stated here today.

10        We'll be in recess for about 15 minutes.

11        (Brief recess taken.)

12             THE COURT:  Considering the factors and having

13   taken some time to consider the argument of counsel, the

14   statements made here as well as the briefing that had been

15   previously filed with the Court, I am going to accept the

16   settlement, find that it is a fair, reasonable, and adequate

17   settlement.

18        I'm going to find, based on what's stated here in the

19   briefing, that it does not appear to me that collusion --

20   that this is a product of collusion, that it was a product

21   of arm's length negotiation.  While there was an honest

22   difference of opinion in terms of the ultimate value of the

23   settlement, I think that there doesn't appear to be any

24   collusion.

25        And part of that consideration, of course, is the fact

16-10446.845
fe838fa6-b6bf-4815-bcaa-03781845f312

Linda J. Langford, CSR, RDR, CRR

Page 48

1    that the parties appeared before an experienced and well

2    respected mediator, a labor law mediator.  And I understand

3    it didn't settle there, but that's usually how things get

4    started once you appear get before a good mediator.  And

5    that appears what happened here.

6         Considering the other factors, the complexity, expense,

7    likely duration of litigation, that's pretty much the same

8    in all these wage-and-hour litigations.  This can take a

9    long time and drag on and get very expensive.  It can get

10   complex just as we heard from the lawyers' arguments here

11   this morning.

12        The state of the proceedings is not overrated as we

13   discussed earlier.  This lawsuit -- the Law case had been

14   pending for a little over a year before it went to media-

15   tion.  It was filed in August of 2013; mediation, October

16   of 2014.  And so there had been time for ample discovery,

17   and discovery was taken.  And so I find that the parties

18   had sufficient information.

19        I know that's one of your arguments, Mr. Thomas, that

20   they didn't have sufficient information to make really a

21   good judgment in terms of the value of the settlement,

22   particularly with respect to the Harbor Links employees.

23   But I believe based upon what I have before me that they

24   had sufficient information and that the Harbor Links --

25   that's the crux of your objection is that this is unfair

16-10446.846

fe838fa6-b6bf-4815-bcaa-03781845f312

Linda J. Langford, CSR, RDR, CRR

Page 49

1    to the Harbor Links employees, and it doesn't appear to

2    me to be unfair.

3          Looking at the numbers, they are receiving 43 percent

4    of the settlement and looks to me like maybe your argument

5    that your -- your position is that, well, the settlement

6    just should have been higher, should have been more than

7    1.2 million.  That's always the case in these settlements.

8    We can always argue back and forth as to what you're -- you

9    know, you realize you could get more, you realize you could

10   get less, but takes longer, gets more expensive.  And so

11   that's why I find that the settlement is reasonable here.

12         With support of the class, the range that we've got

13   here appears to be more than a reasonable range for this

14   type of lawsuit.

15         In support of the class, there were 280 opted in, one

16   opted out, two filed objections.  We got letters from around

17   20 supporting it, including, what, 30 or so from --  from

18   the Harbor Links employees that support the -- the settle-

19   ment, that's for accepting the settlement.

20         And so I'm going to approve the settlement as agreed

21   by the parties, approve the attorneys' fees requested, the

22   service fees to the main plaintiffs, and then the expenses.

23         Anything that I left out that I need to address?

24              MR. GONNELLI:  Your Honor, I would just put in

25   the record as a formality to finalize the class settlement

# EXHIBIT 3

# Brierwood Country Club

5324 Rogers Rd - Hamburg, NY 14075 - 716-648-2700 X 204 - 716-648-1849

## BANQUET/EVENT CONTRACT

| | | | |
|---|---|---|---|
| Group Name | 0 | Sales Manager | Mandy _____, Director of Cate |
| Customer | | Phone | 0 |
| Address | | Fax | 0 |
| | 0 | Email | 0 |
| Event Date | Saturday, January 0, 1900 | Food & Beverage Minimum | $++ |
| Time | 12:00 AM to 12:00 AM | Non-Member Fee | $0.00 |
| Room(s) | 0 | Set-Up | Banquet Event Order (BEO) will be furnished closer t |
| Estimated Guests | 0 | Event Type | 0 |

THIS CONTRACT is made and entered into as of _____ =TODAY() _____ by and between Brierwood Country Club

(hereinafter 'Club') and _____ ('Customer') as follows:

**CONTRACT TO PURCHASE:**  Customer acknowledges that the completion, execution and delivery of this Contract to the Club, together with the payment of the Deposit, as described below, constitute Cu

to purchase and hold an Event at the Club.

**PAYMENT AND DEPOSIT:**

| | | | |
|---|---|---|---|
| Initial Deposit of: | $0.00 | Due by | March 8, 2014 |
| Additional Deposit of: | $0.00 | Due by | January 0, 1900 |

Payment of these deposits will confirm your reservation and hold your date.  All deposits are non-refundable and non-transferable and will be credited to the cost of your event or retained by us if you canc

deposit is not received by the due date, we may cancel your reservation and we will then have no further obligation to you under this agreement.   The deposit in the form of a valid credit card, check, or mo

received upon execution of this Contract.  The final payment due under the Contract must be paid prior to the commencement of the Event or as agreed by the Club.  If the final payment is not paid within t

of the Event, Customer agrees that the final payment may be charged to the credit card on file and agrees not to dispute such charge.  The final payment may be made by credit card, money order or 'corpor

checks for final payment).  Any check that is returned for non-sufficient funds (NSF) shall be assessed a $50.00 fee and be subject to collection.

**FOOD & BEVERAGE MINIMUM:**                                                        $++

This is the minimum amount that must be spent by you or your guests at your event for food and beverages, even if the number of guests who attend your event is less than the final attendance figure that

guests attend your event than expected, our Sales Manager will work with you to add to or upgrade your menu selection for your event so that the Food & Beverage Minimum is put to what you believe i

that the Food & Beverage Minimum does not include cash bar sales, service charges or sales tax.

**OPTION DATE:** The function space and services referred to in this Contract shall be released automatically by the Club without notice to the Customer, unless a fully executed copy of this Contract and the

been received by the Club on or before contract due date.   In the event that another group or organization requests the same or similar arrangements on a definite basis on or prior to the option date, and the

functions, the Customer will be given written notice of such matter and be given seventy-two (72) hours in which to submit an executed copy of this Contract and the requisite deposit to confirm the commit

space will be released.

**CANCELLATION:** If the Customer cancels the Event in its entirety, the Club shall have suffered damages equivalent to the lost profits that the Club would have made from the food and beverage, incidenta

connection with the Event.   The parties acknowledge that it is difficult to quantify such damages and instead have agreed that the Club can assess a fee against the Customer as liquidated damages and not

34

CGPM_0000039

| | |
|---|---|
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | ering |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | event. |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | stomer's irrevocable offer |
| 25 | |
| 26 | |
| 27 | |
| 28 | |
| 29 | |
| 30 | l your event.  If each |
| 31 | |
| 32 | ney order must be |
| 33 | |
| 34 | en (10) days from the date |
| 35 | ate' check *(no personal |
| 36 | |
| 37 | |
| 38 | |
| 39 | |
| 40 | you supply to us.  If fewer |
| 41 | |
| 42 | the best use.  *Please note |
| 43 | |
| 44 | |
| 45 | requisite deposit have |
| 46 | Club cannot handle both |
| 47 | ment on a definite basis or |
| 48 | |
| 49 | |
| 50 | |
| 51 | |
| 52 | l purchases, etc. in |
| 53 | as a penalty (such damage |

35

Confidential

CGPM_0000040

| | A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|---|
| 54 | amount agreed to be expressed as a percentage of food and beverage revenue, incidental purchases, etc. lost by the Club as a result of the said cancellation, as reasonably determined by the Club).  Should th | | | | | | | |
| 55 | any reason, to cancel the Event, cancellation must be received in writing.  Furthermore, the Customer agrees to pay the following damages: | | | | | | | |
| 56 | | | | | | | | |
| 57 | | | | | | | | |
| 58 | | | | | | | | |

36

CGPM_0000041

| | |
|---|---|
| 54 | e Customer decide, for |
| 55 | |
| 56 | |
| 57 | |
| 58 | |

Confidential

CGPM_0000042

| | A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|---|
| 59 | If written cancellation is received: | | | | | | Percentage of the Event cost due the Club: | |
| 60 | More than 181 days prior to scheduled event | | | | | | Booking deposit will be held as payment | |
| 61 | 180-121 days prior to scheduled event | | | | | | 60% | |
| 62 | 120-30 days prior to scheduled event | | | | | | 80% | |
| 63 | Less than 30 days prior to scheduled event | | | | | | 100% | |
| 64 | | | | | | | | |
| 65 | *EVENT SPACE*   Event space is reserved only for the time indicated.  Additional meeting/event time or set up/tear down time, if needed, must be specified in this contract.  Should you anticipate any progr | | | | | | | |
| 66 | advise us as soon as possible so that we may reserve the appropriate space.  Any new function space requirements subsequent to the program outlined above shall be subject to space availability and additi | | | | | | | |
| 67 | requested.  The Club reserves the right to re-assign function space with prior written approval from the Customer. | | | | | | | |
| 68 | | | | | | | | |
| 69 | | | | | | | | |
| 70 | | | | | | | | |
| 71 | *PRICE CHANGES*   Menu pricing is subject to change.  Alternatively, the Club, at its option, may in the event of increased costs make reasonable substitutions in menu items and Customer agrees to accept | | | | | | | |
| 72 | prior written notice. | | | | | | | |
| 73 | | | | | | | | |
| 74 | *NUMBER OF ATTENDEES:*   The guaranteed number of attendants at each catered function must be communicated to the Banquet Coordinator at the Club not less than seven (7) working days, excluding | | | | | | | |
| 75 | A Banquet Event Order will be completed and sent for each scheduled function.  The guaranteed attendance figure you provide by that date will not be subject to reduction.  Final charges will be based on t | | | | | | | |
| 76 | attendees (or the number of persons for which the catered portion of the event was originally booked, if no guarantee number is provided) or the total number served, whichever is greater. | | | | | | | |
| 77 | | | | | | | | |
| 78 | | | | | | | | |
| 79 | | | | | | | | |
| 80 | | | | | | | | |
| 81 | *LABOR AND SERVICE CHARGES*   The Club reserves the right to charge a service fee for the set-up of rooms with extraordinary requirements. | | | | | | | |
| 82 | | | | | | | | |
| 83 | | | | | | | | |
| 84 | *TAXES AND SERVICE CHARGES:*   A 20% taxable service charge and state sales tax will be added to all food and beverage charges.  Sales tax will be compiled in strict accordance with federal, state, and lo | | | | | | | |
| 85 | other charges.  All taxes and service charge are subject to change. | | | | | | | |
| 86 | | | | | | | | |
| 87 | | | | | | | | |
| 88 | *OVERTIME* : This banquet/event must end by the specified time.  If guests remain beyond the event closure time, the Club will need to account for overtime of staff and fines will be assessed as follows: 30- | | | | | | | |
| 89 | | | | | | | | |
| 90 | | | | | | | | |
| 91 | | | | | | | | |
| 92 | | | | | | | | |
| 93 | *FUNCTION SERVICES AND CATERING* : Prior to the event, the Club's Banquet Coordinator will contact the Customer (or other authorized representatives) to assist in detailed planning and preparations | | | | | | | |
| 94 | comprising the event.  It is agreed that all on-site food and beverage will be made through the Club.  We reserve the right to confiscate food or beverages that are brought onto our property without our con | | | | | | | |
| 95 | must be consumed during the times specified for your event and may not be removed from our property.  The Club reserved the right to cease service of alcoholic beverages in the event that persons under | | | | | | | |
| 96 | mandated age limit is present at the function and attempt to receive service of alcoholic beverages.  In addition, the Club may request proper identification (photo ID) of any person of questionable age and | | | | | | | |
| 97 | service if either the person is under age or proper identification cannot be produced, and refuse alcoholic beverage service to anyone, in the Club's judgment, that appears to be intoxicated. | | | | | | | |
| 98 | | | | | | | | |
| 99 | | | | | | | | |
| 100 | | | | | | | | |
| 101 | | | | | | | | |
| 102 | *INDEMNIFICATION* : Customer agrees that Club shall not be liable to Customer, its officers, directors, agents, servants, employees or participants in the Event, for any and all claims, actions, proceedings, | | | | | | | |
| 103 | losses and liabilities, including, but not limited to, reasonable attorney's fees both at trial and on appeal, in whole or in part directly or indirectly arising out of, (i) the negligent acts or omissions of any parti | | | | | | | |
| 104 | of anyone employed by the Customer for whose acts it may be liable, or (ii) a breach of any covenant, representation or warranty contained herein.  Customer shall at all times indemnify and hold Club harm | | | | | | | |
| 105 | injury to persons or any loss of or damage to property caused by any casualty or accident not arising from any negligence on the part of the club. | | | | | | | |
| 106 | | | | | | | | |
| 107 | | | | | | | | |
| 108 | | | | | | | | |
| 109 | *DAMAGE:*   Customer is responsible for any and all destruction or defacement of Club property, and shall reimburse the Club for any charges or expenses that are incurred as a result of this banquet or even | | | | | | | |
| 110 | the Club prior to the banquet/event, an outside security firm may be contracted at the Customer's expense to ensure the safety of the guests and property. | | | | | | | |
| 111 | | | | | | | | |

38

CGPM_0000043

| | |
|---|---|
| 59 | |
| 60 | |
| 61 | |
| 62 | |
| 63 | |
| 64 | |
| 65 | um revisions, please |
| 66 | onal changes at the time |
| 67 | |
| 68 | |
| 69 | |
| 70 | |
| 71 | uch substitutions with |
| 72 | |
| 73 | |
| 74 | olidays, prior to the event. |
| 75 | he guaranteed number of |
| 76 | |
| 77 | |
| 78 | |
| 79 | |
| 80 | |
| 81 | |
| 82 | |
| 83 | |
| 84 | al tax regulations on all |
| 85 | |
| 86 | |
| 87 | |
| 88 | 0 minutes over, $500.00. |
| 89 | |
| 90 | |
| 91 | |
| 92 | |
| 93 | or catered functions |
| 94 | ent. Food or beverages |
| 95 | he state or province |
| 96 | efuse alcoholic beverage |
| 97 | |
| 98 | |
| 99 | |
| 100 | |
| 101 | |
| 102 | amages, costs, expenses, |
| 103 | ipant in the Event, or that |
| 104 | hless from or on account of |
| 105 | |
| 106 | |
| 107 | |
| 108 | |
| 109 | . If deemed necessary by |
| 110 | |
| 111 | |

Confidential

CGPM_0000044

| | A | C | D | E | G | H |
|---|---|---|---|---|---|---|
| 112 | | | | | | |
| 113 | | | | | | |
| 114 | *HOLD HARMLESS:*   Customer shall not be liable for any claims, liabilities, obligations, and causes or actions arising from any negligence on the part of the club agrees to protect, defend, indemnify, and oth | | | | | |
| 115 | Club and its officers, directors, agents, and employees, of and from any and all claims, liabilities, obligations, and causes of action of whatever kind arising in any manner whatsoever out of or in connection | | | | | |
| 116 | of the Customer or the agents, employees, attendees, participants, or otherwise in connection with the Event. | | | | | |
| 117 | | | | | | |
| 118 | | | | | | |
| 119 | *INSURANCE:*   The Club is not responsible for personal injury to guests or event participants as a result of accidents due to their own carelessness, nor is it responsible for personal property loss or damage. | | | | | |
| 120 | liability and agrees to maintain sufficient insurance coverage. | | | | | |
| 121 | | | | | | |
| 122 | | | | | | |
| 123 | | | | | | |
| 124 | | | | | | |
| 125 | *FORCE MAJEURE:*   If for any reason beyond the Club's or the Customer's reasonable control, including but not limited to strikes, labor disputes, acts, regulations, or orders of government authorities, civil | | | | | |
| 126 | war, acts of God, fires, flood or other emergency conditions, any delay in necessary and essential repairs of the Club, or the Club is unable to perform its obligations under this Contract, such non-performan | | | | | |
| 127 | party may terminate this Contract without further liability of any nature, upon return of the Deposit.  In no event shall the Club or the Customer be liable for consequential damages of any nature for any re | | | | | |
| 128 | | | | | | |
| 129 | | | | | | |
| 130 | | | | | | |
| 131 | *REPRESENTATIONS:*   Each party represents and warrants that (i) it has full power, authority and legal right to execute, deliver and perform this Contract, (ii) the execution, delivery and performance has | | | | | |
| 132 | all necessary corporate action, and (iii) the execution, delivery and performance of this Contract will not cause it to be in breach or default of any contract to which it is a party. | | | | | |
| 133 | | | | | | |
| 134 | | | | | | |
| 135 | | | | | | |
| 136 | *ENTIRE CONTRACT:*   This Contract shall incorporate and supersede any and all prior understandings between the parties.  Each of the foregoing representations, warranties and covenants shall be true at | | | | | |
| 137 | hereof.  Each of such representations, warranties, and covenants shall be deemed to be material and to have been relied upon by the Club notwithstanding any investigation made by the Club. | | | | | |
| 138 | | | | | | |
| 139 | | | | | | |
| 140 | *RIGHTS OF ASSIGNMENT:*   This Contract shall not be assignable by Customer without the prior written approval of the Club, in its sole discretion.  Any such assignment without the Club's prior written a | | | | | |
| 141 | | | | | | |
| 142 | | | | | | |
| 143 | | | | | | |
| 144 | *DEFAULT* :  In the event either shall breach any provision of this Contract, the non-breaching party may, at its option and without notice or demand, declare this Contract to be in default and terminate this | | | | | |
| 145 | remedies available under this Contract or as provided by law.  In the event either party initiates legal action to enforce the terms of this Contract, the prevailing party shall be entitled to recover its attorney' | | | | | |
| 146 | | | | | | |
| 147 | *GOVERNING LAW:* This Contract shall be governed and construed in accordance with the law of the State of Texas. | | | | | |
| 148 | | | | | | |
| 149 | | | | | | |
| 150 | | | | | | |
| 151 | Submitted By: | | | | Date: | =TODAY() |
| 152 | | **Mandy _____, Director of Catering** | | | | |
| 153 | | | | | | |
| 154 | Accepted By: | | | | Date: | |
| 155 | | *Signature of Client* | | | | |

Confidential

CGPM_0000045

| J | I |
|---|---|
| 112 | |
| 113 | |
| 114 | erwise hold harmless the |
| 115 | with the acts or omissions |
| 116 | |
| 117 | |
| 118 | |
| 119 | Customer assumes all |
| 120 | |
| 121 | |
| 122 | |
| 123 | |
| 124 | |
| 125 | lisorder, disasters, acts of |
| 126 | e is excused and such |
| 127 | son whatsoever. |
| 128 | |
| 129 | |
| 130 | |
| 131 | been duly authorized by |
| 132 | |
| 133 | |
| 134 | |
| 135 | |
| 136 | all times during the term |
| 137 | |
| 138 | |
| 139 | |
| 140 | pproval shall be void.. |
| 141 | |
| 142 | |
| 143 | |
| 144 | Contract and pursue all |
| 145 | fees. |
| 146 | |
| 147 | |
| 148 | |
| 149 | |
| 150 | |
| 151 | |
| 152 | |
| 153 | |
| 154 | |
| 155 | |

41

CGPM_0000046

# EXHIBIT 4

## BANQUET/EVENT CONTRACT #

| Contract Date: | | Group Name: | |
|---|---|---|---|
| Event Date: | | Catering Manager | Lisa Alessi<br>716-683-6161 ext. 20<br>716-683-6198 fax |
| Customer: | | Phone | |
| Address: | | Fax: | |

| Time: | EventType: | Set-Up: | | Estimate of Charges |
|---|---|---|---|---|
| | Attendees: | Room Rental - | | |
| Rooms | | Food & Beverage Minimum | | |
| | | Total F&B charges: | | |

      **THIS CONTRACT** is made and entered into this_____day of _____, 2010 by and between The Fox Valley Club (hereinafter "Club") and _____ ("Customer") as follows:

**CONTRACT TO PURCHASE.** Customer acknowledges that the completion, execution and delivery of this Contract to the Club, together with the payment of the Deposit, as described below, constitute Customer's irrevocable offer to purchase and hold an Event at the Club.

**PAYMENT AND DEPOSIT:** A $_____ non-refundable deposit in the form of a valid credit card or check must be received upon execution of this Contract. The final payment due under the Contract must be paid prior to the commencement of the Event or as agreed by the Club. If the final payment is not paid within ten (10) days from the date of the Event, Customer agrees that the final payment may be charged to the credit card on file and agrees not to dispute such charge. The final payment may be made by check, money order or credit card. Any check that is returned for non-sufficient funds (NSF) shall be assessed a $50.00 fee and be subject to collection.

**OPTION DATE:** The function space and services referred to in this Contract shall be released automatically by the Club without notice to the Customer, unless a fully executed copy of this Contract and the requisite deposit have been received by the Club on or before _____. In the event that another group or organization requests the same or similar arrangements on a definite basis on or prior to the option date, and the Club cannot handle both functions, the Customer will be given written notice of such matter and be given seventy-two (72) hours in which to submit an executed copy of this Contract and the requisite deposit to confirm the commitment on a definite basis or space will be released.

**CANCELLATION:** If the Customer cancels the Event in its entirety, the Club shall have suffered damages equivalent to the lost profits that the Club would have made from the food and beverage, incidental purchases, etc. in connection with the Event. The parties acknowledge that it is difficult to quantify such damages and instead have agreed that the Club can assess a fee against the Customer as liquidated damages and not as a penalty (such damage amount agreed to be expressed as a percentage of food and beverage revenue, incidental purchases, etc. lost by the

43

CGPM_0000138

Club as a result of the said cancellation, as reasonably determined by the Club). Should the Customer decide, for any reason, to cancel the Event, the Customer agrees to pay the following damages:

| If written cancellation is received: | Percentage of the Event cost due the Club: |
|---|---|
| More than 181 days prior to scheduled event | Booking deposit will be held as payment |
| 180-121 days prior to scheduled event | 60% |
| 120-30 days prior to scheduled event | 80% |
| Less than 30 days prior to scheduled event | 100% |

*EVENT SPACE* Event space is reserved only for the time indicated. Additional meeting/event time or set up/tear down time, if needed, must be specified in this contract. Should you anticipate any program revisions, please advise us as soon as possible so that we may reserve the appropriate space. Any new function space requirements subsequent to the program outlined above shall be subject to space availability and additional changes at the time requested. The Club reserves the right to re-assign function space with prior written approval from the Customer.

*PRICE CHANGES* Menu pricing is subject to change. Alternatively, the Club, at its option, may in the event of increased costs make reasonable substitutions in menu items and Customer agrees to accept such substitutions with prior written notice.

*NUMBER OF ATTENDEES* The guaranteed number of attendants at each catered function must be communicated to the Banquet Coordinator at the Club not less than seven (7) working days, excluding holidays, prior to the event. A Banquet Event Order will be completed and sent for each scheduled function. Final charges will be based on the guaranteed number of attendees (or the number of persons for which the catered portion of the event was originally booked, if no guarantee number is provided) or the total number served, whichever is greater.

*LABOR AND SERVICE CHARGES* The Club reserves the right to charge a service fee for the set-up of rooms with extraordinary requirements.

*TAXES AND SERVICE CHARGES* A 20% taxable service charge and state sales tax will be added to all food and beverage charges. Sales tax will be compiled in strict accordance with federal, state, and local tax regulations on all other charges. All taxes and service charge are subject to change.

*OVERTIME* this banquet/event must end by the specified time. If guests remain beyond the event closure time, the Club will need to account for overtime of staff and fines will be assessed as follows: 15-60 minutes over, $500.00.

*FUNCTION SERVICES AND CATERING* Prior to the event, the Club's Banquet Coordinator will contact the Customer (or other authorized representatives) to assist in detailed planning and preparations for catered functions comprising the event. It is agreed that all on-site food and beverage will be made through the Club. The Club reserved the right to cease service of alcoholic beverages in the event that persons under the state or province mandated age limit is present at the function and attempt to receive service of alcoholic beverages. In addition, the Club may request proper identification (photo ID) of any person of questionable age and refuse alcoholic beverage service if either the person is under age or proper identification cannot be produced, and refuse alcoholic beverage service to anyone, in the Club's judgment, that appears to be intoxicated.

*INDEMNIFICATION* Customer agrees that Club shall not be liable to Customer, its officers, directors, agents, servants, employees or participants in the Event, for any and all claims, actions, proceedings, damages, costs, expenses, losses and liabilities, including, but not limited to, reasonable attorney's fees both at trial and on appeal, in whole or in part directly or indirectly arising out of, (i) the negligent acts or omissions of any participant in the Event, or that of anyone employed by the Customer for whose acts it may be liable, or (ii) a breach of any covenant, representation or warranty contained herein. Customer shall at all times indemnify and hold Club harmless from or on account of injury to persons or any loss of or damage to property caused by any casualty or accident not arising from any negligence on the part of the club.

*DAMAGE* Customer is responsible for any and all destruction or defacement of Club property, and shall reimburse the Club for any charges or expenses that are incurred as a result of this banquet or event. If deemed necessary by

CGPM_0000139

the Club prior to the banquet/event, an outside security firm may be contracted at the Customer's expense to ensure the safety of the guests and property.

**_HOLD HARMLESS_**  Customer shall not be liable for any clams, liabilities, obligations, and causes or actions arising from any negligence on the part of the club agrees to protect, defend, indemnify, and otherwise hold harmless the Club and its officers, directors, agents, and employees, of and from any and all claims, liabilities, obligations, and causes of action of whatever kind arising in any manner whatsoever out of or in connection with the acts or omissions of the Customer or the agents, employees, attendees, participants, or otherwise in connection with the Event.

**_INSURANCE_** The Club is not responsible for personal injury to guests or event participants as a result of accidents due to their own carelessness, nor is it responsible for personal property loss or damage.  Customer assumes all liability and agrees to maintain sufficient insurance coverage.

**_FORCE MAJEURE_**  If for any reason beyond the Club's or the Customer's reasonable control, including but not limited to strikes, labor disputes, acts, regulations, or orders of government authorities, civil disorder, disasters, acts of war, acts of God, fires, flood or other emergency conditions, any delay in necessary and essential repairs of the Club, or the Club is unable to perform its obligations under this Contract, such non-performance is excused and such party may terminate this Contract without further liability of any nature, upon return of the Deposit.  In no event shall the Club or the Customer be liable for consequential damages of any nature for any reason whatsoever.

**_REPRESENTATIONS_** _Each_ party represents and warrants that (i) it has full power, authority and legal right to execute, deliver and perform this Contract, (ii) the execution, delivery and performance has been duly authorized by all necessary corporate action, and (iii) the execution, delivery and performance of this Contract will not cause it to be in breach or default of any contract to which it is a party.

**_ENTIRE CONTRACT_** This Contract shall incorporate and supersede any and all prior understandings between the parties.  Each of the foregoing representations, warranties and covenants shall be true at all times during the term hereof.  Each of such representations, warranties, and covenants shall be deemed to be material and to have been relied upon by the Club notwithstanding any investigation made by the Club.

**_RIGHTS OF ASSIGNMENT_** This Contract shall not be assignable by Customer without the prior written approval of the Club, in its sole discretion.  Any such assignment without the Club's prior written approval shall be void.

**_DEFAULT_**: In the event either shall breach any provision of this Contract, the non-breaching party may, at its option and without notice or demand, declare this Contract to be in default and terminate this Contract and pursue all remedies available under this Contract or as provided by law.  In the event either party initiates legal action to enforce the terms of this Contract, the prevailing party shall be entitled to recover its attorney's fees.

**_GOVERNING LAW:_** This Contract shall be governed and construed in accordance with the law of the State of New York.

_Submitted_

_By:_ _____          _Date:_ _____

　　　　_Lisa Alessi, Banquet Sales Manager_

_Accepted_

_By:_ _____ _Date:_ _____

　　　　_Customer_

CGPM_0000140

# EXHIBIT 5

# HARBOR LINKS GOLF COURSE
## Event Contracts Report
### ADMIN

Event Number: DEVANE2736 / Contract Agreement: Banquet

DATE  8/7/2009
TIME  17:52:03
PAGE  1

## *CLIENT BILLING INFORMATION*

| | |
|---|---|
| CLIENT NAME: | ██████ |
| CLIENT ADDRESS: | ██████ |
| PHONE NUMBER: | ██████ |
| ALT. PHONE: | |
| FAX NUMBER: | |
| EMAIL: | |

## *EVENT CONTACT INFORMATION*

| | |
|---|---|
| CONTACT NAME: | ██████ |
| CONTACT TITLE: | ██████ |
| WORK PHONE: | ██████ |
| HOME PHONE: | |
| FAX NUMBER: | |
| CELL PHONE: | |
| EMAIL: | |

## *GENERAL EVENT INFORMATION*

EVENT NUMBER: DEVANE2736      EVENT NAME: ██████      CONTRACT DATE: Friday, August 07, 2009

EVENT DATE(S): Saturday, September 26, 2009   THROUGH: Saturday, September 26, 2009   FROM: 01:00...   TO: 04:00...

EVENT TYPE: Other      EST. COUNT: 125      FINAL COUNT:

DEPOSIT DUE: 8/7/2009...   DEPOSIT AMT: $1,700.00   BALANCE DUE: 9/12/2009...   BALANCE AMT: $0.00

TERMS: NONE   LIMITS: $5,000.00   TAX EXEMPT: NO

## *EVENT DETAILS*

| ITEM # | ITEM DESCRIPTION | QTY | UNIT PRICE | TAX RATE | GRAT RATE | TOTAL |
|---|---|---|---|---|---|---|
| 1201000000145 | Silver Buffet | 125 | $37.95 | 8.62 | 20.00 | $4,743.75 |
| 1201000000145 | Beer, Wine and Soda | 125 | $14.95 | 8.62 | 20.00 | $1,868.75 |

* INDICATES TAX AMOUNT IS INCLUDED IN THE PRICE

| | |
|---|---|
| Total Items | $6,612.50 |
| Total Tax | $570.33 |
| Total Grat | $1,322.50 |
| CONTRACT TOTAL: | $8,505.33 |

## *TERMS AND CONDITIONS*

CONTRACT TO PURCHASE. Customer acknowledges that the completion, execution and delivery of this Contract to the Club, together with the payment of the Deposit, as described below, constitute Customer's irrevocable offer to purchase and hold an Event at the Course.

PAYMENT AND DEPOSIT: A non-refundable deposit in the form of a valid credit card or check must be received upon execution of this Contract. The final payment due under the Contract must be paid prior to the commencement of the Event or as agreed by the Course. The Course requires that the final payment must be made by either certified check or money order. If the final payment is not paid fourteen (14) days from the date of the Event, Customer agrees that the final payment may be charged to the credit card on file and agrees not to dispute such charge, or the Course has the right to cancel the event.

DEPOSIT AMOUNT RECEIVED $ 1,700.00   DATE 8 / 7 / 09   INITIALS ⟋

OPTION DATE: The function space and services referred to in this Contract shall be released automatically by the Course without notice to the Customer, unless a fully executed copy of this Contract and the requisite deposit have been received by the Course before 1 week from the date of this contract. In the event that another group or organization requests the same or similar arrangements on a definite basis on or prior to the option date, and the Course cannot handle both functions, the Customer will be given written notice of such matter and be given seventy-two (72) hours in which to submit an executed copy of this Contract and the required deposit to confirm the commitment on a definite basis or space will be released.

CANCELLATION: If the Customer cancels the Event in its entirety, the Course shall have suffered damages equivalent to the lost profits that the Course would have made from the food and beverage, incidental purchases, etc. in connection with the Event. The parties acknowledge that it is difficult to quantify such damages and instead have agreed that the Course can assess a fee against

EVENT NUMBER: DEVANE2736                    PAGE: 1 OF 3

Confidential

CGPM_0000300

the Customer as liquidated damages and not as a penalty (such damage amount agreed to be expressed as a percentage of food and beverage revenue, incidental purchases, etc. lost by the Course as a result of the said cancellation, as reasonably determined by the Course). Should the Customer decide, for any reason, to cancel the Event, the Customer agrees to pay the following damages: If written cancellation is received: Percentage of the Event cost due the Course:
More than 181 days prior to scheduled event      Booking deposit will be held as payment
180-121 days prior to scheduled event  60%
120-30 days prior to scheduled event   80%
Less than 30 days prior to scheduled event  100%

EVENT SPACE  Event space is reserved only for the time indicated.  Additional meeting/event time or set up/tear down time, if needed, must be specified in this contract.  Should you anticipate any program revisions, please advise us as soon as possible so that we may reserve the appropriate space.  Any new function space requirements subsequent to the program outlined above shall be subject to space availability and additional changes at the time requested.  The Course reserves the right to re-assign function space with prior written approval from the Customer.

PRICE CHANGES  Menu pricing is subject to change.  Alternatively, the Course, at its option, may in the event of increased costs make reasonable substitutions in menu items and Customer agrees to accept such substitutions with prior written notice.

DATE CHANGES  All date change requests must be in the form of a written authorization to Harbor Links.

NUMBER OF ATTENDEES  The guaranteed number of attendants at each catered function must be communicated to the Banquet Coordinator at the Course not less than fourteen (14) working days, excluding holidays, prior to the event.  A Banquet Event Order will be completed and sent for each scheduled function.  Final charges will be based on the guaranteed number of attendees (or the number of persons for which the catered portion of the event was originally booked, if no guarantee number is provided) or the total number served, whichever is greater.

LABOR AND SERVICE CHARGES (1) Server per (50) Guests is the service standard for cocktail parties at Harbor Links. (1) Server per (2) tables up to (12) people is the service standard for sit down dinners at Harbor Links. Any additional staff requested will be at a charge of $30.00 per hour, minimum of four hours, per staff member.

If guest count exceeds (150), two Bar Attendants will be furnished. The Course reserves the right to charge a service fee for the set-up of rooms with extraordinary requirements.

TAXES AND SERVICE CHARGES  An 20% service charge and 8.625 % New York state sales tax will be added to all food and beverage charges.  Sales tax will be compiled in strict accordance with federal, state, and local tax regulations on all other charges. All taxes and service charge are subject to change.

OVERTIME  This banquet/event must end by the specified time.  If guests remain beyond the event closure time, the Course will need to account for overtime of staff and fines will be assessed as follows: First hour charge = $2,500, each additional hour = $1000 (applicable service charge and taxes apply.)

FUNCTION SERVICES AND CATERING  Prior to the event, the Course's Banquet Coordinator will contact the Customer (or other authorized representatives) to assist in detailed planning and preparations for catered functions comprising the event.  It is agreed that all on-site food and beverage will be made through the Course with the exception of wedding cake.  The Course reserved the right to cease service of alcoholic beverages in the event that persons under the state or province mandated age limit is present at the function and attempt to receive service of alcoholic beverages.  In addition, the Course may request proper identification (photo ID) of any person of questionable age and refuse alcoholic beverage service if either the person is under age or proper identification cannot be produced; and refuse alcoholic beverage service to anyone, in the Course's judgment, that appears to be intoxicated.

INDEMNIFICATION  Customer agrees that Course shall not be liable to Customer, its officers, directors, agents, servants, employees or participants in the Event, for any and all claims, actions, proceedings, damages, costs, expenses, losses and liabilities, including, but not limited to, reasonable attorney's fees both at trial and on appeal, in whole or in part directly or indirectly arising out of, (i) the negligent acts or omissions of any participant in the Event, or that of anyone employed by the Customer for whose acts it may be liable, or (ii) a breach of any covenant, representation or warranty contained herein.  Customer shall at all times indemnify and hold Course harmless from or on account of injury to persons or any loss of or damage to property caused by any casualty or accident whatsoever arising out of the Event.

DAMAGE  Customer is responsible for any and all destruction or defacement of Course property, and shall reimburse the Course for any charges or expenses that are incurred as a result of this banquet or event.  If deemed necessary by the Course prior to the banquet/event, an outside security firm may be contracted at the Customer's expense to ensure the safety of the guests and property.

HOLD HARMLESS  Customer agrees to protect, defend, indemnify, and otherwise hold harmless the Course and its officers, directors, agents, and employees, of and from any and all claims, liabilities, obligations, and causes of action of whatever kind

EVENT NUMBER:  DEVANE2736                                                                      PAGE: 2 OF 3

Confidential                                                                       CGPM_0000301

arising in any manner whatsoever out of or in connection with the acts or omissions of the Customer or the agents, employees, attendees, participants, or otherwise in connection with the Event.

INSURANCE  The Course is not responsible for personal injury to guests or event participants as a result of accidents due to their own carelessness, nor is it responsible for personal property loss or damage. Customer assumes all liability and agrees to maintain sufficient insurance coverage. Any cords provided by vendors must be taped down.

FORCE MAJEURE  If for any reason beyond the Course's or the Customer's reasonable control, including but not limited to strikes, labor disputes, acts, regulations, or orders of government authorities, civil disorder, disasters, acts of war, acts of God, fires, flood or other emergency conditions, any delay in necessary and essential repairs of the Course, or the Course is unable to perform its obligations under this Contract, such non-performance is excused and such party may terminate this Contract without further liability of any nature, upon return of the Deposit.  In no event shall the Club or the Customer be liable for consequential damages of any nature for any reason whatsoever.

REPRESENTATIONS  Each party represents and warrants that (i) it has full power, authority and legal right to execute, deliver and perform this Contract, (ii) the execution, delivery and performance has been duly authorized by all necessary corporate action, and (iii) the execution, delivery and performance of this Contract will not cause it to be in breach or default of any contract to which it is a party.

ENTIRE CONTRACT  This Contract shall incorporate and supersede any and all prior understandings between the parties.  Each of the foregoing representations, warranties and covenants shall be true at all times during the term hereof.  Each of such representations, warranties, and covenants shall be deemed to be material and to have been relied upon by the Course notwithstanding any investigation made by the Course.

RIGHTS OF ASSIGNMENT  This Contract shall not be assignable by Customer without the prior written approval of the Club, in its sole discretion.  Any such assignment without the Course's prior written approval shall be void.

DEFAULT: In the event either shall breach any provision of this Contract, the non-breaching party may, at its option and without notice or demand, declare this Contract to be in default and terminate this Contract and pursue all remedies available under this Contract or as provided by law.  In the event either party initiates legal action to enforce the terms of this Contract, the prevailing party shall be entitled to recover its attorney's fees.

GOVERNING LAW: This Contract shall be governed and construed in accordance with the law of the State of New York.

UNSIGNED CONTRACT IS NOT VALID AFTER 30 DAYS FROM THE DATE OF CONTRACT AS NOTED ON PAGE ONE.

NOTE: ADDITIONAL ADDENDUM SHEET(S) DEALING WITH SPECIAL PREPARATIONS AND SET UP INSTRUCTIONS ACCOMPANY THIS CON

EVENT NUMBER: DEVANE2736          EVENT NAME: ▮▮▮▮▮▮▮▮

EVENT DATE(S): Saturday, September 26, 2009          THROUGH: Saturday, September 26, 2009

APPROVED (CLIENT'S SIGNATURE):          DATE:

APPROVED (SALESMAN'S SIGNATURE):          DATE: 8/7/09

EVENT NUMBER:  DEVANE2736          PAGE: 3 OF 3

# EXHIBIT 6



## *Tan Tara Golf Club*

**4391 Tonawanda Creek Road North - North Tonawanda, NY 14120 - 716-694-0366 x 103 -**

### BANQUET/EVENT CONTRACT

| | | | |
|---|---|---|---|
| Group Name | 0 | Sales Manager | Tammy Dawes, Banquet Coordinator |
| Customer | | Phone | 0 |
| Address | | Fax | 0 |
| | 0 | Email | 0 |
| Event Date | Saturday, January 0, 1900 | Food & Beverage Minimum | $++ |
| Time | 12:00 AM to 12:00 AM | Non-Member Fee | $0.00 |
| Room(s) | 0 | Set-Up | Banquet Event Order (BEO) will be furnished closer to event. |
| Estimated Guests | 0 | Event Type | 0 |

THIS CONTRACT is made and entered into as of        <u>**Monday, January 20, 2014**</u>   by and between Tan Tara Golf Club
(hereinafter 'Club') and    ('Customer') as follows:

***CONTRACT TO PURCHASE:***  Customer acknowledges that the completion, execution and delivery of this Contract to the Club, together with the payment of the Deposit, as described below, constitute Customer's irrevocable offer to purchase and hold an Event at the Club.

***PAYMENT AND DEPOSIT:***

          Initial Deposit of:     $0.00        Due by January 30, 2014
          Additional Deposit of:   $0.00        Due by January 0, 1900

Payment of these deposits will confirm your reservation and hold your date. All deposits are non-refundable and non-transferable and will be credited to the cost of your event or retained by us if you cancel your event. If each deposit is not received by the due date, we may cancel your reservation and we will then have no further obligation to you under this agreement. The deposit in the form of a valid credit card, check, or money order must be received upon execution of this Contract. The final payment due under the Contract must be paid prior to the commencement of the Event or as agreed by the Club. If the final payment is not paid within ten (10) days from the date of the Event, Customer agrees that the final payment may be charged to the credit card on file and agrees not to dispute such charge. The final payment may be made by credit card, money order or 'corporate' check *(no personal checks for final payment). Any check that is returned for non-sufficient funds (NSF) shall be assessed a $50.00 fee and be subject to collection.

***FOOD & BEVERAGE MINIMUM:***        $++
This is the minimum amount that must be spent by you or your guests at your event for food and beverages, even if the number of guests who attend your event is less than the final attendance figure that you supply to us. If fewer guests attend your event than expected, our Sales Manager will work with you to add to or upgrade your menu selection for your event so that the Food & Beverage Minimum is put to what you believe is the best use. *Please note that the Food & Beverage Minimum does not include cash bar sales, service charges or sales tax.

***OPTION DATE:*** The function space and services referred to in this Contract shall be released automatically by the Club without notice to the Customer, unless a fully executed copy of this Contract and the requisite deposit have been received by the Club on or before contract due date. In the event that another group or organization requests the same or similar arrangements on a definite basis on or prior to the option date, and the Club cannot handle both functions, the Customer will be given written notice of such matter and be given seventy-two (72) hours in which to submit an executed copy of this Contract and the requisite deposit to confirm the commitment on a definite basis or space will be released.

***CANCELLATION:*** If the Customer cancels the Event in its entirety, the Club shall have suffered damages equivalent to the lost profits that the Club would have made from the food and beverage, incidental purchases, etc. in connection with the Event. The parties acknowledge that it is difficult to quantify such damages and instead have agreed that the Club can assess a fee against the Customer as liquidated damages and not as a penalty (such damage amount agreed to be expressed as a percentage of food and beverage revenue, incidental purchases, etc. lost by the Club as a result of the said cancellation, as reasonably determined by the Club). Should the Customer decide, for any reason, to cancel the Event, cancellation must be received in writing. Furthermore, the Customer agrees to pay the following damages:

    Banquet/Event Contract                                                                 Page 1 of 3

Confidential                                             CGPM_0000001

| If written cancellation is received: | Percentage of the Event cost due the Club: |
|---|---|
| More than 181 days prior to scheduled event | Booking deposit will be held as payment |
| 180-121 days prior to scheduled event | 60% |
| 120-30 days prior to scheduled event | 80% |
| Less than 30 days prior to scheduled event | 100% |

*EVENT SPACE*  Event space is reserved only for the time indicated.  Additional meeting/event time or set up/tear down time, if needed, must be specified in this contract.  Should you anticipate any program revisions, please advise us as soon as possible so that we may reserve the appropriate space.  Any new function space requirements subsequent to the program outlined above shall be subject to space availability and additional changes at the time requested.  The Club reserves the right to re-assign function space with prior written approval from the Customer.

*PRICE CHANGES*  Menu pricing is subject to change.  Alternatively, the Club, at its option, may in the event of increased costs make reasonable substitutions in menu items and Customer agrees to accept such substitutions with prior written notice.

*NUMBER OF ATTENDEES:*  The guaranteed number of attendants at each catered function must be communicated to the Banquet Coordinator at the Club not less than seven (7) working days, excluding holidays, prior to the event.  A Banquet Event Order will be completed and sent for each scheduled function.  The guaranteed attendance figure you provide by that date will not be subject to reduction.  Final charges will be based on the guaranteed number of attendees (or the number of persons for which the catered portion of the event was originally booked, if no guarantee number is provided) or the total number served, whichever is greater.

*LABOR AND SERVICE CHARGES*  The Club reserves the right to charge a service fee for the set-up of rooms with extraordinary requirements.

*TAXES AND SERVICE CHARGES:*  A 20% taxable service charge and state sales tax will be added to all food and beverage charges.  Sales tax will be compiled in strict accordance with federal, state, and local tax regulations on all other charges.  All taxes and service charge are subject to change.

*OVERTIME:*  This banquet/event must end by the specified time.  If guests remain beyond the event closure time, the Club will need to account for overtime of staff and fines will be assessed as follows: 30-60 minutes over, $500.00.

*FUNCTION SERVICES AND CATERING:*  Prior to the event, the Club's Banquet Coordinator will contact the Customer (or other authorized representatives) to assist in detailed planning and preparations for catered functions comprising the event.  It is agreed that all on-site food and beverage will be made through the Club.  We reserve the right to confiscate food or beverages that are brought onto our property without our consent.  Food or beverages must be consumed during the times specified for your event and may not be removed from our property.  The Club reserved the right to cease service of alcoholic beverages in the event that persons under the state or province mandated age limit is present at the function and attempt to receive service of alcoholic beverages.  In addition, the Club may request proper identification (photo ID) of any person of questionable age and refuse alcoholic beverage service if either the person is under age or proper identification cannot be produced, and refuse alcoholic beverage service to anyone, in the Club's judgment, that appears to be intoxicated.

*INDEMNIFICATION:*  Customer agrees that Club shall not be liable to Customer, its officers, directors, agents, servants, employees or participants in the Event, for any and all claims, actions, proceedings, damages, costs, expenses, losses and liabilities, including, but not limited to, reasonable attorney's fees both at trial and on appeal, in whole or in part directly or indirectly arising out of, (i) the negligent acts or omissions of any participant in the Event, or that of anyone employed by the Customer for whose acts it may be liable, or (ii) a breach of any covenant, representation or warranty contained herein.  Customer shall at all times indemnify and hold Club harmless from or on account of injury to persons or any loss of or damage to property caused by any casualty or accident not arising from any negligence on the part of the club.

*DAMAGE:*  Customer is responsible for any and all destruction or defacement of Club property, and shall reimburse the Club for any charges or expenses that are incurred as a result of this banquet or event.  If deemed necessary by the Club prior to the banquet/event, an outside security firm may be contracted at the Customer's expense to ensure the safety of the guests and property.

Banquet/Event Contract

Page 2 of 3

Confidential

CGPM_0000002

**_HOLD HARMLESS:_** Customer shall not be liable for any claims, liabilities, obligations, and causes or actions arising from any negligence on the part of the club agrees to protect, defend, indemnify, and otherwise hold harmless the Club and its officers, directors, agents, and employees, of and from any and all claims, liabilities, obligations, and causes of action of whatever kind arising in any manner whatsoever out of or in connection with the acts or omissions of the Customer or the agents, employees, attendees, participants, or otherwise in connection with the Event.

**_INSURANCE:_** The Club is not responsible for personal injury to guests or event participants as a result of accidents due to their own carelessness, nor is it responsible for personal property loss or damage. Customer assumes all liability and agrees to maintain sufficient insurance coverage.

**_FORCE MAJEURE:_** If for any reason beyond the Club's or the Customer's reasonable control, including but not limited to strikes, labor disputes, acts, regulations, or orders of government authorities, civil disorder, disasters, acts of war, acts of God, fires, flood or other emergency conditions, any delay in necessary and essential repairs of the Club, or the Club is unable to perform its obligations under this Contract, such non-performance is excused and such party may terminate this Contract without further liability of any nature, upon return of the Deposit. In no event shall the Club or the Customer be liable for consequential damages for any reason whatsoever.

**_REPRESENTATIONS:_** Each party represents and warrants that (i) it has full power, authority and legal right to execute, deliver and perform this Contract, (ii) the execution, delivery and performance has been duly authorized by all necessary corporate action, and (iii) the execution, delivery and performance of this Contract will not cause it to be in breach or default of any contract to which it is a party.

**_ENTIRE CONTRACT:_** This Contract shall incorporate and supersede any and all prior understandings between the parties. Each of the foregoing representations, warranties and covenants shall be true at all times during the term hereof. Each of such representations, warranties, and covenants shall be deemed to be material and to have been relied upon by the Club notwithstanding any investigation made by the Club.

**_RIGHTS OF ASSIGNMENT:_** This Contract shall not be assignable by Customer without the prior written approval of the Club, in its sole discretion. Any such assignment without the Club's prior written approval shall be void..

**_DEFAULT_**: In the event either shall breach any provision of this Contract, the non-breaching party may, at its option and without notice or demand, declare this Contract to be in default and terminate this Contract and pursue all remedies available under this Contract or as provided by law. In the event either party initiates legal action to enforce the terms of this Contract, the prevailing party shall be entitled to recover its attorney's fees.

**_GOVERNING LAW:_** This Contract shall be governed and construed in accordance with the law of the State of Texas.


Submitted By: _____          Date: **_Monday, January 20, 2014_** _____
                      **Tammy Dawes, Banquet Coordinator**

Accepted By: _____          Date: _____
                      **Signature of Client**


Banquet/Event Contract                                                    Page 3 of 3

Confidential                                                                           CGPM_0000003

# EXHIBIT 7



# *Brierwood Country Club*

5324 Rogers Rd - Hamburg, NY 14075 - 716-648-2700 X 204 - 716-648-1849

## BANQUET/EVENT CONTRACT

| Group Name | Redacted | Sales Manager | Tim Eyring, Catering Sales Manager |
|---|---|---|---|
| Customer | Redacted | Phone | Redacted |
| Address | **Redacted** | Fax | 0 |
| | | Email | 0 |
| Event Date | Sunday, November 3, 2013 | Food & Beverage Minimum | $100++ |
| Time | 2:00pm to 4:00pm | Non-Member Fee | $0.00 |
| Room(s) | Bowling Alley | Set-Up | Banquet Event Order (BEO) will be furnished closer to event. |
| Estimated Guests | 25 | Event Type | Bowling Party |

THIS CONTRACT is made and entered into as of    **Wednesday, October 09, 2013**  by and between Brierwood Country Club (hereinafter 'Club') and Redacted ('Customer') as follows:

*CONTRACT TO PURCHASE:*  Customer acknowledges that the completion, execution and delivery of this Contract to the Club, together with the payment of the Deposit, as described below, constitute Customer's irrevocable offer to purchase and hold an Event at the Club.

*PAYMENT AND DEPOSIT:*

    Initial Deposit of:    $25.00    Due by October 19, 2013
    Additional Deposit of:    N/A    Due by N/A

Payment of these deposits will confirm your reservation and hold your date.  All deposits are non-refundable and non-transferable and will be credited to the cost of your event or retained by us if you cancel your event.  If each deposit is not received by the due date, we may cancel your reservation and we will then have no further obligation to you under this agreement.  The deposit in the form of a valid credit card, check, or money order must be received upon execution of this Contract.  The final payment due under the Contract must be paid prior to the commencement of the Event or as agreed by the Club.  If the final payment is not paid within ten (10) days from the date of the Event, Customer agrees that the final payment may be charged to the credit card on file and agrees not to dispute such charge.  The final payment may be made by credit card, money order or 'corporate' check *(no personal checks for final payment).  Any check that is returned for non-sufficient funds (NSF) shall be assessed a $50.00 fee and be subject to collection.

*FOOD & BEVERAGE MINIMUM:*    **$100++**
This is the minimum amount that must be spent by you or your guests at your event for food and beverages, even if the number of guests who attend your event is less than the final attendance figure that you supply to us.  If fewer guests attend your event than expected, our Sales Manager will work with you to add to or upgrade your menu selection for your event so that the Food & Beverage Minimum is put to what you believe is the best use.  *Please note that the Food & Beverage Minimum does not include cash bar sales, service charges or sales tax.

*OPTION DATE:* The function space and services referred to in this Contract shall be released automatically by the Club without notice to the Customer, unless a fully executed copy of this Contract and the requisite deposit have been received by the Club on or before contract due date.  In the event that another group or organization requests the same or similar arrangements on a definite basis on or prior to the option date, and the Club cannot handle both functions, the Customer will be given written notice of such matter and be given seventy-two (72) hours in which to submit an executed copy of this Contract and the requisite deposit to confirm the commitment on a definite basis or space will be released.

*CANCELLATION:* If the Customer cancels the Event in its entirety, the Club shall have suffered damages equivalent to the lost profits that the Club would have made from the food and beverage, incidental purchases, etc. in connection with the Event.  The parties acknowledge that it is difficult to quantify such damages and instead have agreed that the Club can assess a fee against the Customer as liquidated damages and not as a penalty (such damage amount agreed to be expressed as a percentage of food and beverage revenue, incidental purchases, etc. lost by the Club as a result of the said cancellation, as reasonably determined by the Club).  Should the Customer decide, for any reason, to cancel the Event, cancellation must be received in writing.  Furthermore, the Customer agrees to pay the following damages:

Banquet/Event Contract                                                                                                           Page 1 of 3

| If written cancellation is received: | Percentage of the Event cost due the Club: |
| --- | --- |
| More than 181 days prior to scheduled event | Booking deposit will be held as payment |
| 180-121 days prior to scheduled event | 60% |
| 120-30 days prior to scheduled event | 80% |
| Less than 30 days prior to scheduled event | 100% |

*EVENT SPACE* Event space is reserved only for the time indicated. Additional meeting/event time or set up/tear down time, if needed, must be specified in this contract. Should you anticipate any program revisions, please advise us as soon as possible so that we may reserve the appropriate space. Any new function space requirements subsequent to the program outlined above shall be subject to space availability and additional changes at the time requested. The Club reserves the right to re-assign function space with prior written approval from the Customer.

*PRICE CHANGES* Menu pricing is subject to change. Alternatively, the Club, at its option, may in the event of increased costs make reasonable substitutions in menu items and Customer agrees to accept such substitutions with prior written notice.

*NUMBER OF ATTENDEES:* The guaranteed number of attendants at each catered function must be communicated to the Banquet Coordinator at the Club not less than seven (7) working days, excluding holidays, prior to the event. A Banquet Event Order will be completed and sent for each scheduled function. The guaranteed attendance figure you provide by that date will not be subject to reduction. Final charges will be based on the guaranteed number of attendees (or the number of persons for which the catered portion of the event was originally booked, if no guarantee number is provided) or the total number served, whichever is greater.

*LABOR AND SERVICE CHARGES* The Club reserves the right to charge a service fee for the set-up of rooms with extraordinary requirements.

*TAXES AND SERVICE CHARGES:* A 20% taxable service charge and state sales tax will be added to all food and beverage charges. Sales tax will be compiled in strict accordance with federal, state, and local tax regulations on all other charges. All taxes and service charge are subject to change.Service Charge: The Club's standard Service Charge for this Event is the amount set forth above. The Service Charge is an amount which is paid directly to the Club. The Club uses the proceeds to pay competitive wages to our staff, as we believe this allows us to attract and retain excellent staff members. However, the Service Charge is not paid directly to any particular staff member or members who provide service to you at your Event. If you wish to add a separate additional gratuity to your bill, you are welcome to do so.

*OVERTIME:* This banquet/event must end by the specified time. If guests remain beyond the event closure time, the Club will need to account for overtime of staff and fines will be assessed as follows: 30-60 minutes over, $500.00.

*FUNCTION SERVICES AND CATERING:* Prior to the event, the Club's Banquet Coordinator will contact the Customer (or other authorized representatives) to assist in detailed planning and preparations for catered functions comprising the event. It is agreed that all on-site food and beverage will be made through the Club. We reserve the right to confiscate food or beverages that are brought onto our property without our consent. Food or beverages must be consumed during the times specified for your event and may not be removed from our property. The Club reserved the right to cease service of alcoholic beverages in the event that persons under the state or province mandated age limit is present at the function and attempt to receive service of alcoholic beverages. In addition, the Club may request proper identification (photo ID) of any person of questionable age and refuse alcoholic beverage service if either the person is under age or proper identification cannot be produced, and refuse alcoholic beverage service to anyone, in the Club's judgment, that appears to be intoxicated.

*INDEMNIFICATION:* Customer agrees that Club shall not be liable to Customer, its officers, directors, agents, servants, employees or participants in the Event, for any and all claims, actions, proceedings, damages, costs, expenses, losses and liabilities, including, but not limited to, reasonable attorney's fees both at trial and on appeal, in whole or in part directly or indirectly arising out of, (i) the negligent acts or omissions of any participant in the Event, or that of anyone employed by the Customer for whose acts it may be liable, or (ii) a breach of any covenant, representation or warranty contained herein. Customer shall at all times indemnify and hold Club harmless from or on account of injury to persons or any loss of or damage to property caused by any casualty or accident not arising from any negligence on the part of the club.

*DAMAGE:* Customer is responsible for any and all destruction or defacement of Club property, and shall reimburse the Club for any charges or expenses that are incurred as a result of this banquet or event. If deemed necessary by the Club prior to the banquet/event, an outside security firm may be contracted at the Customer's expense to ensure the safety of the guests and property.

Banquet/Event Contract        Page 2 of 3

Confidential

CGPM_0000494

***HOLD HARMLESS:***  Customer shall not be liable for any claims, liabilities, obligations, and causes or actions arising from any negligence on the part of the club agrees to protect, defend, indemnify, and otherwise hold harmless the Club and its officers, directors, agents, and employees, of and from any and all claims, liabilities, obligations, and causes of action of whatever kind arising in any manner whatsoever out of or in connection with the acts or omissions of the Customer or the agents, employees, attendees, participants, or otherwise in connection with the Event.

***INSURANCE:***  The Club is not responsible for personal injury to guests or event participants as a result of accidents due to their own carelessness, nor is it responsible for personal property loss or damage.  Customer assumes all liability and agrees to maintain sufficient insurance coverage.

***FORCE MAJEURE:***  If for any reason beyond the Club's or the Customer's reasonable control, including but not limited to strikes, labor disputes, acts, regulations, or orders of government authorities, civil disorder, disasters, acts of war, acts of God, fires, flood or other emergency conditions, any delay in necessary and essential repairs of the Club, or the Club is unable to perform its obligations under this Contract, such non-performance is excused and such party may terminate this Contract without further liability of any nature, upon return of the Deposit.  In no event shall the Club or the Customer be liable for consequential damages of any nature for any reason whatsoever.

***REPRESENTATIONS:***  Each party represents and warrants that (i) it has full power, authority and legal right to execute, deliver and perform this Contract, (ii) the execution, delivery and performance has been duly authorized by all necessary corporate action, and (iii) the execution, delivery and performance of this Contract will not cause it to be in breach or default of any contract to which it is a party.

***ENTIRE CONTRACT:***  This Contract shall incorporate and supersede any and all prior understandings between the parties.  Each of the foregoing representations, warranties and covenants shall be true at all times during the term hereof.  Each of such representations, warranties, and covenants shall be deemed to be material and to have been relied upon by the Club notwithstanding any investigation made by the Club.

***RIGHTS OF ASSIGNMENT:***  This Contract shall not be assignable by Customer without the prior written approval of the Club, in its sole discretion.  Any such assignment without the Club's prior written approval shall be void..

***DEFAULT:***  In the event either shall breach any provision of this Contract, the non-breaching party may, at its option and without notice or demand, declare this Contract to be in default and terminate this Contract and pursue all remedies available under this Contract or as provided by law.  In the event either party initiates legal action to enforce the terms of this Contract, the prevailing party shall be entitled to recover its attorney's fees.

***GOVERNING LAW:***  This Contract shall be governed and construed in accordance with the law of the State of  New York.

Submitted By: _____  Date: ***Wednesday, October 09, 2013***

Tim Eyring, Catering Sales Manager

**Redacted**

Accepted By: _____  Date: _____

*Signature of Client*  **Redacted**

Banquet/Event Contract                                    Page 3 of 3

# EXHIBIT 8



# THE
# FOX VALLEY
# CLUB

6161 Genesee - Lancaster, NY 14086 - 716-683-6161 - 716-683-6198

## BANQUET/EVENT CONTRACT

| | | | |
|---|---|---|---|
| Group Name | Redacted | Sales Manager | Laura Jedlikowski, Director of Catering |
| Customer | Redacted | Phone | Redacted |
| Address | **Redacted** | Fax | |
| | | Email | Redacted |
| Event Date | Saturday October 4, 2014 | Food & Beverage Minimum | $12,000.00 |
| Time | 6pm - 11pm | Non-Member Fee | $0.00 |
| Room(s) | Ballroom, Lancaster, Patio | Set-Up | Banquet Event Order (BEO) will be furnished closer to event. |
| Estimated Guests | 130-150 | Event Type | Wedding Reception |

THIS CONTRACT is made and entered into as of ___Wednesday October 9, 2013___ by and between The Fox Valley Club (hereinafter 'Club') and [ **Redacted** ]('Customer') as follows:

*CONTRACT TO PURCHASE:* Customer acknowledges that the completion, execution and delivery of this Contract to the Club, together with the payment of the Deposit, as described below, constitute Customer's irrevocable offer to purchase and hold an Event at the Club.

*PAYMENT AND DEPOSIT:*

    Initial Deposit of: $1,000.00    Due by October 20, 2013

    Additional Deposit of: $1,000.00    Due by January 31, 2014

Payment of these deposits will confirm your reservation and hold your date. All deposits are non-refundable and non-transferable and will be credited to the cost of your event or retained by us if you cancel your event. If each deposit is not received by the due date, we may cancel your reservation and we will then have no further obligation to you under this agreement. The deposit in the form of a valid credit card, check, or money order must be received upon execution of this Contract. The final payment due under the Contract must be paid prior to the commencement of the Event or as agreed by the Club. If the final payment is not paid within ten (10) days from the date of the Event, Customer agrees that the final payment may be charged to the credit card on file and agrees not to dispute such charge. The final payment may be made by credit card, money order or 'corporate' check *(no personal checks for final payment). Any check that is returned for non-sufficient funds (NSF) shall be assessed a $50.00 fee and be subject to collection.

*FOOD & BEVERAGE MINIMUM:*    $   12,000

This is the minimum amount that must be spent by you or your guests at your event for food and beverages, even if the number of guests who attend your event is less than the final attendance figure that you supply to us. If fewer guests attend your event than expected, our Sales Manager will work with you to add to or upgrade your menu selection for your event so that the Food & Beverage Minimum is put to what you believe is the best use. *Please note that the Food & Beverage Minimum does not include cash bar sales, service charges or sales tax.

*OPTION DATE:* The function space and services referred to in this Contract shall be released automatically by the Club without notice to the Customer, unless a fully executed copy of this Contract and the requisite deposit have been received by the Club on or before contract due date. In the event that another group or organization requests the same or similar arrangements on a definite basis on or prior to the option date, and the Club cannot handle both functions, the Customer will be given written notice of such matter and be given seventy-two (72) hours in which to submit an executed copy of this Contract and the requisite deposit to confirm the commitment on a definite basis or space will be released.

*CANCELLATION:* If the Customer cancels the Event in its entirety, the Club shall have suffered damages equivalent to the lost profits that the Club would have made from the food and beverage, incidental purchases, etc. in connection with the Event. The parties acknowledge that it is difficult to quantify such damages and instead have agreed that the Club can assess a fee against the Customer as liquidated damages and not as a penalty (such damage amount agreed to be expressed as a percentage of food and beverage revenue, incidental purchases, etc. lost by the Club as a result of the said cancellation, as reasonably determined by the Club). Should the Customer decide, for any reason, to cancel the Event, cancellation must be received in writing. Furthermore, the Customer agrees to pay the following damages:

Banquet/Event Contract

Page 1 of 3

| If written cancellation is received: | Percentage of the Event cost due the Club: |
|---|---|
| More than 181 days prior to scheduled event | Booking deposit will be held as payment |
| 180-121 days prior to scheduled event | 60% |
| 120-30 days prior to scheduled event | 80% |
| Less than 30 days prior to scheduled event | 100% |

*EVENT SPACE*  Event space is reserved only for the time indicated.  Additional meeting/event time or set up/tear down time, if needed, must be specified in this contract.  Should you anticipate any program revisions, please advise us as soon as possible so that we may reserve the appropriate space.  Any new function space requirements subsequent to the program outlined above shall be subject to space availability and additional changes at the time requested.  The Club reserves the right to re-assign function space with prior written approval from the Customer.

*PRICE CHANGES*  Menu pricing is subject to change.  Alternatively, the Club, at its option, may in the event of increased costs make reasonable substitutions in menu items and Customer agrees to accept such substitutions with prior written notice.

*NUMBER OF ATTENDEES:*  The guaranteed number of attendants at each catered function must be communicated to the Banquet Coordinator at the Club not less than seven (7) working days, excluding holidays, prior to the event.  A Banquet Event Order will be completed and sent for each scheduled function.  The guaranteed attendance figure you provide by that date will not be subject to reduction.  Final charges will be based on the guaranteed number of attendees (or the number of persons for which the catered portion of the event was originally booked, if no guarantee number is provided) or the total number served, whichever is greater.

*LABOR AND SERVICE CHARGES*  The Club reserves the right to charge a service fee for the set-up of rooms with extraordinary requirements.

*TAXES AND SERVICE CHARGES:*  A 20% taxable service charge and state sales tax will be added to all food and beverage charges.  Sales tax will be compiled in strict accordance with federal, state, and local tax regulations on all other charges.  All taxes and service charge are subject to change.  Service Charge: The Club's standard Service Charge for this Event is the amount set forth above. The Service Charge is an amount which is paid directly to the Club. The Club uses the proceeds to pay competitive wages to our staff, as we believe this allows us to attract and retain excellent staff members. However, the Service Charge is not paid directly to any particular staff member or members who provide service to you at your Event. If you wish to add a separate additional gratuity to your bill, you are welcome to do so.

*OVERTIME*:  This banquet/event must end by the specified time.  If guests remain beyond the event closure time, the Club will need to account for overtime of staff and fines will be assessed as follows: 30-60 minutes over, $500.00.

*FUNCTION SERVICES AND CATERING*:  Prior to the event, the Club's Banquet Coordinator will contact the Customer (or other authorized representatives) to assist in detailed planning and preparations for catered functions comprising the Event.  It is agreed that all on-site food and beverage will be made through the Club.  We reserve the right to confiscate food or beverages that are brought onto our property without our consent.  Food or beverages must be consumed during the times specified for your event and may not be removed from our property.  The Club reserved the right to cease service of alcoholic beverages in the event that persons under the state or province mandated age limit is present at the function and attempt to receive service of alcoholic beverages.  In addition, the Club may request proper identification (photo ID) of any person of questionable age and refuse alcoholic beverage service if either the person is under age or proper identification cannot be produced, and refuse alcoholic beverage service to anyone, in the Club's judgment, that appears to be intoxicated.

*INDEMNIFICATION*:  Customer agrees that Club shall not be liable to Customer, its officers, directors, agents, servants, employees or participants in the Event, for any and all claims, actions, proceedings, damages, costs, expenses, losses and liabilities, including, but not limited to, reasonable attorney's fees both at trial and on appeal, in whole or in part directly or indirectly arising out of, (i) the negligent acts or omissions of any participant in the Event, or that of anyone employed by the Customer for whose acts it may be liable, or (ii) a breach of any covenant, representation or warranty contained herein.  Customer shall at all times indemnify and hold Club harmless from or on account of injury to persons or any loss of or damage to property caused by any casualty or accident not arising from any negligence on the part of the club.

*DAMAGE:*  Customer is responsible for any and all destruction or defacement of Club property, and shall reimburse the Club for any charges or expenses that are incurred as a result of this banquet or event.  If deemed necessary by the Club prior to the banquet/event, an outside security firm may be contracted at the Customer's expense to ensure the safety of the guests and property.

Banquet/Event Contract                                                                                            Page 2 of 3

*HOLD HARMLESS:*  Customer shall not be liable for any claims, liabilities, obligations, and causes or actions arising from any negligence on the part of the club agrees to protect, defend, indemnify, and otherwise hold harmless the Club and its officers, directors, agents, and employees, of and from any and all claims, liabilities, obligations, and causes of action of whatever kind arising in any manner whatsoever out of or in connection with the acts or omissions of the Customer or the agents, employees, attendees, participants, or otherwise in connection with the Event.

*INSURANCE:*  The Club is not responsible for personal injury to guests or event participants as a result of accidents due to their own carelessness, nor is it responsible for personal property loss or damage.  Customer assumes all liability and agrees to maintain sufficient insurance coverage.

*FORCE MAJEURE:*  If for any reason beyond the Club's or the Customer's reasonable control, including but not limited to strikes, labor disputes, acts, regulations, or orders of government authorities, civil disorder, disasters, acts of war, acts of God, fires, flood or other emergency conditions, any delay in necessary and essential repairs of the Club, or the Club is unable to perform its obligations under this Contract, such non-performance is excused and such party may terminate this Contract without further liability of any nature, upon return of the Deposit.  In no event shall the Club or the Customer be liable for consequential damages of any nature for any reason whatsoever.

*REPRESENTATIONS:*  Each party represents and warrants that (i) it has full power, authority and legal right to execute, deliver and perform this Contract, (ii) the execution, delivery and performance has been duly authorized by all necessary corporate action, and (iii) the execution, delivery and performance of this Contract will not cause it to be in breach or default of any contract to which it is a party.

*ENTIRE CONTRACT:*  This Contract shall incorporate and supersede any and all prior understandings between the parties. Each of the foregoing representations, warranties and covenants shall be true at all times during the term hereof.  Each of such representations, warranties, and covenants shall be deemed to be material and to have been relied upon by the Club notwithstanding any investigation made by the Club.

*RIGHTS OF ASSIGNMENT:*  This Contract shall not be assignable by Customer without the prior written approval of the Club, in its sole discretion.  Any such assignment without the Club's prior written approval shall be void..

*DEFAULT:*  In the event either shall breach any provision of this Contract, the non-breaching party may, at its option and without notice or demand, declare this Contract to be in default and terminate this Contract and pursue all remedies available under this Contract or as provided by law.  In the event either party initiates legal action to enforce the terms of this Contract, the prevailing party shall be entitled to recover its attorney's fees.

*GOVERNING LAW:*  This Contract shall be governed and construed in accordance with the law of the State of  Texas.

Submitted By:  _Laura Jedlikowski_   Date: _10/16/13_

Laura Jedlikowski, Director of Catering

Accepted By:   **Redacted**   Date: _10-16-13_

Signature of Client   **Redacted**

Confidential                                                                                CGPM_0000498

# EXHIBIT 9

HARBOR LINKS GOLF COURSE
1 Fairway Drive

5167674816

# *Event Contract*

## *Client Billing Information*          ## *Event Contact Information*

| | |
|---|---|
| **Client Name:** ███ | **Contact Name:** ███ |
| **Client Address:** | **Contact Title:** |
| | **Work Phone:** |
| **Phone Number:** | **Home Phone:** |
| **Alt. Phone:** | **Fax:** |
| **Fax:** | **Cell Phone:** |
| **Email:** | **Email:** ███ |

## *General Event Information*

**Event Name:** ███

| | | |
|---|---|---|
| **Event No:** FERRAN4936 | **Event Type:** Wedding | **Contract Date:** 08/30/2013 |
| **Begin Date:** 05/30/2014 | **End Date:** 05/30/2014 | **Est. Count:** 125 |
| **Begin Time:** 06:30PM | **End Time:** 11:59PM | **Final Count:** 0 |
| **Terms:** 0 | | |
| **Limits:** 2500.00 | **Deposit Due:** 08/30/2013 | **Deposit Amount:** 2500.00 |
| **Tax Exempt:** No | **Balance Due:** 05/16/2014 | **Balance Amount:** 0.00 |

## *Event Details*

| ITEM # | ITEM DESCRIPTION | QUANTITY | UNIT PRICE | SUBTOTAL |
|---|---|---|---|---|
| 1201000000145 | Wedding Gala | 125 | 85.00 | 10625.00 |
| 1201000000145 | Ceremony Site | 1 | 500.00 | 500.00 |

| | |
|---|---|
| **CONTRACT SUBTOTAL** | 11125.00 |
| **CONTRACT SERVICE CHARGE** | 2225.00 |
| **CONTRACT TAX** | 959.53 |
| **CONTRACT TOTAL** | 14309.53 |

## *Terms and Conditions*

Confidential

CGPM_0000303

CONTRACT TO PURCHASE._Customer acknowledges that the completion, execution and delivery of this Contract to the Club, together with the payment of the Deposit, as described below, constitute Customer's irrevocable offer to purchase and hold an Event at the Course.

PAYMENT AND DEPOSIT: A non-refundable deposit in the form of a valid credit card or check must be received upon execution of this Contract._The final payment due under the Contract must be paid prior to the commencement of the Event or as agreed by the Course. The Course requires that the final payment must be made by either certified check or money order. If the final payment is not paid fourteen (14) days from the date of the Event, Customer agrees that the final payment may be charged to the credit card on file and agrees not to dispute such charge, or the Course has the right to cancel the event.

DEPOSIT AMOUNT RECIEVED $_____    DATE____/____/____    INITIALS_____

OPTION DATE: The function space and services referred to in this Contract shall be released automatically by the Course without notice to the Customer, unless a fully executed copy of this Contract and the requisite deposit have been received by the Course before 1 week from the date of this contract. In the event that another group or organization requests the same or similar arrangements on a definite basis on or prior to the option date, and the Course cannot handle both functions, the Customer will be given written notice of such matter and be given seventy-two (72) hours in which to submit an executed copy of this Contract and the required deposit to confirm the commitment on a definite basis or space will be released.

CANCELLATION:_If the Customer cancels the Event in its entirety, the Course shall have suffered damages equivalent to the lost profits that the Course would have made from the food and beverage, incidental purchases, etc. in connection with the Event._The parties acknowledge that it is difficult to quantify such damages and instead have agreed that the Course can assess a fee against the Customer as liquidated damages and not as a penalty (such damage amount agreed to be expressed as a percentage of food and beverage revenue, incidental purchases, etc. lost by the Course as a result of the said cancellation, as reasonably determined by the Course)._Should the Customer decide, for any reason, to cancel the Event, the Customer agrees to pay the following damages:

If written cancellation is received: Percentage of the Event cost due the Course:

More than 181 days prior to scheduled event:_Booking deposit will be held as payment

180-121 days prior to scheduled event: 60%
120-30 days prior to scheduled event: 80%
Less than 30 days prior to scheduled event: 100%

EVENT SPACE_Event space is reserved only for the time indicated._Additional meeting/event time or set up/tear down time, if needed, must be specified in this contract._Should you anticipate any program revisions, please advise us as soon as possible so that we may reserve the appropriate space._Any new function space requirements subsequent to the program outlined above shall be subject to space availability and additional changes at the time requested._The Course reserves the right to re-assign function space with prior written approval from the Customer.

PRICE CHANGES_Menu pricing is subject to change._Alternatively, the Course, at its option, may in the event of increased costs make reasonable substitutions in menu items and Customer agrees to accept such substitutions with prior written notice.

DATE CHANGES:_All date change requests must be in the form of a written authorization to Harbor Links.

NUMBER OF ATTENDEES_The guaranteed number of attendants at each catered function must be communicated to the Banquet Coordinator at the Course not less than fourteen (14) working days, excluding holidays, prior to the event. A Banquet Event Order will be completed and sent for each scheduled function._Final charges will be based on the guaranteed number of attendees (or the number of persons for which the catered portion of the event was originally booked, if no guarantee number is provided) or the total

number served, whichever is greater.

LABOR AND SERVER CHARGES (1) Server per (50) Guests is the service standard for cocktail parties at Harbor Links. (1) Server per (15) guests is the service standard for sit down dinners at Harbor Links. Any additional staff requested will be at a charge of $30.00 per hour, minimum of four hours, per staff member. If guest count exceeds (150), two Bar Attendants will be furnished. The Course reserves the right to charge an fee for the set-up of rooms with extraordinary requirements.

TAXES AND SERVICE CHARGES_The Course charges a Service Charge of 20% of the total bill. This fee is paid directly to the Course. We use the proceeds from this fee to pay competitive wages to our service staff as we believe this allows us to attract and retain excellent staff members. However, the Service Charge is not paid directly to the particular server or servers who provided service to you for your meal, outing or event. If you wish to add a separate additional gratuity to your bill, you are welcome to do so. A 8.625 % New York state and Nassau County sales tax will be added to all food and beverage charges and the service charge._Sales tax will be compiled in strict accordance with federal, state, and local tax regulations on all other charges._All taxes and service charges are subject to change.

OVERTIME_This banquet/event must end by the specified time._If guests remain beyond the event closure time, the Course will need to account for overtime of staff and fines will be assessed as follows: First hour charge = $2,500, each additional hour = $1000 (applicable service charge and taxes apply.)

FUNCTION SERVICES AND CATERING_Prior to the event, the Course's Banquet Coordinator will contact the Customer (or other authorized representatives) to assist in detailed planning and preparations for catered functions comprising the event._It is agreed that all on-site food and beverage will be made through the Course with the exception of wedding cake._The Course reserved the right to cease service of alcoholic beverages in the event that persons under the state or province mandated age limit is present at the function and attempt to receive service of alcoholic beverages._In addition, the Course may request proper identification (photo ID) of any person of questionable age and refuse alcoholic beverage service if either the person is under age or proper identification cannot be produced, and refuse alcoholic beverage service to anyone, in the Course's judgment, that appears to be intoxicated.

INDEMNIFICATION_Customer agrees that Course shall not be liable to Customer, its officers, directors, agents, servants, employees or participants in the Event, for any and all claims, actions, proceedings, damages, costs, expenses, losses and liabilities, including, but not limited to, reasonable attorney's fees both at trial and on appeal, in whole or in part directly or indirectly arising out of, (i) the negligent acts or omissions of any participant in the Event, or that of anyone employed by the Customer for whose acts it may be liable, or (ii) a breach of any covenant, representation or warranty contained herein._Customer shall at all times indemnify and hold Course harmless from or on account of injury to persons or any loss of or damage to property caused by any casualty or accident whatsoever arising out of the Event.

DAMAGE_Customer is responsible for any and all destruction or defacement of Course property, and shall reimburse the Course for any charges or expenses that are incurred as a result of this banquet or event._If deemed necessary by the Course prior to the banquet/event, an outside security firm may be contracted at the Customer's expense to ensure the safety of the guests and property.

HOLD HARMLESS_Customer agrees to protect, defend, indemnify, and otherwise hold harmless the Course and its officers, directors, agents, and employees, of and from any and all claims, liabilities, obligations, and causes of action of whatever kind arising in any manner whatsoever out of or in connection with the acts or omissions of the Customer or the agents, employees, attendees, participants, or otherwise in connection with the Event.

INSURANCE_The Course is not responsible for personal injury to guests or event participants as a result of accidents due to their own carelessness, nor is it responsible for personal property loss or damage._Customer assumes all liability and agrees to maintain sufficient insurance coverage. Any cords provided by vendors must be taped down.

FORCE MAJEURE_If for any reason beyond the Course's or the Customer's reasonable control, including but

not limited to strikes, labor disputes, acts, regulations, or orders of government authorities, civil disorder, disasters, acts of war, acts of God, fires, flood or other emergency conditions, any delay in necessary and essential repairs of the Course, or the Course is unable to perform its obligations under this Contract, such non-performance is excused and such party may terminate this Contract without further liability of any nature, upon return of the Deposit. In no event shall the Club or the Customer be liable for consequential damages of any nature for any reason whatsoever.

REPRESENTATIONS Each party represents and warrants that (i) it has full power, authority and legal right to execute, deliver and perform this Contract, (ii) the execution, delivery and performance has been duly authorized by all necessary corporate action, and (iii) the execution, delivery and performance of this Contract will not cause it to be in breach or default of any contract to which it is a party.

ENTIRE CONTRACT This Contract shall incorporate and supersede any and all prior understandings between the parties. Each of the foregoing representations, warranties and covenants shall be true at all times during the term hereof. Each of such representations, warranties, and covenants shall be deemed to be material and to have been relied upon by the Course notwithstanding any investigation made by the Course.

RIGHTS OF ASSIGNMENT This Contract shall not be assignable by Customer without the prior written approval of the Club, in its sole discretion. Any such assignment without the Course's prior written approval shall be void.

DEFAULT: In the event either shall breach any provision of this Contract, the non-breaching party may, at its option and without notice or demand, declare this Contract to be in default and terminate this Contract and pursue all remedies available under this Contract or as provided by law. In the event either party initiates legal action to enforce the terms of this Contract, the prevailing party shall be entitled to recover its attorney's fees.

GOVERNING LAW: This Contract shall be governed and construed in accordance with the law of the State of New York.

UNSIGNED CONTRACT IS NOT VALID AFTER 30 DAYS FROM THE DATE OF CONTRACT AS NOTED ON PAGE ONE.

---

Note: Additional addendum sheet(s) dealing with special preparations and set up instructions may accompany this contract.

Approved (Client's Signature):_____ Date:_____

Approved (Salesman's Signature):_____ Date: _____

Confidential

CGPM_0000306

# EXHIBIT 10

NEW YORK STATE SUPREME COURT
NIAGARA COUNTY

DIANE LAW, DIANE GULLA, DANIEL
HOWARD, DERIK KANE, MICHAEL
OVERDORF, AND SARA OWCZARZAK, On
Behalf of Themselves And All Others Similarly
Situated,

Index No. E150883/2013

Plaintiffs,

**DEFENDANT'S RESPONSE TO
PLAINTIFFS' SECOND SET OF
INTERROGATORIES**

-against-

CGPM/WMC OPERATING, LLC, dba ARNOLD
PALMER GOLF MANAGEMENT,

Defendant.

Defendant CGPM/WMC Operating, LLC, dba Arnold Palmer Golf Management, by its

attorneys, Littler Mendelson, P.C., hereby responds and objects to Plaintiffs' Second Set of

Interrogatories to Defendant (the "Interrogatories") as follows:

## QUALIFICATIONS AND GENERAL OBJECTIONS

The following Qualifications and General Objections apply to the responses set forth

herein and will not necessarily be repeated in response to each individual Interrogatory:

1.     The answers and objections set forth herein are made without prejudice to, and

without waiving, the following:

a.     Defendant's right to object on the grounds of competency, privilege,

relevance, materiality, or any other proper ground, to Plaintiffs' Second Set of Interrogatories or

to the use of any information provided herewith or which may hereinafter be provided or

produced in response to Plaintiffs' Second Set of Interrogatories, for any purpose, in whole or in

part, in this or any subsequent step or proceeding in this action or any other action;

b.     Defendant's right to object on any and all grounds at any time to other

1

discovery procedures involving or relating to the subject matter of Plaintiffs' Second Set of Interrogatories; and

        c.     Defendant's right to provide, at any time, revisions, corrections, or clarifications with respect to any of the information provided, or the answers or objections made in response to Plaintiffs' Second Set of Interrogatories.

        2.     Defendant objects to each of the Interrogatories to the extent they improperly seek the disclosure of information that is neither material, necessary, nor relevant to the subject matter of this action, or that are not reasonably calculated to lead to the discovery of admissible evidence.

        3.     Defendant objects to each of the Interrogatories to the extent they are vague, ambiguous, compound, duplicative or fail to define terms and phrases necessary to provide a meaningful answer.

        4.     Defendant objects to each of the Interrogatories to the extent they are overly broad, unduly burdensome and lack particularity.

        5.     Defendant objects to each of the Interrogatories to the extent they assert a legal claim or call for a legal conclusion.

        6.     Defendant objects to each of the Interrogatories to the extent they call for information not in Defendant's possession, custody, or control.

        7.     Defendant objects to each of the Interrogatories to the extent they seek information that is already in the possession of Plaintiffs, publicly available from other sources, in the possession of third parties or equally accessible to Plaintiffs.

        8.     The following answers are based upon information presently known to be available to Defendant, and except for explicit facts admitted herein, no incidental or implied

admissions are intended hereby.  The fact that Defendant has answered or objected to any part hereof should not be taken as an admission that Defendant accepts or admits the existence of any facts set forth or presumed by Plaintiffs' Second Set of Interrogatories or that such answer or objection constitutes admissible evidence.  The fact that Defendant has answered part or all of any request in Plaintiffs' Second Set of Interrogatories is not intended and shall not be construed by Plaintiffs as a waiver by Defendant of all or any part of any objection to any request.

9.     Defendant objects to each of the Interrogatories that seek information outside the possible statute of limitations period covered by the claims in this action, i.e., the period from August 20, 2007 to the present.

10.     Defendant objects to each of the Interrogatories that seek information concerning events or actions prior to or after the termination of Plaintiffs' employment or that are not otherwise reasonably limited in temporal scope.

11.     Defendant objects to each of the Interrogatories that seek information and/or documents concerning any events or employment practices about which Plaintiffs do not complain.

12.     Defendant objects to each of the Interrogatories that seek information pertinent to a "class" of employees, other than the named Plaintiffs.

13.     To the extent that the Interrogatory calls for information prepared in anticipation of litigation or for information or material covered by the work product doctrine, or which constitutes information which is privileged or concerns confidential, proprietary information or trade secrets or implicates the privacy rights of third parties (including financial and personal privacy), Defendant objects to such Interrogatory.  Defendant will neither supply nor produce any information protected from disclosure by virtue of HIPAA, the attorney work product

3

doctrine, the attorney-client privilege, the self-critical analysis privilege, and/or the trade secret or privacy doctrines. Any inadvertent disclosure of any privileged information by Defendant is without prejudice to, and is not a waiver of, any subsequent assertion of privilege by Defendant as to the document(s) or information disclosed or as to other document(s) or information.

14. Based on applicable privacy and confidentiality constraints and considerations of relevance and over breadth, to the extent that any or all of the Interrogatories seek personal information (such as an individual's Social Security number, date of birth, and, if he/she is affiliated with Defendant, his/her home address and telephone number) regarding a putative class member, non-party individual or otherwise seeks information relating to non-parties to this action, Defendant objects and shall limit any or all of their Responses herein to relevant, non-personal information applicable to Plaintiffs' claims.

15. The Responses made herein are based on Defendant's investigation to date of those sources within their control and where they reasonably believe responsive documents may exist. Defendant reserves their right to supplement and/or amend these Responses as provided by the CPLR.

16. Unless otherwise specified, all responses are limited to the Relevant Period, as defined in the "Definitions" Section below.

17. All Responses made herein are made subject to the objections stated above and any further objection specifically stated.

## DEFINITIONS

1. In this Response, the term "Plaintiffs" refers to Diane Law, Diane Gulla, Daniel Howard, Derik Kane, Michael Overdorf, and Sara Owczarzak, individually and collectively, and any agents, attorneys, representatives, or any other persons acting or purporting to act on behalf

of Plaintiffs.

2.      In this Response, the term "Defendant" or "CGPM" means Defendant CGPM/WMC Operating LLC dba Arnold Palmer Golf Management and/or anyone acting or purporting to act on its behalf, affiliates, related companies, alter egos, and includes all officers, directors, trustees, agents, attorneys and agents of any of them.

3.      In this Response, unless otherwise specified, the term "Relevant Period" refers to August 20, 2007 through the present.

4.      In this Response, the term "Clubs" refers collectively to the four golf clubs at issue in this case: Fox Valley Club, Brierwood Country Club, Harbor Links, and Tan Tara Country Club.

5.      In this Response, the term "Service charge" refers to a charge collected by each of the Clubs for all banquet events, which is equal to 20% of the total cost of each event.

## RESPONSE TO INTERROGATORIES

### INTERROGATORY NO. 19:

For the "BANQUET/EVENT CONTRACT" produced at Bates CGPM 0000001 through 0000003, please state:

    (a)    Who created the document?
    (b)    When was the document created?
    (c)    At which Club(s) was the document used?
    (d)    For what time period was the document in use?
    (e)    What is the purpose of the document?
    (f)    Was the document provided to customers?
    (g)    If the document was provided to customers, was the practice to provide the document to customers before the date of the event?

### RESPONSE:

The document produced at Bates CGPM 0000001 through 0000003 is an example of a Banquet/Event Contract, created by Tammy Dawes, and used prior to approximately September,

5

2013 at the Tan Tara Golf Club.  A Banquet/Event Contract is customarily provided to customers

at the Tan Tara Golf Club prior to their event.

**INTERROGATORY NO. 20:**

For the "Addendum A Special Terms and Conditions" document at Bates CGPM
0000006, please state:

      (a)    Who created the document?
      (b)    When was the document created?
      (c)    At which Club(s) was the document used?
      (d)    For what time period was the document in use?
      (e)    What is the purpose of the document?
      (f)    Was the document provided to customers?
      (g)    If the document was provided to customers, was the practice to provide the
           Document to customers before the date of the event?

**RESPONSE:**

The document produced at Bates CGPM 0000006 is an example of an Addendum to the

Banquet Event Order, created by Mandy Brookens, and used beginning in approximately 2010 at

the Brierwood Country Club.  This Addendum was customarily provided to customers with the

Banquet/Event Contract at Brierwood Country Club prior to their event.

**INTERROGATORY NO. 21:**

For the "BANQUET EVENT ORDER" Document produced at CGPM Bates 0000011
Through 0000014, please state:

      (a)    Who created the document?
      (b)    When was the document created?
      (c)    At which Club(s) was the document used?
      (d)    For what time period was the document in use?
      (e)    What is the purpose of the document?
      (f)    Was the document provided to customers?
      (g)    If the document was provided to customers, was the practice to provide the
           Document to customers before the date of the event?

**RESPONSE:**

The document produced at Bates CGPM 00000011 through CGPM 00000014 is an

6

example of a Banquet Event Order, created by Mandy Brookens, and used prior to approximately

September, 2013 at the Brierwood Country Club.   A Banquet Event Order is customarily

provided to customers at Brierwood Country Club prior to their event.

**INTERROGATORY NO. 22:**

For the "BANQUET EVENT ORDER" produced at CGPM Bates 0000015 through
0000019, please state:

- (a)   Who created the document?
- (b)   When was the document created?
- (c)   At which Club(s) was the document used?
- (d)   For what time period was the document in use?
- (e)   What is the purpose of the document?
- (f)   Was the document provided to customers?
- (g)   If the document was provided to customers, was the practice to provide the
        Document to customers before the date of the event?

**RESPONSE:**

The document produced at Bates CGPM 0000015 through 0000019 is an example of a

Banquet Event Order, created by Mandy Brookens, and was used prior to approximately

September, 2013 at the Brierwood Country Club.   A Banquet Event Order is customarily

provided to customers at Brierwood Country Club prior to their event.

**INTERROGATORY NO. 23:**

For the "BANQUET/EVENT CONTRACT" produced at CGPM Bates 0000039 through
0000046, please state:

- (a)   Who created the document?
- (b)   When was the document created?
- (c)   At which Club(s) was the document used?
- (d)   For what time period was the document in use?
- (e)   What is the purpose of the document?
- (f)   Was the document provided to customers?
- (g)   If the document was provided to customers, was the practice to provide the
        Document to customers before the date of the event?

**RESPONSE:**

The document produced at Bates CGPM 0000039 through 0000046 is an example of a Banquet/Event Contract, created by Mandy Brookens, and used prior to approximately September, 2013 at Brierwood Country Club. A Banquet/Event Contract is customarily provided to customers at Brierwood Country Club prior to their event.

**INTERROGATORY NO. 24:**

For the "Estimate of Charges" produced at CGPM Bates 0000054 through 0000055, please state:

(a)     Who created the document?
(b)     When was the document created?
(c)     At which Club(s) was the document used?
(d)     For what time period was the document in use?
(e)     What is the purpose of the document?
(f)     Was the document provided to customers?
(g)     If the document was provided to customers, was the practice to provide the Document to customers before the date of the event?

**RESPONSE:**

Defendant is in the process of gathering the information responsive to Interrogatory No. 24, and will supplement its answers accordingly.

**INTERROGATORY NO. 25:**

For the documents produced at Bates CGPM 0000060-69 and 0000070-77:

(a)     Who created the document?
(b)     When was the document created?
(c)     At which Club(s) was the document used?
(d)     For what time period was the document in use?
(e)     What is the purpose of the document?
(f)     Was the document provided to customers?
(g)     If the document was provided to customers, was the practice to provide the Document to customers before the date of the event?

**RESPONSE:**

The documents produced at Bates CGPM 0000060-69 and 0000070-77 are examples of

marketing materials created by Mandy Brookens, which she  provided to some of her customers

at the Brierwood Country Club since approximately 2010.

**INTERROGATORY NO. 26:**

For the "BANQUET/EVENT CONTRACT #" produced at CGPM Bates 0000138 through 0000140, please state:

    (a)    Who created the document?
    (b)    When was the document created?
    (c)    At which Club(s) was the document used?
    (d)    For what time period was the document in use?
    (e)    What is the purpose of the document?
    (f)    Was the document provided to customers?
    (g)    If the document was provided to customers, was the practice to provide the Document to customers before the date of the event?

**RESPONSE:**

The document produced at Bates CGPM 0000138 through 0000140 is an example of a

Banquet/Event Contract, created by Lisa Alessi, and used prior to approximately 2011 at the Fox

Valley Club.  A Banquet/Event Contract is customarily provided to customers at the Fox Valley

Club prior to their event.

**INTERROGATORY NO. 27:**

For the "BANQUET/EVENT CONTRACT' produced at CGPM Bates 0000141 through 0000143, please state:

    (a)    Who created the document?
    (b)    When was the document created?
    (c)    At which Club(s) was the document used?
    (d)    For what time period was the document in use?
    (e)    What is the purpose of the document?
    (f)    Was the document provided to customers?
    (g)    If the document was provided to customers, was the practice to provide the Document to customers before the date of the event?

**RESPONSE:**

The document produced at Bates CGPM 0000141 through 0000143 is an example of a

9

Banquet/Event Contract, created by Joelle LoDestro, and used from approximately 2011 to September, 2013 at the Fox Valley Club. A Banquet/Event Contract is customarily provided to customers at the Fox Valley Club prior to their event.

**INTERROGATORY NO. 28:**

For the "HARBOR LINKS GOLF COURSE Event Contracts Report" produced at CGPM Bates 0000300 through 0000302, please state:

(a)     Who created the document?
(b)     When was the document created?
(c)     At which Club(s) was the document used?
(d)     For what time period was the document in use?
(e)     What is the purpose of the document?
(f)     Was the document provided to customers?
(g)     If the document was provided to customers, was the practice to provide the Document to customers before the date of the event?

**RESPONSE:**

The document produced at Bates CGPM 0000300 through 0000302 is an example of an Event Contract, created by Janine Phelan, and used prior to approximately October, 2012 at Harbor Links Golf Course. An Event Contract is customarily provided to customers at Harbor Links Golf Course prior to their event.

**INTERROGATORY NO. 29:**

For the "HARBOR LINKS GOLF COURSE Event Contract" produced at CGPM Bates 0000303 through 0000306, please state:

(a)     Who created the document?
(b)     When was the document created?
(c)     At which Club(s) was the document used?
(d)     For what time period was the document in use?
(e)     What is the purpose of the document?
(f)     Was the document provided to customers?
(g)     If the document was provided to customers, was the practice to provide the Document to customers before the date of the event?

10

**RESPONSE:**

The document produced at Bates CGPM 0000303 through 0000306 is an example of an Event Contract, created by Janine Phelan, and used on or after approximately October, 2012 at Harbor Links Golf Course.  An Event Contract is customarily provided to customers at Harbor Links Golf Course prior to their event.

**INTERROGATORY NO. 30:**

Are there any exemplars of banquet contracts, menus, event contracts or orders, estimates of charges, or similar documents that were in use at any of the four Clubs on or after August 20, 2007 that have not been produced?

**RESPONSE:**

There are additional exemplars of banquet contracts, menus, event contracts or orders, estimates of charges, or similar documents that were in use at the Clubs on or after August 20, 2007, which Defendant is in the process of collecting, and will supplement its document production accordingly.

**INTERROGATORY NO. 31:**

With respect to the Answer filed by Defendant on December 9, 2013, state all facts that support your denial of the allegations in paragraphs 14 through 22, inclusive, of Plaintiffs' Amended Complaint.

**RESPONSE:**

Defendant objects to this Interrogatory on the grounds that the response calls for legal argument. Defendant further objects to this Interrogatory to the extent it seeks information protected from discovery by virtue of the attorney-client privilege or the attorney work product doctrine. Moreover, the Interrogatory seeks information beyond that which is permitted under N.Y. C.P.L.R. § 3131.

11

**INTERROGATORY NO. 32:**

With respect to the Answer filed by Defendant on December 9, 2013 and assuming a response is required, state all facts that support your denial of the allegations in paragraphs 25 through 28, inclusive, of Plaintiffs' Amended Complaint.

**RESPONSE:**

Defendant objects to this Interrogatory on the grounds that the response calls for legal argument. Defendant further objects to this Interrogatory to the extent it seeks information protected from discovery by virtue of the attorney-client privilege or the attorney work product doctrine. Moreover, the Interrogatory seeks information beyond that which is permitted under N.Y. C.P.L.R. § 3131.

Date:   August 4, 2014
        Rochester, New York

_____
Craig R. Benson
Erin W. Smith
LITTLER MENDELSON, P.C.
400 Linden Oaks, Suite 110
Rochester, NY  14625
585.203.3400

*Attorneys for Defendant*

128044870.1

12

TO:    FARUQI & FARUQI, LLP
Adam Gonnelli, Esq.
369 Lexington Avenue, 10th Floor
New York, NY 10017
Tel.: 212-983-9300
Fax: 212-983-9331

FARUQI & FARUQI, LLP
David E. Bower, Esq.
10866 Wilshire Boulevard, Suite 1470
Los Angeles, CA 90024
Tel.: 424-256-2884
Fax: 424-256-2885

RUPP, BAASE, PFALZGRAF, CUNNINGHAM,
COPPOLA, LLC
John Ottaviano, Esq.
Thomas P. Cunningham, Esq.
172 East Avenue
Lockport, NY 14094
Tel.: 716-438-0488
Fax: 716-438-0489

*Attorneys for Plaintiffs*

13

## VERIFICATION

STATE OF TEXAS       )
                         )   ss:
COUNTY OF   Dallas     )

Rand Huguely, being duly sworn, deposes and says that he has reviewed Defendant's Response to Plaintiffs' Second Set of Interrogatories and that the statements made therein are true and accurate to the best of his knowledge, information and belief.



_____
Rand Huguely, General Counsel

Sworn to before me this
4th day of August, 2014.

_____
Notary Public

PEGGY BUREAU
Notary Public, State of Texas
My Commission Expires
July 15, 2015

1280-44870.1

# EXHIBIT 11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

WILLARD OWENS, JEREMY ELLISON,
THOMAS LIVINGSTON, JAMES ROUSSEVE,
BASILLE NEWMAN, ZEBEDEE POUNCEY,
TONI TYLER, Individually and on Behalf of All
Other Persons Similarly Situated,

Plaintiffs,

v.

FRESHDIRECT LLC, FRESHDIRECT
HOLDINGS, INC., U.T.F. TRUCKING, INC.,
JASON ACKERMAN, and DAVID
MCINERNEY, Jointly and Severally,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

ECF CASE

No.: 1:14-cv-1909 (VEC) (GWG)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__10/30/15____

ORDER GRANTING PLAINTIFFS' MOTION FOR CERTIFICATION
OF THE SETTLEMENT CLASS, FINAL APPROVAL OF THE CLASS ACTION
SETTLEMENT, APPROVAL OF THE FLSA SETTLEMENT, AND APPROVAL OF
ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND SERVICE PAYMENTS

This matter came before the Court on the application of Plaintiffs Willard Owens, Jeremy

Ellison, Thomas Livingston, James Rousseve, Basille Newman, Zebedee Pouncey and Toni

Tyler ("Named Plaintiffs") and FreshDirect LLC, FreshDirect Holdings, Inc., U.T.F. Trucking,

Inc., Jason Ackerman and David McInerney ("Defendants") for final approval of the settlement

set forth in the May 20, 2015 Settlement and General Release (the "Agreement") relating to the

above-captioned class and collective action.  The Court having held a Final Fairness Hearing on

October 30, 2015 at 3:00 p.m. and considered all papers filed and proceedings had herein and

otherwise being fully informed of the premises and good cause appearing therefore, it is on this

__30th__ day of __October__, 2015.

IT IS HEREBY ORDERED THAT:

1.     For purposes of this Order and Final Judgment, the Court adopts and incorporates

the definitions set forth in the Agreement, including, but not limited to, the following:

Settlement Class: All individuals whom Defendants have employed or are
employing who hold or held the title of drivers/truckers (including both corporate
office services and residential services), helpers, walkers, and/or runners, or who
performed or are performing any of the duties of a driver, trucker, helper, walker,
and/or runner, regardless of job title at any time between March 18, 2008 and
March 6, 2015. Agreement ¶ 6.

Authorized Claimant: Any of the Settlement Class Members who submit a timely
and fully completed Claim Form in accordance with the terms of the Agreement
and who become entitled to receive a Settlement Payment under the Agreement.
Agreement ¶ 7.

Gross Settlement Sum: One Million Two Hundred Thirty-Five Thousand Dollars
and Zero Cents ($1,235,000.00), which represents the maximum total amount that
Defendants will fund under this Agreement, inclusive of Settlement Payments,
Class Counsel's Fees, Class Counsel's Costs, Service Payments, and Settlement
Expenses. Agreement ¶ 29.

Net Settlement Sum. The Gross Settlement Sum less the amounts awarded to
Class Counsel, Settlement Expenses, and the Service Payments to Named
Plaintiffs. Agreement ¶ 31.

Bar Date: The date by which any Settlement Class Member who wishes to qualify
as an Authorized Claimant must file a Claim Form. The Bar Date shall be no later
than forty-five (45) calendar days after the date on which the Claims
Administrator post-marks the Settlement Notice and Claim Forms to the
Settlement Class Members. Settlement Class Members must timely file a fully
completed Claim Form on or before forty-five (45) calendar days after the date
Settlement Notice and Claim Forms are post-marked in order to be considered an
Authorized Claimant. Agreement ¶ 10.

Settlement Notice: The notice substantially in the form attached as Exhibit A to
the Agreement, as modified under the Court's June 22, 2015 Order (Dkt. No. 163)
and July 21, 2015 Order (Dkt. No. 165), to be directed to the Settlement Class
Members and to explain the Settlement and Settlement Class Members' options
sent to the Class following preliminary approval. Agreement ¶ 44.

Claim Form: The Proof of Claim, which is to be mutually agreed upon by the
Parties and is to be used by Settlement Class Members who choose to file a claim
in the Action. A copy of the Claim Form is attached as Exhibit B to the
Agreement. Agreement ¶ 9.

Claim Submission Period: The period beginning with the date the Settlement Notice and Claim Forms are post-marked to Settlement Class Members and ending on the Bar Date. Settlement Class Members must timely file a Claim Form so that it is post-marked on or before the Bar Date to be an Authorized Claimant. Agreement ¶ 11.

Claims Administrator: The third-party claims administration firm agreed upon by the Parties, who will perform all of the administrative duties assigned in Paragraphs 58, 60 through 63 of the Agreement. The Parties designate Simpluris, Inc. as the Claims Administrator. Agreement ¶ 12.

Released Parties: Defendants, all affiliated entities, and their past, present, and future parent companies, affiliates, subsidiaries, divisions, predecessors, successors, partners, owners, joint ventures, affiliated organizations, shareholders, insurers, reinsurers and assigns, and each of its/their past, present and future officers, directors, trustees, agents, employees, attorneys, contractors, representatives, plan fiduciaries and/or administrators, benefits plan sponsored or administered by Defendants or affiliated entities, or divisions, units, branches, and any other persons or entities acting on their behalf, including any party that was or could have been named as a defendant in the Action. Agreement ¶ 39.

Final Effective Date: The first date after all of the following events and conditions have been met or have occurred: (i) the Court enters an Order authorizing notice of the proposed Settlement and Notice of Final Fairness Hearing; (ii) the Bar Date has passed; (iii) the Court entered a Final Approval Order and Final Judgment; (iv) the deadline has passed without action for counsel for the Parties to terminate the Agreement; (v) the time to appeal from the Final Approval Order and Final Judgment has expired and no Notice of Appeal has been filed or in the event that an appeal is filed, the appellate process is exhausted and the Final Approval Order and Final Judgment has remained intact in all material respects; and (vi) the Final Fairness Hearing has occurred. Agreement ¶ 23.

Settled Claims: Any and all claims for relief, whether suspected or unsuspected, which the Named Plaintiffs or any Settlement Class Members have had, now have, or may have in the future against the Parties or any of them for any acts occurring between March 18, 2008 to March 6, 2015 in connection with being employed by Defendants, that are either or both: (1) alleged in the Action or (2) arise out of the facts, matters, transactions or occurrences referred to in the Action that could have been alleged as separate claims, causes of action, lawsuits or other theories of relief, whether under federal law, state law or common law (including all violations of the Fair Labor Standards Act ("FLSA") and the New York Labor Law ("NYLL")).  "Settled Claims" also includes all types of relief available for the above referenced theories of relief, including, without limitations, any claims for unpaid wages, unpaid overtime, illegally retained gratuities, damages, reimbursement, restitution, losses, penalties, fines, liens, attorneys' fees, costs,

expenses, debts, interest, injunctive or declaratory relief, chargebacks, liquidated damages or similar relief. Agreement ¶ 47.

Class Counsel: Douglas B. Lipsky of Bronson Lipsky LLP and Jeffrey M. Gottlieb of Gottlieb & Associates. Agreement ¶ 13.

Final Fairness Hearing: The hearing contemplated by the Parties, to occur no earlier than one hundred-twenty (120) days after the date of entry of this Order, at which the Court will approve, in final, the Agreement and make such other final rulings as are contemplated by this Agreement, including the Final Judgment. Agreement ¶ 24.

Settlement Vouchers: The Settlement Payments shall be in the form of FreshDirect vouchers that Authorized Claimants can redeem for residential delivery solely through the FreshDirect website and/or mobile application for any product then-available on FreshDirect's website, subject to product availability, alcohol-related age restrictions, any other age-restricted items, delivery window availability, and such other restrictions or limitations as are applicable from time-to-time to its customers. The Settlement Vouchers must be redeemed within one hundred twenty (120) days of their issue date. During this 120-day period, Authorized Claimants may use the Settlement Vouchers as many times as they would like until they have exhausted the balance on the Voucher. Agreement ¶ 54.

2.      The Bar Date in paragraph 10 of the Agreement is extended to cover Claim forms submitted by Class Members to the Claims Administrator on or by October 10, 2015.

3.      This Court hereby approves the settlement set forth in the Agreement and finds that the settlement is, in all respects, fair, reasonable, adequate and in the best interests of the Settlement Class Members in accordance with Fed. R. Civ. P. 23(e) and 29 U.S.C. § 216. This Agreement is the product of arm's-length settlement negotiations.

4.      The Settlement Notice given to the Settlement Class Members fully and accurately informed them of the proposed settlement, was the best notice practicable under the circumstances, and constitutes valid, due and sufficient notice to all Class Members, complying fully with Fed. R. Civ. P. 23, the Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq.*, the United States Constitution, and any other applicable laws, as appropriate.

5.      Ten (10) Settlement Class Members properly and timely exercised their opt-out rights in this lawsuit. Under the Agreement, these Settlement Class Members are not deemed to have released or discharged the Released Parties from any and all Settled Claims

6.      As of the date of this Order, and except as to any rights or claims the Agreement creates, the Named Plaintiffs and all Settlement Class Members shall be deemed to have forever and fully released Rule 23 Released Claims (as defined in Agreement ¶ 47). All Settlement Class Members who have opted into the FLSA collective action, via submitting a timely (as measured by the agreed upon extended Bar Date stated above in Paragraph 2) and valid/substantially compliant Claim Form, shall be deemed to have forever and fully released all FLSA Released Claims (as defined in Agreement ¶ 47) during the FLSA settlement class period. Settlement Class Members who have opted-out of this lawsuit have not by operation of this Order released their Rule 23 or FLSA Released claims, if any.

7.      The Court grants Plaintiffs' Motion for Service Payments (Dkt. Nos. 172-173) and awards Service Payments of $5,000.00 to Named Plaintiffs Willard Owens, Jeremy Ellison, Thomas Livingston, James Rousseve, Basille Newman, Zebedee Pouncey and Toni Tyler, totaling $35,000.00, from the Gross Settlement Sum. These Service Payments are reasonable in light of the efforts they have expended in furthering the Class Members' interests, and the risks they incurred by becoming and continuing as litigants.

8.      The Court grants Plaintiffs' Motion for Attorneys' Fees and Reimbursement of Expenses (Dkt. Nos. 170-171) and awards Class Counsel 32.3% of the Gross Settlement Sum in attorneys' fees, equaling $400,000.00, and $4,894.52 in reimbursable expenses. The fee award is justified by the work that Class Counsel did negotiating the settlement and conducting the

litigation, the ultimate recovery, the risk that Class Counsel undertook in bringing the claims, and the work that Class Counsel will likely have to perform following the entry of this Order.

9.     The following event series shall be followed in connection with distributing the Individual Payments to the Authorized Claimants:

> i.     The Claims Administrator shall provide written notice to Defendants' Counsel of the number of Authorized Claimants, number of opt-out forms received, and the amount of the Claims Payment within ten (10) calendar days after the Final Effective Date.  Agreement ¶ 63.
>
> ii.    Within ten (10) calendar days of the Claims Administrator's written notice to Defendants' Counsel of the number of Authorized Claimants, the number of valid opt-out forms received, and the Claims Payment owed, Defendants shall remit to the Claims Administrator the Counsel Fees, Counsel Costs and Service Payments.  Agreement ¶ 63.
>
> iii.   Vouchers will be distributed by the Claims Administrator within twenty (20) calendar days of such notice.  Accordingly, the vouchers shall be distributed to the Authorized Claimants within thirty (30) calendar days after the Final Effective Date.  The vouchers shall be valid for one hundred and twenty (120) calendar days. Agreement ¶ 63.
>
> iv.    The distribution of Counsel Fees, Counsel Costs and the Service Payments shall be made within thirty (30) calendar days of the Final Effective Date.  Agreement ¶ 63.b.
>
> v.     Defendants shall endeavor as soon as practicable and in accordance with applicable law to revise their on-line check out procedure to permit customers to add a gratuity for the delivery personnel to the cost of an order, which Defendants will remit to the delivery personnel associated with that order.  Agreement ¶¶ 55, 63.d.

10.    The Court approves up to $28,500.00 to be paid from the Gross Settlement Sum to the Claims Administrator, Simpluris, Inc. for its administration fee.

11.    The Court retains jurisdiction over this action for the purpose of enforcing the Agreement and overseeing the distribution of settlement funds. The parties shall abide by all terms of the Agreement, which are incorporated herein, and this Order.

12.     The Court hereby dismisses the above-captioned action in its entirety, with prejudice to Plaintiffs Willard Owens, Jeremy Ellison, Thomas Livingston, James Rousseve, Basille Newman, Zebedee Pouncey and Toni Tyler and the Authorized Claimants, and with no further award of attorneys' fees or costs or expenses, except as awarded herein

SO ORDERED: The objection submitted by Mr. Mohamed Kamara is not valid because it was not timely filed.

Dated: New York, New York
    October 30, 2015    , 2015

_____ Valerie Caproni _____
The Honorable Valerie E. Caproni, U.S.D.J.

# EXHIBIT 12

Friedman, J.P., Richter, Andrias, Kapnick, Webber, JJ.

6322        Jahangir Ahmed, etc.,                    Index 15384/15
                    Plaintiff-Appellant,

                        -against-

            Morgan's Hotel Group
            Management, LLC, et al.,
                    Defendants-Respondents.
            _____

Leeds Brown Law, P.C., Carle Place (Brett R. Cohen of counsel),
for appellant.

Fox Rothschild LLP, New York (Francis V. Cook of counsel), for
respondents.
            _____

        Order, Supreme Court, New York County (Robert R. Reed, J.),

entered on or about February 28, 2017, which, to the extent

appealed from, granted defendants' motion for summary judgment

dismissing the complaint, and denied plaintiff's motions for

summary judgment, class action certification, and leave to amend

the complaint, unanimously affirmed, without costs.

        Plaintiff, a banquet server's assistant at a hotel, claims

that defendants wrongly withheld gratuities from him (see Labor

Law § 196-d), because they kept administrative charges to which

he was entitled.  12 NYCRR 146-2.18(b) provides, "There shall be

a rebuttable presumption that any charge in addition to charges

for food, beverage, lodging ... is a charge purported to be a

gratuity."  However, defendants' Banquet Event Order (BEO), which

70

served as the detailed contract and bill for catered events,
satisfied the statutory requirement that the "administrative
charge" for events not be a charge purported to be a "gratuity"
and that it be clearly identified so that "a reasonable customer
would understand that such charge was not purported to be a
gratuity" (see id. 146-2.19).   The BEO reflected two separate
charges in addition to food and beverage charges and notified
customers that the gratuity would be distributed to the staff and
that the administrative charge was not a gratuity but the
property of the hotel.   No reasonable customer would have been
confused (see Samiento v World Yacht Inc., 10 NY3d 70, 79
[2008]).   That other documents generated in connection with the
event, such as proposals, did not include the explanatory
language does not render the BEO language ineffective.

Plaintiff also claims that defendants' notice to him that
they intended to take a credit toward the basic minimum hourly
rate if he received enough tips (12 NYCRR 146-1.3; see also Labor
Law 195[3]) did not fully comply with 12 NYCRR 146-2.2, because
it did not state that, in the event plaintiff did not earn enough
tips to meet the minimum, they would be responsible for paying
him the difference.   However, Labor Law § 198(1-d) provides that
"it shall be an affirmative defense that ... the employer made
complete and timely payment of all wages due pursuant to this

71

article," and the record demonstrates that plaintiff was always

paid more than minimum wage.

In view of the foregoing, we do not reach plaintiff's

remaining arguments.

THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.

ENTERED:  APRIL 19, 2018

_____
CLERK

72

# EXHIBIT 13

| ARNOLD PALMER | |
|---|---|
| FARUQI & FARUQI, LLP | |
| EXPENSE REPORT | |
| | |
| **CATEGORY** | **AMOUNT** |
| | |
| Commercial Copies | $2,072.32 |
| Computer & Other Research Fee(s) (Lexis/Westlaw/Bloomberg) | $6,380.88 |
| Courier & Overnight Delivery Services | $835.96 |
| Court Filing/Service Fee(s)/Appellate Printing & Service | $5,288.12 |
| Mediation Fees | $6,133.34 |
| Postage | $341.23 |
| Process Service/Witness Fees | $1,123.78 |
| Reproduction (Internal) | $1,578.00 |
| Telephone/Fax | $765.40 |
| Travel Expenses (including hotels, meals & transportation)* | $21,003.73 |
| | |
| **TOTAL:** | **$45,522.76** |
| | |
| *Includes estimated travel and hotel expenses of $5,500 for attending the Final Appoval Hearing.* | |

# EXHIBIT 14



Faruqi & Faruqi, LLP focuses on complex civil litigation, including securities, antitrust, wage and hour, consumer, and pharmaceutical class actions as well as shareholder derivative and merger and transactional litigation. The firm is headquartered in New York, and maintains offices in California, Delaware, Pennsylvania and Georgia.

Since its founding in 1995, Faruqi & Faruqi, LLP has served as lead or co-lead counsel in numerous high-profile cases which have provided significant recoveries to investors, consumers and employees.

# <u>PRACTICE AREAS</u>

## SECURITIES FRAUD LITIGATION

From its inception, Faruqi & Faruqi, LLP has devoted a substantial portion of its practice to class action securities fraud litigation. In *In re PurchasePro.com, Inc. Securities Litigation*, No. CV-S-01-0483 (JLQ) (D. Nev.), as co-lead counsel for the class, Faruqi & Faruqi, LLP secured a $24.2 million settlement in a securities fraud litigation even though the corporate defendant was in bankruptcy. As noted by Senior Judge Justin L. Quackenbush in approving the settlement, ***"I feel that counsel for plaintiffs evidenced that they were and are skilled in the field of securities litigation."***

Other past achievements include: *In re Olsten Corp. Sec. Litig.*, No. 97-CV-5056 (RDH) (E.D.N.Y.) (recovered $24.1 million dollars for class members) (Judge Hurley stated: "The quality of representation here I think has been excellent."), *In re Tellium, Inc. Sec. Litig.*, No. 02-CV-5878 (FLW) (D.N.J.) (recovered $5.5 million dollars for class members); *In re Mitcham Indus., Inc. Sec. Litig.*, No. H-98-1244 (S.D. Tex.) (recovered $3 million dollars for class members despite the fact that corporate defendant was on the verge of declaring bankruptcy), and *Ruskin v. TIG Holdings, Inc.*, No. 98 Civ. 1068 LLS (S.D.N.Y.) (recovered $3 million dollars for class members).

Recently, Faruqi & Faruqi, LLP, as sole lead counsel, won a historic appeal in the United States Court of Appeals for the Fourth Circuit in *Zak v. Chelsea Therapeutics Inc. Int'l, Ltd.*, Civ. No. 13-2730 (2015), where the Court reversed a trial court's *scienter* ruling for the first time since the enactment of the Private Securities Litigation Reform Act of 1995 ("PSLRA"). The Court remanded the case to the district court, where Faruqi & Faruqi, LLP defeated defendants' motion to dismiss and subsequently obtained final approval of a $5.5 million settlement for the class. *McIntyre v. Chelsea Therapeutics Int'l, LTD*, No. 12-CV-213 (MOC) (DCK) (W.D.N.C.). In *In re Avalanche Biotechnologies Sec. Litig.*, No. 3:15-cv-03185-JD (N.D. Cal.), Faruqi & Faruqi, LLP served as sole lead counsel for the class in the federal court action, and, together with counsel in the parallel state court action, secured final approval of a $13 million global settlement of both actions on January 19, 2018. In *Rihn v. Acadia Pharmaceuticals, Inc.*, No. 3:15-cv-00575-BTM-DHB (S.D. Cal.), the court denied defendants' first motion to dismiss, and on January 8, 2018, Faruqi & Faruqi, LLP, as sole lead counsel for the class, secured final approval of a $2.95 million



settlement for the class.  In *In re Geron Corp., Sec. Litig.*, No. 14-CV-1424 (CRB) (N.D. Cal.), Faruqi & Faruqi, LLP, as sole lead counsel for the class, defeated defendants' motion to dismiss and, on July 21, 2017, obtained final approval of a settlement awarding $6.25 million to the class.  Also, in *In re Dynavax Techs. Corp. Sec. Litig.*, No. 13-CV-2796 (CRB) (N.D. Cal.), Faruqi & Faruqi, LLP, as sole lead counsel for the class, defeated defendants' motion to dismiss, and on February 6, 2017, secured final approval of a $4.5 million settlement on behalf of the class.  In *In re L&L Energy, Inc. Sec. Litig.*, No. 13-cv-6704 (RA) (S.D.N.Y.), Faruqi & Faruqi, LLP, as co-lead counsel, obtained final approval on July 31, 2015 of a $3.5 million settlement for the class.  In *In re Ebix, Inc. Securities Litigation*, No. 11-cv-2400 (RWS) (N.D. Ga.), the court denied defendants' motion to dismiss and Faruqi & Faruqi, LLP, as sole lead counsel, obtained final approval on June 13, 2014 of a $6.5 million settlement for the class.  In *Shapiro v. Matrixx Initiatives, Inc.*, No. CV-09-1479 (PHX) (ROS) (D. Ariz.), Faruqi & Faruqi, LLP, as co-lead counsel for the class, defeated defendants' motion to dismiss, succeeded in having the action certified as a class action, and secured final approval of a $4.5 million settlement for the class.  *See also In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*, No. 13 Civ. 214 (HB) (S.D.N.Y.) (as sole lead counsel, obtained final approval of a $1.34 million settlement on behalf of the class); *Simmons v. Spencer, et al.*, No. 13 Civ. 8216 (RWS) (S.D.N.Y.) (as co-lead counsel obtained final approval of settlement awarding $1.5 million to the class).

Additionally, Faruqi & Faruqi, LLP is serving as court-appointed lead counsel in the following cases:

- *Loftus v. Primero Mining Corp.*, No. 16-01034-BRO (RAOx) (C.D. Cal.) (appointed sole lead counsel for the class); and
- *Bielousov v. GoPro, Inc., et al.*, No. 4:16-CV-06654-CW (N.D. Cal.) (as sole lead counsel for the class, defeated defendants' motion to dismiss);
- *Cabrera Jr.* v. *Tahoe Resources, Inc., et al.*, No. 1:17-cv-05155-AT (S.D.N.Y.) (appointed sole lead counsel for the class).

## SHAREHOLDER MERGER AND TRANSACTIONAL LITIGATION

Faruqi & Faruqi, LLP is nationally recognized for its excellence in prosecuting shareholder class actions brought nationwide against officers, directors and other parties responsible for corporate wrongdoing. Most of these cases are based upon state statutory or common law principles involving fiduciary duties owed to investors by corporate insiders as well as Exchange Act violations.

Faruqi & Faruqi, LLP has obtained significant monetary and therapeutic recoveries, including millions of dollars in increased merger consideration for public shareholders; additional disclosure of significant material information so that shareholders can intelligently gauge the fairness of the terms of proposed transactions and other types of therapeutic relief designed to increase competitive bids and protect shareholder value.  As noted by Judge Timothy S. Black of the United States District Court for the Southern District of Ohio in appointing lead counsel *Nichting v. DPL Inc.*, Case No. 3:11-cv-14 (S.D. Ohio),

2



"[a]lthough all of the firms seeking appointment as Lead Counsel have impressive resumes, the Court is most impressed with Faruqi & Faruqi."

For example, in *Hall v. Berry Petroleum Co.*, No. 8476-VCG (Del. Ch.), Faruqi & Faruqi, LLP as sole lead counsel was credited by the Delaware Chancery Court with contributing to an increase in exchange ratio in an all-stock transaction that provided Berry Petroleum Co. stockholders with an additional $600 million in consideration for their shares as well as the disclosure of additional material information regarding the transaction. The court noted at the settlement hearing "[t]he ability of petitioning counsel [Faruqi] is known to the Court, and plaintiff's counsel [Faruqi] are well versed in the prosecution of corporate law actions." Faruqi & Faruqi, LLP achieved a similar result in *In Re Energysolutions, Inc. Shareholder Litigation*, Cons. C.A. No. 8203-VCG (Del. Ch.), in which the Faruqi Firm, as co-lead counsel, was credited in part with an increase in the merger consideration from $3.75 to $4.15 in cash per Energysolution share by the acquirer Energy Capital, and credited with additional material disclosures distributed to stockholders. In approving the settlement of the case and noting that the price increase amounted to an extra $36 million for stockholders, the Delaware Court stated that the standing and ability of the stockholders' counsel, including Faruqi & Faruqi, LLP and its co-counsel, is "…among the highest in our bar." *See In Re Energysolutions, Inc. S'holder Litig.*, Cons. C.A. No. 8203-VCG (Del. Ch. Feb. 11, 2014). In *In Re Jefferies Group, Inc. Shareholders Litigation*, C.A. No. 8059-CB (Del. Ch.), Faruqi & Faruqi, LLP acted as co-lead counsel representing Jeffries Group, Inc. stockholders in challenging the transaction with Leucadia National Corporation. After years of vigorous litigation, the parties reached a settlement that recovered $70 million additional consideration for the former Jeffries Group Inc. stockholders.

In *In re Playboy Enterprises, Inc. Shareholders Litigation*, Consol. C.A. No. 5632-VCN (Del. Ch.), Faruqi & Faruqi, LLP achieved a substantial post close settlement of $5.25 million. In *In re Cogent, Inc. Shareholders Litigation*, Consol. C.A. No. 5780-VC (Del. Ch.) Faruqi & Faruqi, LLP, as co-lead counsel, obtained a post-close cash settlement of $1.9 million after two years of hotly contested litigation; In *Rice v. Lafarge North America, Inc., et al.*, No. 268974-V (Montgomery Cty., Md. Circuit Ct.), Faruqi & Faruqi, LLP, as co-lead counsel represented the public shareholders of Lafarge North America ("LNA") in challenging the buyout of LNA by its French parent, Lafarge S.A., at $75.00 per share. After discovery and intensive injunction motions practice, the price per share was increased from $75.00 to $85.50 per share, or a total benefit to the public shareholders of $388 million. The Lafarge court gave Class counsel, including Faruqi & Faruqi, LLP, shared credit with a special committee appointed by the company's board of directors for a significant portion of the price increase.

Similarly, in *In re: Hearst-Argyle Shareholder Litig.,* Lead Case No. 09-Civ-600926 (N.Y. Sup. Ct.) as co-lead counsel for plaintiffs, Faruqi & Faruqi, LLP litigated, in coordination with Hearst-Argyle's special committee, an increase of over 12.5%, or $8,740,648, from the initial transaction value offered for Hearst-



Argyle Television Inc.'s stock by its parent company, Hearst Corporation.  Faruqi & Faruqi, LLP, in *In re Alfa Corp. Shareholder Litig.*, Case No. 03-CV-2007-900485.00 (Montgomery Cty, Ala. Cir. Ct.) was instrumental, along with the Company's special committee, in securing an increased share price for Alfa Corporation shareholders of $22.00 from the originally-proposed $17.60 per share offer, which represented over a $160 million benefit to class members, and obtained additional proxy disclosures to ensure that Alfa shareholders were fully-informed before making their decision to vote in favor of the merger, or seek appraisal.

Moreover, in *In re Fox Entertainment Group, Inc. S'holders Litig.*, Consolidated C.A. No. 1033-N (Del. Ch. 2005), Faruqi & Faruqi, LLP, a member of the three (3) firm executive committee, and in coordination with Fox Entertainment Group's special committee, created an increased offer price from the original proposal to shareholders, which represented an increased benefit to Fox Entertainment Group, Inc. shareholders of $450 million.  Also, in *In re Howmet Int'l S'holder Litig.*, Consolidated C.A. No. 17575 (Del. Ch. 1999) Faruqi & Faruqi, LLP, in coordination with Howmet's special committee, successfully obtained an increased benefit to class members of $61.5 million dollars).

Recently, in *In re Orchard Enterprises, Inc. Stockholder Litigation*, C.A. No. 7840-VCL (Del. Ch.), Faruqi & Faruqi, LLP acted as co-lead counsel with two other firms.  That action involved the approval of a merger by Orchard's Board of Directors pursuant to which Dimensional Associates LLC would cash-out the stock of Orchard's minority common stockholders at a price of $2.05 per share and then take Orchard private.  On April 11, 2014, the parties reached an agreement to settle their claims for a payment of $10.725 million to be distributed among the Class, which considerably exceeded the $2.62 per share difference between the $2.05 buyout price and the $4.67 appraisal price determined in *In re Appraisal of The Orchard Enterprises, Inc.*, C.A. No. 5713-CS, 2012 WL 2923305 (Del. Ch. July 18, 2012).

Faruqi also has noteworthy successes in achieving injunctive or declaratory relief pre and post close in cases where corporate wrongdoing deprives shareholders of material information or an opportunity to share in potential profits.  In *In re Harleysville Group, Inc. S'holders Litigation*, C.A. Bo. 6907-VCP (Del. Ch. 2014), Faruqi as sole lead counsel obtained significant disclosures for stockholders pre-close and secured valuable relief post close in the form of an Anti-Flip Provision providing former stockholders with 25% of any profits in Qualifying Sale.   In April 2012, Faruqi as sole lead obtained an unprecedented injunction in *Knee v. Brocade Communications Systems, Inc.*, No. 1-12-CV-220249, slip op. at 2 (Cal. Super. Ct. Apr. 10, 2012) (Kleinberg, J.).  In *Brocade*, Faruqi, as sole lead counsel for plaintiffs, successfully obtained an injunction enjoining Brocade's 2012 shareholder vote because certain information relating to projected executive compensation was not properly disclosed in the proxy statement.  (Order After Hearing [Plaintiff's Motion for Preliminary Injunction; Motions to Seal]).  In *Kajaria v. Cohen*, No. 1:10-CV-03141 (N.D. Ga., Atlanta Div.), Faruqi & Faruqi, LLP, succeeded in having the district court order Bluelinx Holdings

4



Inc., the target company in a tender offer, to issue additional material disclosures to its recommendation statement to shareholders before the expiration of the tender offer.

## SHAREHOLDER DERIVATIVE LITIGATION

Faruqi & Faruqi, LLP has extensive experience litigating shareholder derivative actions on behalf of corporate entities.  This litigation is often necessary when the corporation has been injured by the wrongdoing of its officers and directors.  This wrongdoing can be either active, such as the wrongdoing by certain corporate officers in connection with purposeful backdating of stock-options, or passive, such as the failure to put in place proper internal controls, which leads to the violation of laws and accounting procedures.  A shareholder has the right to commence a derivative action when the company's directors are unwilling or unable, to pursue claims against the wrongdoers, which is often the case when the directors themselves are the wrongdoers.

The purpose of the derivative action is threefold: (1) to make the company whole by holding those responsible for the wrongdoing accountable; (2) the establishment of procedures at the company to ensure the damaging acts can never again occur at the company; and (3) make the company more responsive to its shareholders.  Improved corporate governance and shareholder responsiveness are particularly valuable because they make the company a stronger one going forward, which benefits its shareholders. For example, studies have shown the companies with poor corporate governance scores have 5-year returns that are 3 .95% below the industry average, while companies with good corporate governance scores have 5-year returns that are 7.91 % above the industry-adjusted average.  The difference in performance between these two groups is 11 .86%.  *Corporate Governance Study: The Correlation between Corporate Governance and Company Performance*, Lawrence D. Brown, Ph.D., Distinguished Professor of Accountancy, Georgia State University and Marcus L. Caylor, Ph.D. Student, Georgia State University.  Faruqi & Faruqi, LLP has achieved all three of the above stated goals of a derivative action. The firm regularly obtains significant corporate governance changes in connection with the successful resolution of derivative actions, in addition to monetary recoveries that inure directly to the benefit of the company.  In each case, the company's shareholders indirectly benefit through an improved market price and market perception.

In *In re UnitedHealth Group Incorporated Derivative Litig.*, Case No. 27 CV 06-8065 (Minn. 4th Judicial Dist. 2009) Faruqi & Faruqi, LLP, as co-lead counsel for plaintiffs, obtained a recovery of more than $930 million for the benefit of the Company and corporate governance reforms designed to make UnitedHealth a model of corporate responsibility and transparency.  ***At the time, the settlement reached was believed to be the largest settlement ever in a derivative case***.  See "UnitedHealth's Former Chief

5



to Repay $600 Million," Bloomberg.com, December 6, 2007 ("the settlement . . . would be the largest ever in a 'derivative' suit . . . according to data compiled by Bloomberg.").

As co-lead counsel in *Weissman v. John, et al.*, Cause No. 2007-31254 (Tex. Harris County 2008) Faruqi & Faruqi, LLP, diligently litigated a shareholder derivative action on behalf of Key Energy Services, Inc. for more than three years and caused the company to adopt a multitude of corporate governance reforms which far exceeded listing and regulatory requirements. Such reforms included, among other things, the appointment of a new senior management team, the realignment of personnel, the institution of training sessions on internal control processes and activities, and the addition of 14 new accountants at the company with experience in public accounting, financial reporting, tax accounting, and SOX compliance.

More recently, Faruqi & Faruqi, LLP concluded shareholder derivative litigation in *The Booth Family Trust, et al. v. Jeffries, et al.*, Lead Case No. 05-cv-00860 (S.D. Ohio 2005) on behalf of Abercrombie & Fitch Co. Faruqi & Faruqi, LLP, as co-lead counsel for plaintiffs, litigated the case for six years through an appeal in the U.S. Court of Appeals for the Sixth Circuit where it successfully obtained reversal of the district court's ruling dismissing the shareholder derivative action in April 2011. Once remanded to the district court, Faruqi & Faruqi, LLP caused the company to adopt important corporate governance reforms narrowly targeted to remedy the alleged insider trading and discriminatory employment practices that gave rise to the shareholder derivative action.

The favorable outcome obtained by Faruqi & Faruqi, LLP in *In re Forest Laboratories, Inc. Derivative Litigation*, Lead Civil Action No. 05-cv-3489 (S.D.N.Y. 2005) is another notable achievement for the firm. After more than six years of litigation, Faruqi & Faruqi, LLP, as co-lead counsel, caused the company to adopt industry-leading corporate governance measures that included rigorous monitoring mechanisms and Board-level oversight procedures to ensure the timely and complete publication of clinical drug trial results to the investing public and to deter, among other things, the unlawful off-label promotion of drugs.

## ANTITRUST LITIGATION

The attorneys at Faruqi & Faruqi, LLP represent direct purchasers, competitors, third-party payors, and consumers in a variety of individual and class action antitrust cases brought under Sections 1 and 2 of the Sherman Act. These actions, which typically seek treble damages under Section 4 of the Clayton Act, have been commenced by businesses and consumers injured by anticompetitive agreements to fix prices or allocate markets, conduct that excludes or delays competition, and other monopolistic or conspiratorial conduct that harms competition.

***Actions for excluded competitors***. Faruqi & Faruqi represents competitors harmed by anticompetitive practices that reduce their sales, profits, and/or market share. One representative action is

6



*Babyage.com, Inc., et al. v. Toys "R" Us, Inc., et al.* where Faruqi & Faruqi was retained to represent three internet retailers of baby products, who challenged a dominant retailer's anticompetitive scheme, in concert with their upstream suppliers, to impose and enforce resale price maintenance in violation of §§ 1 and 2 of the Sherman Act and state law. The action sought damages measured as lost sales and profits. This case was followed extensively by the Wall Street Journal. After several years of litigation, this action settled for an undisclosed amount.

*Actions for direct purchasers*. Faruqi & Faruqi represents direct purchasers who have paid overcharges as a result of anticompetitive practices that raise prices. These actions are typically initiated as class actions. A representative action on behalf of direct purchasers is *Rochester Drug Co-Operative, Inc. v. Warner Chilcott Public Limited Company, et al.*, No. 12-3824 (E.D. Pa.), in which Faruqi & Faruqi was appointed co-lead counsel for the proposed plaintiff class under Federal Rule of Civil Procedure 23(g). Faruqi & Faruqi's attorneys are counsel to direct purchasers (typically wholesalers) in multiple such class actions.

*Actions for third-party payors*. Faruqi & Faruqi represents, both in class actions and in individual actions, insurance companies who have reimbursed their policyholders at too high a rate due to anticompetitive prices that raise prices. One representative action is *In re Tricor Antitrust Litigation*, No. 05-360 (D. Del.), where Faruqi & Faruqi represented PacifiCare and other large third-party payors challenging the conduct of Abbott Laboratories and Laboratories Fournier in suppressing generic drug competition, in violation of §§ 1 and 2 of the Sherman Act. The *Tricor* litigation settled for undisclosed amount in 2010.

*Results*. Faruqi & Faruqi's attorneys have consistently obtained favorable results in their antitrust engagements. Non-confidential results include the following: *In re Skelaxin (Metaxalone) Antitrust Litig.*, No. 12-md-2343, (E.D. Tenn.) ($73 million settlement); *In re Wellbutrin XL Antitrust Litig.*, No. 08-2431 (E.D. Pa.) ($37.5 million partial settlement); *In re Iowa Ready-Mixed Concrete Antitrust Litigation*, No. C 10-4038 (N.D. Iowa) ($18.5 million settlement); *In re Metoprolol Succinate Direct Purchaser Antitrust Litigation*, 06-52 (D. Del.) ($20 million settlement); *In re Ready-Mixed Concrete Antitrust Litigation*, No. 05-979 (S.D. Ind.) ($40 million settlement); *Rochester Drug Co-Operative, Inc., et al. v. Braintree Labs, Inc.*, No. 07-142-SLR (D. Del.) ($17.25 million settlement).

A more complete list of Faruqi & Faruqi's active and resolved antitrust cases can be found on its web site at *www.faruqilaw.com*.

## CONSUMER PROTECTION LITIGATION

Attorneys at Faruqi & Faruqi, LLP have advocated for consumers' rights, successfully challenging some of the nation's largest and most powerful corporations for a variety of improper, unfair and deceptive



business practices.  Through our efforts, we have recovered hundreds of millions of dollars and other significant remedial benefits for our consumer clients.

For example, in *Bates v. Kashi Co., et al.*, Case No. 11-CV-1967-H BGS (S.D. Cal. 2011), as co-lead counsel for the class, Faruqi & Faruqi, LLP secured a $5.0 million settlement fund on behalf of California consumers who purchased Kashi products that were deceptively labeled as "nothing artificial" and "all natural."  The settlement provides class members with a full refund of the purchase price in addition to requiring Kashi to modify its labeling and advertising to remove "All Natural" and "Nothing Artificial" from certain products.  As noted by Judge Marilyn L. Huff in approving the settlement, *"Plaintiffs' counsel has extensive experience acting as class counsel in consumer class action cases, including cases involving false advertising claims."*  Moreover, in *Thomas v. Global Vision Products*, Case No. RG-03091195 (California Superior Ct., Alameda Cty.), Faruqi & Faruqi, LLP served as co-lead counsel in a consumer class action lawsuit against Global Vision Products, Inc., the manufacturer of the Avacor hair restoration product and its officers, directors and spokespersons, in connection with the false and misleading advertising claims regarding the Avacor product.  Though the company had declared bankruptcy in 2007, Faruqi & Faruqi, LLP, along with its co-counsel, successfully prosecuted two trials to obtain relief for the class of Avacor purchasers.  In January 2008, a jury in the first trial returned a verdict of almost $37 million against two of the creators of the product.  In November 2009, another jury awarded plaintiff and the class more than $50 million in a separate trial against two other company directors and officers.  This jury award represented the largest consumer class action jury award in California in 2009 (according to VerdictSearch, a legal trade publication).

Additionally, in *Rodriguez v. CitiMortgage, Inc.*, Case No. 11-cv-04718-PGG-DCF (S.D.N.Y. 2011), Faruqi & Faruqi, LLP, as co-lead class counsel, reached a significant settlement with CitiMortgage related to improper foreclosure practices of homes owned by active duty servicemembers. The settlement was recently finalized pursuant to a Final Approval Order dated October 6, 2015, which provides class members with a monetary recovery of at least $116,785.00 per class member, plus the amount of any lost equity in the foreclosed property.

Below is a non-exhaustive list of settlements where Faruqi & Faruqi, LLP and its partners have served as lead or co-lead counsel:

▪ *In re Sinus Buster Products Consumer Litig.,* Case No. 1:12-cv-02429-ADS-AKT (E.D.N.Y. 2012). The firm represented a nationwide class of purchasers of assorted cold, flu and sinus products. A settlement was obtained, providing class members with a cash refund up to $10 and requiring defendant to discontinue the marketing and sale of certain products.
▪ *In re: Alexia Foods, Inc. Litigation.,* Case No. 4:11-cv-06119 (N.D. Cal. 2011).  The firm represented a proposed class of all persons who purchased certain frozen potato products that were deceptively advertised as "natural" or "all natural."  A settlement was obtained, providing class members with the



cash refunds up to $35.00 and requiring defendant to cease using a synthetic chemical compound in future production of the products.

- *In re: Haier Freezer Consumer Litig.*, Case No. 5:11-CV-02911-EJD (N.D. Cal. 2011). The firm represented a nationwide class of consumers who purchased certain model freezers, which were sold in violation of the federal standard for maximum energy consumption. A settlement was obtained, providing class members with cash payments of between $50 and $325.80.

- *Loreto v. Coast Cutlery Co.*, Case No. 11-3977 SDW-MCA (D.N.J. 2011) The firm represented a proposed nationwide class of people who purchased stainless steel knives and multi-tools that were of a lesser quality than advertised. A settlement was obtained, providing class members with a full refund of the purchase price.

- *Rossi v Procter & Gamble Company.*, Case No. 11-7238 (D.N.J. 2011). The firm represented a nationwide class of consumers who purchased deceptively marketed "Crest Sensitivity" toothpaste. A settlement was obtained, providing class members with a full refund of the purchase price.

- *In re: Michaels Stores Pin Pad Litig.*, Case No. 1:11-CV-03350 CPK (N.D. Ill. 2011). The firm represented a nationwide class of persons against Michaels Stores, Inc. for failing to secure and safeguard customers' personal financial data. A settlement was obtained, which provided class members with monetary recovery for unreimbursed out-of-pocket losses incurred in connection with the data breach, as well as up to four years of credit monitoring services.

- *Kelly, v. Phiten*, Case No. 4:11-cv-00067 JEG (S.D. Iowa 2011). The firm represented a proposed nationwide class of consumers who purchased Defendant Phiten USA's jewelry and other products, which were falsely promoted to balance a user's energy flow. A settlement was obtained, providing class members with up to 300% of the cost of the product and substantial injunctive relief requiring Phiten to modify its advertising claims.

- *In re: HP Power-Plug Litigation,* Case No. 06-1221 (N.D. Cal. 2006). The firm represented a proposed nationwide class of consumers who purchased defective laptops manufactured by defendant. A settlement was obtained, which provided full relief to class members, including among other benefits a cash payment up to $650.00 per class member, or in the alternative, a repair free-of-charge and new limited warranties accompanying repaired laptops.

- *Delre v. Hewlett-Packard Co.*, C.A. No. 3232-02 (N.J. Super. Ct. 2002). The firm represented a proposed nationwide class of consumers (approximately 170,000 members) who purchased, HP dvd-100i dvd-writers ("HP 100i") based on misrepresentations regarding the write-once ("DVD+R") capabilities of the HP 100i and the compatibility of DVD+RW disks written by HP 100i with DVD players and other optical storage devices. A settlement was obtained, which provided full relief to class members, including among other benefits, the replacement of defective HP 100i with its more current, second generation DVD writer, the HP 200i, and/or refunds the $99 it had charged some consumers to upgrade from the HP 100i to the HP 200i prior to the settlement.

In addition, Faruqi & Faruqi, LLP and its partners are currently serving as lead or co-lead counsel in the following class action cases:

- *Dei Rossi et al. v. Whirlpool Corp.,* Case No. 2:12-cv-00125-TLN-JFM (E.D. Cal. 2012) (representing a certified class of people who purchased mislabeled KitchenAid brand refrigerators from Whirlpool Corp.)

- *In re: Scotts EZ Seed Litigation*, Case No. 7:12-cv-04727-VB (S.D.N.Y. 2012) (representing a certified class of purchasers of mulch grass seed products advertised as a superior grass seed product capable of growing grass in the toughest conditions and with half the water.)

- *Forcellati et al., v Hyland's, Inc. et al.,* Case No. 2:12-cv-01983-GHK-MRW (C.D. Cal. 2012) (representing a certified nationwide class of purchasers of children's cold and flu products.)

9



- *Avram v. Samsung Electronics America, Inc., et al.,* Case No. 2:11-cv-06973 KM-MCA (D.N.J. 2011) (representing a proposed nationwide class of persons who purchased mislabeled refrigerators from Samsung Electronics America, Inc. for misrepresenting the energy efficiency of certain refrigerators.)
- *Dzielak v. Whirlpool Corp., et al.*, Case No. 12-CIV-0089 SRC-MAS (D.N.J. 2011) (representing a proposed nationwide class of purchasers of mislabeled Maytag brand washing machines for misrepresenting the energy efficiency of such washing machines.)
- *In re: Shop-Vac Marketing and Sales Practices Litigation,* Case No. 4:12-md-02380-YK (M.D. Pa. 2012) (representing a proposed nationwide class of persons who purchased vacuums or Shop Vac's with overstated horsepower and tank capacity specifications.)
- *In re: Oreck Corporation Halo Vacuum And Air Purifiers Marketing And Sales Practices Litigation*, MDL No. 2317 (the firm was appointed to the executive committee, representing a proposed nationwide class of consumers who purchased vacuums and air purifiers that were deceptively advertised effective in eliminating common viruses, germs and allergens.)

## EMPLOYMENT PRACTICES LITIGATION

Faruqi & Faruqi, LLP is a recognized leader in protecting the rights of employees.  The firm's Employment Practices Group is committed to protecting the rights of current and former employees nationwide.  The firm is dedicated to representing employees who may not have been compensated properly by their employer or who have suffered investment losses in their employer-sponsored retirement plan.  The firm also represents individuals (often current or former employees) who assert that a company has allegedly defrauded the federal or state government.

Faruqi & Faruqi represents current and former employees nationwide whose employers have failed to comply with state and/or federal laws governing minimum wage, hours worked, overtime, meal and rest breaks, and unreimbursed business expenses.  In particular, the firm focuses on claims against companies for (i) failing to properly classify their employees for purposes of paying them proper overtime pay, or (ii) requiring employees to work "off-the-clock," and not paying them for all of their actual hours worked.

In prosecuting claims on behalf of aggrieved employees, Faruqi & Faruqi has successfully defeated summary judgment motions, won numerous collective certification motions, and obtained significant monetary recoveries for current and former employees.  In the course of litigating these claims, the firm has been a pioneer in developing the growing area of wage and hour law.  In *Creely, et al. v. HCR ManorCare, Inc.*, C.A. No. 3:09-cv-02879 (N.D. OH), Faruqi & Faruqi, along with its co-counsel, obtained one of the first decisions to reject the application of the Supreme Court's Fed. R. Civ. P. 23 certification analysis in *Wal-Mart Stores, Inc. v. Dukes et. al.,* 131 S. Ct. 2541 (2011) to the certification process of collective actions brought pursuant to the Fair Labor Standards Act of 1938 ("FLSA").  The firm, along with its co-counsel, also recently won a groundbreaking decision for employees seeking to prosecute wage and hour claims on a collective basis in *Symczyk v. Genesis Healthcare Corp. et al.*, No. 10-3178 (3d Cir. 2011).  In *Symczyk,* the Third Circuit reversed the district court's ruling that an offer of judgment mooted a named plaintiff's claim in an action asserting wage and hour violations of the FLSA.  Notably, the Third Circuit also affirmed the

10



two-step process used for granting certification in FLSA cases. The *Creely* decision, like the Third Circuit's *Genesis* decision, will invariably be relied upon by courts and plaintiffs in future wage and hour actions.

Some of the firm's notable recoveries include *Bazzini v. Club Fit Management, Inc.,* C.A. No. 08-cv-4530 (S.D.N.Y. 2008), wherein the firm settled a FLSA collective action lawsuit on behalf of tennis professionals, fitness instructors and other health club employees on very favorable terms. Similarly, in *Garcia, et al., v. Lowe's Home Center, Inc., et al.*, C.A. No. GIC 841120 (Cal. Sup. Ct. 2008), Faruqi & Faruqi served as co-lead counsel and recovered $1.6 million on behalf of delivery workers who were unlawfully treated as independent contractors and not paid appropriate overtime wages or benefits.

The firm's Employment Practices Group also represents participants and beneficiaries of employee benefit plans covered by the Employee Retirement Income Security Act of 1874 ("ERISA"). In particular the firm protects the interests of employees in retirement savings plans against the wrongful conduct of plan fiduciaries. Often, these retirement savings plans constitute a significant portion of an employee's retirement savings. ERISA, which codifies one of the highest duties known to law, requires an employer to act in the best interests of the plan's participants, including the selection and maintenance of retirement investment vehicles. For example, an employer who administers a retirement savings plan (often a 401(k) plan) has a fiduciary obligation to ensure that the retirement plan's assets (including employee and any company matching contributions to the plan) are directed into appropriate and prudent investment vehicles.

Faruqi & Faruqi has brought actions on behalf of aggrieved plan participants where a company and/or certain of its officers breached their fiduciary duty by allowing its retirement plans to invest in shares of its own stock despite having access to materially negative information concerning the company which materially impacted the value of the stock. The resulting losses can be devastating to employees' retirement accounts. Under certain circumstances, current and former employees can seek to hold their employers accountable for plan losses caused by the employer's breach of their ERISA-mandated duties.

The firm's Employment Practices Group also represents whistleblowers in actions under both federal and state False Claims Acts. Often, current and former employees of business entities that contract with, or are otherwise bound by obligations to, the federal and state governments become aware of wrongdoing that causes the government to overpay for a good or service. When a corporation perpetrates such fraud, a whistleblower may sue the wrongdoer in the government's name to recover up to three times actual damages and additional civil penalties for each false statement made. Whistleblowers who initiate such suits are entitled to a portion of the recovery attained by the government, generally ranging from 15% to 30% of the total recovery.

False Claims Act cases often arise in context of Medicare and Medicaid fraud, pharmaceutical fraud, defense contractor fraud, federal government contractor fraud, and fraudulent loans and grants. For instance, in *United States of America, ex rel. Ronald J. Streck v. Allergan, Inc. et al.*, No. 2:08-cv-05135-

11



ER (E.D. Pa.), Faruqi & Faruqi represents a whistleblower in an un-sealed case alleging fraud against thirteen pharmaceutical companies who underpaid rebates they were obliged to pay to state Medicaid programs on drugs sold through those programs.

Based on its experience and expertise, the firm has served as the principal attorneys representing current and former employees in numerous cases across the country alleging wage and hour violations, ERISA violations and violations of federal and state False Claims Acts.

# ATTORNEYS

## NADEEM FARUQI

Mr. Faruqi is Co-Founder and Managing Partner of the firm.  Mr. Faruqi oversees all aspects of the firm's practice areas.  Mr. Faruqi has acted as sole lead or co-lead counsel in many notable class or derivative action cases, such as: *In re Olsten Corp. Secs. Litig.*, C.A. No. 97-CV-5056 (E.D.N.Y.) (recovered $25 million dollars for class members); *In re PurchasePro, Inc., Secs. Litig.*, Master File No. CV-S-01-0483 (D. Nev. 2001) ($24.2 million dollars recovery on behalf of the class in securities fraud action); *In re Avatex Corp. S'holders Litig.*, C.A. No. 16334-NC (Del. Ch. 1999) (established certain new standards for preferred shareholders rights); *Dennis v. Pronet, Inc.*, C.A. No. 96-06509 (Tex. Dist. Ct.) (recovered over $15 million dollars on behalf of shareholders); *In re Tellium, Inc. Secs. Litig.*, C.A. No. 02-CV-5878 (D.N.J.) (class action settlement of $5.5 million); *In re Tenet Healthcare Corp. Derivative Litig.*, Lead Case No. 01098905 (Cal. Sup. Ct. 2002) (achieved a $51.5 million benefit to the corporation in derivative litigation).

Upon graduation from law school, Mr. Faruqi was associated with a large corporate legal department in New York.  In 1988, he became associated with Kaufman Malchman Kirby & Squire, specializing in shareholder litigation, and in 1992, became a member of that firm.  While at Kaufman Malchman Kirby & Squire, Mr. Faruqi served as one of the trial counsel for plaintiff in *Gerber v. Computer Assocs. Int'l, Inc.*, 91-CV-3610 (E.D.N.Y. 1991).  Mr. Faruqi actively participated in cases such as: *Colaprico v. Sun Microsystems*, No. C-90-20710 (N.D. Cal. 1993) (recovery in excess of $5 million on behalf of the shareholder class); *In re Jackpot Secs. Enters., Inc. Secs. Litig.*, CV-S-89-805 (D. Nev. 1993) (recovery in excess of $3 million on behalf of the shareholder class); *In re Int'l Tech. Corp. Secs. Litig.*, CV 88-440 (C.D. Cal. 1993) (recovery in excess of $13 million on behalf of the shareholder class); and *In re Triangle Inds., Inc. S'holders Litig.*, C.A. No. 10466 (Del. Ch. 1990) (recovery in excess of $70 million).

Mr. Faruqi earned his Bachelor of Science Degree from McGill University, Canada (B.Sc. 1981), his Master of Business Administration from the Schulich School of Business, York University, Canada (MBA 1984) and his law degree from New York Law School (J.D., *cum* laude, 1987).  Mr. Faruqi was Executive Editor of New York Law School's Journal of International and Comparative Law.  He is the author of "Letters

12



of Credit: Doubts As To Their Continued Usefulness," Journal of International and Comparative Law, 1988. He was awarded the Professor Ernst C. Stiefel Award for Excellence in Comparative, Common and Civil Law by New York Law School in 1987.

Mr. Faruqi is licensed to practice law in New York and is admitted to the United States District Courts for the Southern, Eastern and Western Districts of New York, and the District of Colorado, and the United States Court of Appeals for the Second and Third Circuits.

## LUBNA M. FARUQI

Ms. Faruqi is Co-Founder of Faruqi & Faruqi, LLP.  Ms. Faruqi is involved in all aspects of the firm's practice.  Ms. Faruqi has actively participated in numerous cases in federal and state courts which have resulted in significant recoveries for shareholders.

Ms. Faruqi was involved in litigating the successful recovery of $25 million to class members in *In re Olsten Corp. Secs. Litig.*, C.A. No. 97-CV-5056 (E.D.N.Y.).  She helped to establish certain new standards for preferred shareholders in Delaware in *In re Avatex Corp. S'holders Litig.*, C.A. No. 16334-NC (Del. Ch. 1999).  Ms. Faruqi was also lead attorney in *In re Mitcham Indus., Inc. Secs. Litig.*, Master File No. H-98-1244 (S.D. Tex. 1998), where she successfully recovered $3 million on behalf of class members despite the fact that the corporate defendant was on the verge of declaring bankruptcy.

Upon graduation from law school, Ms. Faruqi worked with the Department of Consumer and Corporate Affairs, Bureau of Anti-Trust, the Federal Government of Canada.  In 1987, Ms. Faruqi became associated with Kaufman Malchman Kirby & Squire, specializing in shareholder litigation, where she actively participated in cases such as: *In re Triangle Inds., Inc. S'holders Litig.*, C.A. No. 10466 (Del. Ch. 1990) (recovery in excess of $70 million); *Kantor v. Zondervan Corp.*, C.A. No. 88 C5425 (W.D. Mich. 1989) (recovery of $3.75 million on behalf of shareholders); and *In re A.L. Williams Corp. S'holders Litig.*, C.A. No. 10881 (Del. Ch. 1990) (recovery in excess of $11 million on behalf of shareholders).

Ms. Faruqi graduated from McGill University Law School at the age of twenty-one with two law degrees: Bachelor of Civil Law (B.C.L.) (1980) and a Bachelor of Common Law (L.L.B.) (1981).

Ms. Faruqi is licensed to practice law in New York and is admitted to the United States District Court for the Southern District of New York.

## PETER KOHN

Mr. Kohn is a partner in Faruqi & Faruqi, LLP's Pennsylvania office.

Prior to joining the firm, Mr. Kohn was a shareholder at Berger & Montague, P.C., where he prepared for trial several noteworthy lawsuits under the Sherman Act, including *In re Buspirone Patent & Antitrust Litigation*, MDL No. 1410 (S.D.N.Y.) ($220M settlement), *In re Cardizem CD Antitrust Litigation*,

13



No. 99-MD-1278 (E.D. Mich.) ($110M settlement), *Meijer, Inc. v. Warner-Chilcott*, No. 05-2195 (D.D.C.) ($22M settlement), *In re Relafen Antitrust Litigation*, No. 01-12239 (D. Mass.) ($175M settlement), *In re Remeron Direct Purchaser Antitrust Litigation*, No. 03-cv-0085 (D.N.J.) ($75M settlement), *In re Terazosin Hydrochloride Antitrust Litigation*, No. 99-MDL-1317 (S.D. Fla.) ($72.5M settlement), and *In re Tricor Direct Purchaser Antitrust Litig.*, No. 05-340 (D. Del.) ($250M settlement). The court appointed him as co-lead counsel for the plaintiffs in *In re Pennsylvania Title Ins. Antitrust Litig.*, No. 08cv1202 (E.D. Pa.) (pending action on behalf of direct purchasers of title insurance alleging illegal cartel pricing under § 1 of the Sherman Act).

A sampling of Mr. Kohn's reported cases in the antitrust arena includes *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, Civil Action No. 14-md-02503-DJC, 2015 U.S. Dist. LEXIS 125999 (D. Mass. Aug. 14, 2015) (denying motion to dismiss reverse payment claims under the Sherman Act); *King Drug Co. of Florence v. Cephalon, Inc.*, 88 F. Supp. 3d 402 (E.D. Pa. 2015) (reverse payment claims under the Sherman Act survived summary judgment); *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 64 F. Supp. 3d 665 (E.D. Pa. 2014) (denying motion to dismiss product hopping claims under the Sherman Act); *In re Lidoderm Antitrust Litig.*, 74 F. Supp. 3d 1052 (N.D. Cal. 2014) (denying motion to dismiss reverse payment claims under the Sherman Act); *Mylan Pharms., Inc. v. Warner Chilcott Pub.*, No. 12-3824, 2013 U.S. Dist. LEXIS 152467 (E.D. Pa. June 11, 2013) (denying motion to dismiss product hopping claims under the Sherman Act); *In re Hypodermic Prods. Antitrust Litig.*, 484 Fed. Appx. 669 (3d Cir. 2012) (issue of direct purchaser standing under Illinois Brick); *Wallach v. Eaton Corp.*, 814 F. Supp. 2d 428 (D. Del. 2011) (application of the Third Circuit's "complete involvement" exception to the in pari delicto doctrine); *Delaware Valley Surgical Supply Inc. v. Johnson & Johnson*, 523 F.3d 1116 (9th Cir. 2008) (issue of direct purchaser standing under *Illinois Brick*); *Babyage.com, Inc. v. Toys "R" Us, Inc.*, 558 F. Supp.2d 575 (E.D. Pa. 2008) (denying defendants' motion to dismiss following the Supreme Court's decisions in *Twombly* and *Leegin*, and for the first time in the Third Circuit adopting the Merger Guidelines method of relevant market definition); *J.B.D.L. Corp. v. Wyeth-Ayerst Laboratories, Inc.*, 485 F.3d 880 (6th Cir. 2007) (affirming summary judgment in exclusionary contracting case); and *Babyage.com, Inc. v. Toys "R" Us, Inc.*, 458 F. Supp.2d 263 (E.D. Pa. 2006) (discoverability of surreptitiously recorded statements prior to deposition of declarant).

Mr. Kohn is a 1989 graduate of the University of Pennsylvania (B.A., English) and a 1992 *cum laude* graduate of Temple University Law School, where he was senior staff for the *Temple Law Review* and received awards for trial advocacy. Mr. Kohn was recognized as a "recommended" antitrust attorney in the Northeast in 2009 by the Legal 500 guide (www.legal500.com) and was chosen by his peers as a "SuperLawyer" in Pennsylvania in 2009 - 2013, and 2016. Mr. Kohn was an invited speaker at the ABA Section of Antitrust Law's 2016 Spring Meeting in Washington, D.C., for the Health Care & Pharmaceuticals

14



and State Enforcement Committee's program, "Exclusionary or Not?  Product Hopping and REMS." He was also invited to speak for the ABA Section of Antitrust Law's program "Product Hopping Cases:  Where Are We and Where Are We Headed" in December 2015, as well as Harris Martin Publishing's Antitrust Pay-for-Delay Litigation Conference in 2014 and 2015.  In 2011, Mr. Kohn was selected as a Fellow in the Litigation Counsel of America, a trial lawyer honorary society composed of less than one-half of one percent of American lawyers.  He is a member of the bars of the Supreme Court of Pennsylvania (1992-present), the United States District Court for the Eastern District of Pennsylvania (1995-present), the United States District Court for the Eastern District of Michigan (2010-present), the United States Court of Appeals for the Third Circuit (2000-present), the United States Court of Appeals for the Sixth Circuit (2005-present), the United States Court of Appeals for the Ninth Circuit (2016-present), and the United States Court of Appeals for the Federal Circuit (2011-present).

## RICHARD W. GONNELLO

Richard W. Gonnello is a partner in Faruqi & Faruqi, LLP's New York office.

Prior to joining the firm, Mr. Gonnello was a partner at Entwistle & Cappucci LLP and an associate at Latham & Watkins LLP.  He began his career representing large corporations in litigation, arbitration, and governmental investigations.  Mr. Gonnello now represents shareholders in securities fraud cases and other investment disputes.

Mr. Gonnello has represented institutional and individual investors in obtaining substantial recoveries in numerous class actions, including *In re Royal Ahold Sec. Litig.*, No. 03-md-01539 (D. Md. 2003) ($1.1 billion) and *In re Tremont Securities Law, State Law and Insurance Litigation*, No. 08-cv-11117 (S.D.N.Y. 2011) ($100 million+).  Mr. Gonnello has also obtained favorable recoveries for institutional investors pursuing direct securities fraud claims, including cases against *Qwest Communications International, Inc.* ($175 million+) and *Tyco Int'l Ltd* ($21 million).

Mr. Gonnello has successfully argued numerous cases, including *Zak v. Chelsea Therapeutics Int'l, Ltd.*, Civ. No. 13-2370 (2015), which was before the Fourth Circuit Court of Appeals and resulted in the Court's first reversal of a district court's dismissal in the twenty years since the Private Securities Litigation Reform Act was enacted in 1995.

Mr. Gonnello has co-authored the following articles:  "*'Staehr' Hikes Burden of Proof to Place Investor on Inquiry Notice*, "New York Law Journal, December 15, 2008; and "*Potential Securities Fraud: 'Storm Warnings' Clarified*," New York Law Journal, October 23, 2008.

Mr. Gonnello attended the University of Chicago, where he was named to the Dean's List every quarter, and thereafter graduated *summa cum laude* from Rutgers University in 1995, where he was named

15



Phi Beta Kappa.  He received his law degree from UCLA School of Law (J.D. 1998), and was a member of the UCLA Journal of Environmental Law & Policy.

Mr. Gonnello is licensed to practice law in New York and is admitted to the United States District Courts for the Southern and Eastern Districts of New York and the United States Court of Appeals for the Second, Fourth, Seventh and Ninth Circuits.

## JOSEPH T. LUKENS

Mr. Lukens is a partner in Faruqi & Faruqi, LLP's Pennsylvania office.

Mr. Lukens was a shareholder at the Philadelphia firm of Hangley Aronchick Segal Pudlin & Schiller, where he represented large retail pharmacy chains as opt-out plaintiffs in numerous lawsuits under the Sherman Act.  Among those lawsuits were *In re Brand Name Prescription Drugs Antitrust Litigation* (MDL 897, N.D. Ill.), *In re Terazosin Hydrochloride Antitrust Litigation* (MDL 1317, S.D. Fla.), *In re TriCor Direct Purchaser Antitrust Litigation* (05-605, D. Del.), *In re Nifedipine Antitrust Litigation* (MDL1515, D.D.C.), *In re OxyContin Antitrust Litigation* (04-3719, S.D.N.Y), and *In re Chocolate Confectionary Antitrust Litigation* (MDL 1935, M.D. Pa.).  While the results in the opt-out cases are confidential, the parallel class actions in those matters which are concluded have resulted in settlements exceeding $1.1 billion.

Earlier in his career, Mr. Lukens concentrated in commercial and civil rights litigation at the Philadelphia firm of Schnader, Harrison, Segal & Lewis.  The types of matters that Mr. Lukens handled included antitrust, First Amendment, contracts, and licensing.  Mr. Lukens also worked extensively on several notable *pro bono* cases including *Commonwealth v. Morales*, which resulted in a rare reversal on a second post-conviction petition in a capital case in the Pennsylvania Supreme Court.

Mr. Lukens graduated from LaSalle University (B.A. Political Science, *cum laude*, 1987) and received his law degree from Temple University School of Law (J.D., *magna cum laude*, 1992) where he was an editor on the *Temple Law Review* and received several academic awards.  After law school, Mr. Lukens clerked for the Honorable Joseph J. Longobardi, Chief Judge for the United States District Court for the District of Delaware (1992-93).  Mr. Lukens is a member of the bars of the Supreme Court of Pennsylvania (1992-present), the United States Supreme Court (1996-present); the United States District Court for the Eastern District of Pennsylvania (1993-present), the United States Court of Appeals for the Third Circuit (1993-present), and the United States Court of Appeals for the District of New Jersey (1994-present).

Mr. Lukens has several publications, including: *Bringing Market Discipline to Pharmaceutical Product Reformulations*, 42 Int'l Rev. Intel. Prop. & Comp. Law 698 (September 2011) (co-author with Steve Shadowen and Keith Leffler); *Anticompetitive Product Changes in the Pharmaceutical Industry*, 41 Rutgers L.J. 1 (2009) (co-author with Steve Shadowen and Keith Leffler); *The Prison Litigation Reform Act: Three*

16



*Strikes and You're Out of Court — It May Be Effective, But Is It Constitutional?,* 70 Temp. L. Rev. 471 (1997); *Pennsylvania Strips The Inventory Search Exception From Its Rationale – Commonwealth v. Nace*, 64 Temp. L. Rev. 267 (1991).

## STUART J. GUBER

Stuart J. Guber is a Partner in Faruqi & Faruqi, LLP's Pennsylvania office.

Mr. Guber focuses his practice on representing institutional and individual investors in class actions under the federal securities laws, shareholder derivative suits and mergers and acquisitions litigation, as well as other complex litigation representing consumers.  During his 25-year career as a securities and complex litigator, Mr. Guber, as one of the lead attorneys, has successfully litigated numerous shareholder cases to settlement and verdict including *In re Rite Aid Pharmacy Sec. Litig.*, No. MDL 1360 (E.D. Pa) ($320 Million settlement of securities class action); *In re Tycom Ltd. Sec. Litig.*, No. 03-CV-03540 (D. Conn.) ($79 million settlement in securities class action); *In re Providian Financial Corp. Sec. Litig.*, No. 01-CV-3952 (N.D. Cal.) ($65 million settlement in securities class action); *In re Bell South Corp. Sec. Litig.*, No. 02-CV-2142 (N.D. Ga.) ($35 million settlement in securities class action); *In re Evergreen Ultra Short Opportunities Fund Sec. Litig.*, No. 1:08-CV-11064 (D. Mass.) ($25 million class action securities settlement in which participating class members will recover over 65% of their losses); *Robbins v. Koger Properties*, No. 90-896-civ-J-10 (M.D. Flo.) (plaintiffs' trial counsel in jury verdict awarding $81.3 million in damages); *Maiocco, et al. v. Greenway Capital Corp.*, et al., NASD No. 94-04396 (Lead trial counsel for plaintiffs in securities arbitration awarding $227,000 in compensatory damages and $100,000 in punitive damages); *Solomon v. T.F.M., Inc.* (achieved defense verdict as lead trial counsel in securities arbitration representing Philadelphia Stock Exchange options trading firm); *Minerva Group LP v. Keane*, Index No. 800621 (Sup. Ct. NY) (mergers and acquisitions case settled for amendments to merger agreement, additional disclosures and a price bump per share to be paid shareholders from $8.40 per share to $9.25 per share in merger consideration). Mr. Guber has successfully litigated consumer class actions (for e.g., *Nepomuceno v. Knights of Columbus*, No. Civ. A. 96 C 4789 (N.D. Ill.), settled for $22 million in life insurance vanishing premium consumer fraud case) and successfully defended at trial a union health and welfare fund being sued by a healthcare provider (*Centre for Neuro Skills, Inc.-Texas v. Specialties & Paper Products Union No. 527 Health and Welfare Fund*, No. CC-07-10150-A (Cty. Ct. Dallas, Tex.), lead trial defense counsel securing a directed verdict in favor of defendant).

Mr. Guber has also been involved as lead or co-lead counsel in litigation producing a number of noteworthy published decisions including: *South Ferry LP v. Killinger*, 542 F.3d 776 (9th Cir. 2008); *Koehler v. Brody*, 483 F.3d 590 (8th Cir. 2007); *Wagner v. First Horizon Pharm. Corp.*, 464 F.3d 1273 (11th Cir. 2006); *Garfield v. NDC Health*, 466 F.3d 1255 (11th Cir. 2006); *In re Cerner Corp. Sec. Litig.*, 425 F.3d

17



1079 (8th Cir. 2005); *Nevius v. Read-Rite Corp.*, 335 F.3d 843 (9th Cir. 2003); *Robbins v. Koger Properties*, 116 F.3d 1441 (11th Cir. 1997); *Schreiber v. Kellogg*, 50 F.3d 264 (3d Cir. 1995); *In re Evergreen Ultra Short Opportunities Fund Se. Litig.*, 275 F.R.D. 382 (D. Mass. 2011) *Marsden v. Select Med. Corp.*, 246 F.R.D. 480 (E.D. Pa. 2007); *In re Friedman's Inc. Securities Litigation*, 385 F. Supp. 2d 1345 (N.D. Ga. 2005); *In re Bellsouth Corp. Sec. Litig.*, 355 F. Supp. 2d 1350 (N.D. Ga. 2005); *Tri-Star Farms Ltd. v. Marconi*, PLC, et al., 225 F. Supp. 2d 567 (W.D. Pa. 2002); *In re Campbell Soup Company Securities Litigation*, 145 F. Supp. 2d 574 (D.N.J. 2001); *In re Rite Aid Corp. Securities Litigation*, 146 F. Supp. 2d 706 (E.D. Pa. 2001); *In re ValuJet, Inc. Securities Litigation*, 984 F. Supp. 1472 (N.D. Ga.1997); *Schreiber v. Kellogg*, 194 B.R. 559 (E.D. Pa. 1996); *Schreiber v. Kellogg*, 839 F. Supp. 1157 (E.D. Pa. 1993); *Schreiber v. Kellogg*, 838 F. Supp. 998 (E.D. Pa.1993).

Mr. Guber is admitted to practice before the state bars of Pennsylvania and Georgia and is admitted to numerous federal courts including: United States District Courts for the Eastern District of Pennsylvania, Northern District of Georgia, Eastern District of Michigan and District of Colorado; and the United States Circuit Courts of Appeals for the First, Third, Eighth, Ninth, Tenth and Eleventh Circuits. He graduated with a Juris Doctor from Temple University School of Law (1990) and with a B.S. in Business Administration, majoring in accounting from Temple University (1986).

## JAMES M. WILSON, JR.

James M. Wilson, Jr. is a Partner in Faruqi & Faruqi LLP's New York office

Prior to joining Faruqi & Faruqi, Mr. Wilson was a partner at Chitwood Harley Harnes, LLP, and a senior associate with Reed Smith, LLP. Mr. Wilson has represented institutional pension funds, corporations and individual investors in courts around the country and obtained significant recoveries, including the following securities class actions: *In re ArthroCare Sec. Litig.* No. 08-0574 (W.D. Tex.) ($74 million); *In re Maxim Integrated Prod. Sec. Litig.*, No. 08-0832 (N.D.Cal.) ($173 million); *In re TyCom Ltd. Sec. Litig.*, MDL No. 02-1335 (D.N.H.) ($79 million); and *In re Providian Fin. Corp. Sec. Litig.*, No. 01-3952 (N.D. Cal.). Mr. Wilson also has obtained significant relief for shareholders in merger suits, including the following: *In re Zoran Corporation Shareholders Litig.*, No. 6212-VCP (Del. Chancery); and *In re The Coca-Cola Company Shareholder Litigation*, No. 10-182035 (Fulton County Superior Ct.).

Mr. Wilson has authored numerous articles addressing current developments including the following Expert Commentaries published by Lexis Nexis: *The Liability Faced By Financial Institutions From Exposure To Subprime Mortgages; Losses Attributable To Sub-Prime Mortgages; The Supreme Court's Decision in Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc. et al.; Derivative Suite by LLC Members in New York: Tzolis v. Wolff*, 10 N.Y.3d 100 (Feb. 14, 2008).

18



Mr. Wilson obtained his undergraduate degree from Georgia State University (B.A. 1988), his law degree from the University of Georgia (J.D. 1991), and Masters in Tax Law from New York University (LL.M. 1992). He is licensed to practice law in Georgia and New York and is admitted to the United States District Courts for Middle and Northern Districts of Georgia, the Eastern and Southern Districts of New York, the Eastern District of Michigan and the District of Colorado, and the United States Courts of Appeals for the Second, Fifth and Eleventh Circuits.

## ROBERT W. KILLORIN

Robert W. Killorin is a Partner with the firm, and is based in Atlanta.  His practice is focused on shareholder merger and securities litigation. Mr. Killorin is an accomplished trial lawyer with over twenty years of experience in civil litigation.  Prior to joining Faruqi & Faruqi, Mr. Killorin was a partner at the firm of Chitwood Harley Harnes, LLP where he specialized in complex securities litigation.  Mr. Killorin has represented numerous individual plaintiffs, as well as institutional pension funds, corporations and individual investors in courts around the country.  He has obtained significant recoveries, including the following securities class actions: *In re FireEye, Inc. Sec. Litig.,* No. 14-266866 ($10 million settlement pending); *In re ArthroCare Sec. Litig.* No. 08-0574 (W.D. Tex.) ($74 million); *In re Maxim Integrated Prod. Sec. Litig.*, No. 08-0832 (N.D. Cal.) ($173 million); *In re TyCom Ltd. Sec. Litig.*, MDL No. 02-1335 (D.N.H.) ($79 million); and *In re Providian Fin. Corp. Sec. Litig.*, No. 01-3952 (N.D. Cal.). Mr. Killorin has obtained significant relief for shareholders in merger suits, including the following: *In re The Coca-Cola Company Shareholder Litigation*, No. 10-182035 (Fulton County Superior Ct.).

Mr. Killorin authored "Preparing Clients to Testify" – Chapter 19 of *Civil Trial Practice, Winning Techniques of Successful Trial Attorneys*, Lawyers and Judges Publishing Company (2000), and has written articles and lectured on various legal topics. He is listed in Who's Who in American Law and is an AV® Preeminent™ Peer Review Rated attorney.

Mr. Killorin obtained his undergraduate degree from Duke University (B.A., cum laude, 1980) and his law degree from the University of Georgia (J.D. 1983) where he was on the national mock trial team and a national moot court team.  He is licensed to practice law in Georgia and is admitted to the United States Supreme Court, the United States Courts of Appeals for the Tenth and Eleventh Circuits, and the United States District Courts for Middle and Northern Districts of Georgia.

## BRADLEY J. DEMUTH

Bradley J. Demuth's practice is focused on complex antitrust litigation with particular expertise in cases involving pharmaceutical overcharges resulting from delayed generic entry schemes, price fixing, and other anticompetitive conduct.  Mr. Demuth is a partner in the firm's New York office.

19



Upon graduating, cum laude, from American University Washington College of Law (1999), Mr. Demuth served as a law clerk to the United States Court of Appeals for the Second Circuit.  While thereafter associated with Cadwalader, Wickersham & Taft LLP and Skadden, Arps, Slate, Meager & Flom LLP, Mr. Demuth successfully represented several national and multinational corporate defendants in a wide range of antitrust and other commercial disputes.  His antitrust experience includes litigating issues in the pharmaceutical, high-tech, professional sports, consumer goods, luxury goods, financial benchmarking, commodities, and industrial materials contexts.  In 2008, Mr. Demuth received the Pro Bono Service Award for briefing and arguing an appeal made to the New York Supreme Court Appellate Term (1st Dep't) on behalf of displaced low-income tenants.  From 2009-2010, Mr. Demuth served as a Special Assistant Corporation Counsel and acting lead trial counsel for the City of New York, where among other favorable resolutions, he obtained a verdict for the City after a two-week trial in Richardson v. City of New York (Index. No. 14216-99).

Upon joining the Plaintiffs' bar in 2012, Mr. Demuth has made notable contributions in several high-profile pharmaceutical antitrust cases that resulted in significant recoveries, including in:

- American Sales Company, LLC v. Pfizer, Inc. (E.D. Va.) (re Celebrex) (October 2017 $94 million dollar settlement pending final approval);
- In re Aggrenox Antitrust Litigation (D. Conn.) ($146 million settlement);
- Castro v. Sanofi Pasteur, Inc. (D.N.J.) (re Menactra) ($61.5 million settlement); and
- In re Flonase Antitrust Litigation (E.D. Pa.) ($150 million settlement).

Mr. Demuth is also currently involved in several other pending high-profile pharmaceutical antitrust matters including:  In re Generic Pharmaceutical Pricing Antitrust Litigation (E.D. Pa.); In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litigation (E.D.N.Y.); and In re Intuniv Antitrust Litigation (D. Mass.).

Mr. Demuth is a member of the New York State bar and is admitted to practice before the United States Court of Appeals for the Second Circuit, and the United States District Courts for the Southern and Eastern Districts of New York and the District of Colorado.

## TIMOTHY J. PETER

Timothy J. Peter is a Partner in Faruqi & Faruqi, LLP's Pennsylvania office and focuses his practice on securities law and complex civil litigation.

Prior to joining Faruqi & Faruqi, Mr. Peter was an Associate at Cohen Placittella & Roth, P.C. where he was involved in such high profile litigation as: *In re Vioxx Products Liability Litigation* ($8.25 million recovery for the Commonwealth of Pennsylvania) and *In re Evergreen Ultra Short Opportunities Fund Securities Litigation* ($25 million class action securities settlement in which participating class members will

20



recover over 65% of their losses). In addition, Mr. Peter played an important role in the resolution of *In re Minerva Group LP v. Mod-Pac Corp., et al.*, in which defendants increased the price of an insider buyout from $8.20 to $9.25 per share, a significant victory for shareholders. Prior to attending law school, Mr. Peter worked for one of largest financial institutions in the world where he gained significant insight into the inner workings of the financial services industry.

Mr. Peter is a 2009 cum laude graduate of the Michigan State University College of Law, where he served as an associate editor of the Journal of Medicine and Law. He received his undergraduate degree in Economics from the College of Wooster in 2002.

Mr. Peter is admitted to practice in the Commonwealth of Pennsylvania and the U.S. District Court for the Eastern District of Pennsylvania.

## ADAM STEINFELD

Adam Steinfeld is a Partner in Faruqi & Faruqi, LLP's New York office. He practices in the area of antitrust litigation with a focus on competition in the pharmaceutical industry.

Mr. Steinfeld has litigated successfully with significant contributions in *In re Buspirone Patent & Antitrust Litigation*, MDL No. 1410 (S.D.N.Y.) ($220M settlement); *In re Cardizem CD Antitrust Litigation*, No. 99-MD-1278 (E.D. Mich.) ($110M settlement); *In re Relafen Antitrust Litigation*, No. 01-12239 (D. Mass.) ($175M settlement); *In re Remeron Direct Purchaser Antitrust Litigation*, No. 03-cv-0085 (D.N.J.) ($75M settlement); *In re Terazosin Hydrochloride Antitrust Litigation*, No. 99-MDL-1317 (S.D. Fla.) ($72.5M settlement); *In re Tricor Direct Purchaser Antitrust Litig.*, No. 05-340 (D. Del.) ($250M settlement); and *Mylan Pharms., Inc. v. Warner Chilcott*, No. 12-cv-3824 (E.D. Pa.) ($12 million settlement).

Prior to joining Faruqi & Faruqi, Mr. Steinfeld was associated with Grant and Eisenhofer, P.A. (2011-2015) and a partner at Garwin, Gerstein and Fisher, LLP, New York (1997-2009).

Mr. Steinfeld is the author of Nuclear Objections: The Persistent Objector and the Legality of the Use of Nuclear Weapons, 62 Brooklyn L. Rev. 1635 (winter, 1996).

Mr. Steinfeld received his law degree from Brooklyn Law School (J.D., 1997) where he was an editor on the Brooklyn Law Review and received several academic awards. Mr. Steinfeld is a member of the bars of the States of New York, New Jersey and Massachusetts; and is admitted to practice before the United States District Courts for the District New Jersey, Eastern District of New York, Southern District of New York, and Western District of New York. Mr. Steinfeld graduated from Brandeis University (B.A., Politics, 1994).

21



## MICHAEL VAN GORDER

Michael Van Gorder's practice is focused on securities litigation.  Mr. Van Gorder is a Partner in the firm's Delaware office.

Prior to joining F&F, Mr. Van Gorder served as a law clerk to the Honorable James T. Vaughn, Jr. of the Delaware Supreme Court (2015-16).  While attending law school, Mr. Van Gorder served as the Editor-in-Chief of the Delaware Journal of Corporate Law and was selected as a Josiah Oliver Wolcott Fellow with the Delaware Supreme Court.  Before law school, Mr. Van Gorder worked in the private bank of a global financial services firm where he held multiple securities licenses.

Mr. Van Gorder has authored the following article:  Boilermakers v. Chevron:  Are Board Adopted Arbitration Bylaws Valid Under Delaware's General Corporation Law?, 39 Del. J. Corp. L. 443 (2014).

Mr. Van Gorder received his J.D., magna cum laude, from Widener University School of Law (2015).  Mr. Van Gorder received his B.S., Business Management, 2008; M.B.A., Finance, 2011, from Wilmington University.

Mr. Van Gorder is licensed to practice law in the state of Delaware and is admitted to the United States District Courts for the District of Delaware and District of Colorado.

## BENJAMIN HEIKALI

Benjamin Heikali's practice is focused on securities and consumer litigation.  Mr. Heikali is a Partner in the firm's Los Angeles office.

Prior to joining F&F, Mr. Heikali interned at the U.S. Securities and Exchange Commission, Division of Enforcement, focusing on municipal bond litigation and financial fraud work.

Mr. Heikali graduated U.C.L.A. School of Law (J.D., 2015).  During law school, Mr. Heikali was awarded the Masin Family Academic Excellence Award for outstanding performance; and the 2015 American College of Bankruptcy Law Meet, "Best Term Sheet."  As well, Mr. Heikali served as Staff Editor of the U.C.L.A. Entertainment Law Review.  Mr. Heikali received his B.A. in Psychology, with honors, from University of Southern California, 2012.

Mr. Heikali is licensed to practice law in California and is admitted to practice before the United States District Courts for the Central, Northern, Southern, and Eastern Districts of California and the United States Court of Appeals for the Ninth Circuit.

## NINA VARINDANI

Nina Varindani is a Partner in Faruqi & Faruqi, LLP's New York office.

22



Prior to joining the firm, Ms. Varindani practiced commercial litigation at Milber Makris Plousadis & Seiden, LLP where she represented directors, officers and other professionals and corporations in complex commercial litigation in federal and state courts.   Additionally, Ms. Varindani gained further litigation experience in law school through internships at Collen IP and the New York State Judicial Institute.

Ms. Varindani is licensed to practice law in New York and is admitted to practice before the United States District Courts for the Southern District of New York and the Eastern District of New York.

Ms. Varindani graduated from the George Washington University (B.A. in Psychology, 2006) and Pace Law School (J.D., 2010).

## INNESSA MELAMED HUOT

Innessa Melamed Huot is a Partner in Faruqi & Faruqi, LLP's New York office.

Prior to joining the firm, Ms. Huot practiced complex commercial and securities litigation at Gusrae Kaplan Nusbaum PLLC.  Ms. Huot, along with co-counsel, represented minority shareholders at trial in a derivative lawsuit captioned *Lisa Romita v. Castle Oil Corp., et. al.*, Index No.: 53145/2011.  Ms. Huot was also an associate at Traub Lieberman Straus & Shrewsberry LLP, where she represented primary and excess insurance carriers in complex coverage disputes and insurance defense litigation. Additionally, Ms. Huot gained further litigation experience in law school through internships at Wilson Elser Moskowitz Edelman & Dicker, LLP and Citigroup's Office of the General Counsel.

Ms. Huot graduated from Syracuse University (B.A. in Political Science and International Relations, *summa cum laude*, 2007), Pace Law School (J.D., *magna cum laude*, 2011) and Pace Lubin School of Business (M.B.A. in Finance, *summa cum laude*, 2011).

Ms. Huot is licensed to practice law in New York, New Jersey and Connecticut and is admitted to practice before the United States District Courts for the Southern, Eastern, Northern and Western Districts of New York and the District of New Jersey and the United States Courts of Appeal for the Second, Third and Fifth Circuits.

## MEGAN SULLIVAN

Megan Sullivan is a Partner in Faruqi & Faruqi, LLP's New York office.

Prior to joining the firm, Ms. Sullivan was a litigation associate at Crosby & Higgins LLP where she represented institutional and individual investors in securities arbitrations before FINRA and counseled corporate clients in commercial disputes in federal court.  Additionally, Ms. Sullivan gained further litigation experience in law school through internships at the Kings County District Attorney's Office and the Adjudication Division of the New York City Department of Consumer Affairs.

23



Ms. Sullivan graduated from the University of California, Los Angeles (B.A., History, 2008) and from Brooklyn Law School (J.D., *cum laude*, 2011). While at Brooklyn Law School, Ms. Sullivan served as Associate Managing Editor of the Brooklyn Journal of Corporate, Financial and Commercial Law.

Ms. Sullivan is licensed to practice law in the State of New York, and is admitted to the United States District Courts for the Southern and Eastern Districts of New York and the United States Court of Appeals for the Ninth Circuit.

## KATHERINE M. LENAHAN

Katherine M. Lenahan is a Partner in Faruqi & Faruqi, LLP's New York office.

Prior to joining Faruqi & Faruqi, Ms. Lenahan practiced securities litigation at Entwistle & Cappucci LLP. Ms. Lenahan gained further experience through internships for the Honorable Sherry Klein Heitler, Administrative Judge for Civil Matters, First Judicial District, and the Kings County District Attorney's Office.

Ms. Lenahan graduated from Fordham University (B.A., Political Science, *magna cum laude*, 2009) and Fordham University School of Law (J.D., 2012). While at Fordham Law School, Ms. Lenahan served as an associate editor of the Fordham Intellectual Property, Media and Entertainment Law Journal and was a fellow at the Center on Law and Information Policy.

Ms. Lenahan is licensed to practice law in New York, and is admitted to the United States District Court for the Southern District of New York, and the United States Courts of Appeals for the Second and Ninth Circuits.

## STEPHEN G. DOHERTY

Stephen Doherty is Senior Counsel in the Pennsylvania office of Faruqi & Faruqi, LLP. Mr. Doherty practices in the area of antitrust law and is significantly involved in prosecuting antitrust class actions on behalf of direct purchasers of brand name and generic drugs and charging pharmaceutical manufacturers with price fixing and with illegally blocking the market entry of less expensive competitors.

Earlier in his career, Mr. Doherty litigated consumer fraud and employment discrimination cases in both state and federal courts in Pennsylvania and New Jersey. He has served on numerous volunteer boards, including Gilda's Club of Delaware Valley and the BCBA Pro Bono Committee, has served as a volunteer instructor for VITA Education Services, and as a pro bono lawyer for the Consumer Bankruptcy Assistance Project.

Mr. Doherty is a 1992 graduate of Temple University Law School, where he was senior staff for the Temple Law Review and received several academic awards and is the author of Joint Representation Conflicts of Interest: Toward A More Balanced Approach, 65 Temp. L. Rev. 561 (1992). Mr. Doherty is a 1988 graduate of Dickinson College (B.A., Anthropology and Latin American Studies).

NEW YORK        CALIFORNIA        DELAWARE        PENNSYLVANIA        GEORGIA



# NEILL CLARK

Mr. Clark is Of Counsel in Faruqi and Faruqi, LLP's Pennsylvania office.

Before joining the firm, Mr. Clark was an associate at Berger & Montague, P.C. where he was significantly involved in prosecuting antitrust class actions on behalf of direct purchasers of brand name drugs and charging pharmaceutical manufacturers with illegally blocking the market entry of less expensive competitors.

Eight of those cases have resulted in substantial settlements totaling over $950 million: *In re Cardizem CD Antitrust Litig.* settled in November 2002 for $110 million; *In re Buspirone Antitrust Litig.* settled in April 2003 for $220 million; *In re Relafen Antitrust Litig.* settled in February 2004 for $175 million; *In re Platinol Antitrust Litig.* settled in November 2004 for $50 million; *In re Terazosin Antitrust Litig.* settled in April 2005 for $75 million; *In re Remeron Antitrust Litig.* settled in November 2005 for $75 million; *In re Ovcon Antitrust Litig.* settled in 2009 for $22 million; and *In re Tricor Direct Purchaser Antitrust Litig.* settled in April 2009 for $250 million.

Mr. Clark was also principally involved in a case alleging a conspiracy among hospitals and the Arizona Hospital and Healthcare Association to depress the compensation of per diem and traveling nurses, *Johnson et al. v. Arizona Hospital and Healthcare Association et al.*, No. CV07-1292 (D. Ariz.).

Mr. Clark was selected as a "Rising Star" by Pennsylvania Super Lawyers and listed as one of the Top Young Lawyers in Pennsylvania in the December 2005 edition of Philadelphia Magazine. Two cases in which he has been significantly involved have been featured as "Noteworthy Cases" in the NATIONAL LAW JOURNAL articles, "The Plaintiffs' Hot List" (*In re Tricor Antitrust Litig.* October 5, 2009 and *Johnson v. Arizona Hosp. and Healthcare Ass'n.*, October 3, 2011).

Mr. Clark graduated cum laude from Appalachian State University in 1994 and from Temple University Beasley School of Law in 1998, where he earned seven "distinguished class performance" awards, an oral advocacy award and a "best paper" award.

# DAVID CALVELLO

David Calvello is an Associate in Faruqi & Faruqi, LLP's New York office where his focus is litigating Antitrust matters.

Mr. Calvello graduated from the University of Richmond (B.S., 2011) with a double major in Finance and Political Science and Pace Law School (J.D., *magna cum laude*, 2014). He is licensed to practice law in New York and New Jersey and is admitted to practice before the United States District Court for New Jersey.



Prior to joining Faruqi & Faruqi, Mr. Calvello was as an Associate at Kaufman Borgeest & Ryan, LLP where he focused primarily on insurance coverage matters with respect to Directors & Officers (D&O), Errors & Omissions (E&O), and Professional Liability lines of coverage.  In law school, Mr. Calvello served as an editor on the Pace International Law Review and received the New Rochelle Bar Association Award upon graduation.  He was also very active in moot court competitions, and competed in the Willem C. Vis International Commercial Arbitration Moot held in Vienna, Austria.

## SHERIEF MORSY

Sherief Morsy's practice is focused on securities litigation.   Mr. Morsy is an Associate in the firm's New York office.

Prior to joining F&F, Mr. Morsy was a litigation associate at a New York law firm where he specialized in New York State Appellate practice.  Mr. Morsy also gained litigation experience as an intern with the Honorable Shira A. Sheindlin, Southern District of New York (2013).  He interned as well with a New York securities firm, a multinational corporation, and the King's County DA's office.

Mr. Morsy received his J.D., cum laude, from Brooklyn Law School, 2014.  While at Brooklyn Law School, Mr. Morsy was a Notes and Comments Editor of the Brooklyn Law Review.  He is the author of The JOBS Act and Crowdfunding:  How Narrowing the Secondary Market Handicaps Fraud Plaintiffs, 79 Brook. L. Rev. (2014), Brooklyn Law Review, Vol. 79, Issue 3.  Mr. Morsy received his B.A. in Political Science and Philosophy, Rutgers University, 2010.

Mr. Morsy is licensed to practice law in New York and New Jersey and is admitted to the United States District Courts for the Southern and Eastern Districts of New York and the District of New Jersey.

## ALEX HARTZBAND

Alex Hartzband's practice is focused on employment litigation.  Mr. Hartzband is an associate in the firm's New York office.

Prior to joining F&F, Mr. Hartzband was an associate at a prominent New York firm where he represented employees on an individual and class basis on employment matters including, but not limited to:  discrimination; sexual harassment; whistleblower retaliation; and breach of contract.  As well during law school, Mr. Hartzband worked with a New York firm that represented labor unions and individual employees.  Mr. Hartzband was a member of Fordham Law's Moot Court Board.

Mr. Hartzband earned his J.D. from Fordham University School of Law (J.D. 2015).  Mr. Hartzband earned his undergraduate degree from George Washington University (B.A., History, 2012).

26



Mr. Hartzband is licensed to practice law in New York and New Jersey.  Further, Mr. Hartzband is admitted to practice before the United States District Courts for the Southern and Eastern Districts of New York.

## ALEX B. HELLER

Alex B. Heller's practice is focused on securities litigation.  Mr. Heller is an associate in the firm's Pennsylvania office.

Prior to joining F&F, Mr. Heller was an associate at a prominent law firm in Philadelphia where he focused on commercial litigation and corporate counsel matters.

While attending law school, Mr. Heller worked as a law clerk for a large national law firm and as a legal intern for KPMG.  During law school, Mr. Heller served as a research assistant to the Law & Economics Center at George Mason University School of Law.  Mr. Heller, also during law school, served as an associate editor for the George Mason Law Review.

Mr. Heller is a Certified Public Accountant (CPA).  Prior to law school, he practiced public accounting at PricewaterhouseCoopers LLP and Mazars USA LLP, providing audit and assurance services.

Mr. Heller has authored the following articles: Corporate Death Penalty: Prosecutorial Discretion and the Indictment of SAC Capital, 22 GEO. MASON L. REV. 763 (2015); Co-Author, Cybersecurity Disclosures in SEC Filings: When, How, BLOOMBERG BNA (March 13, 2015).

Mr. Heller earned his J.D. from George Mason University School of Law (J.D. 2015).  Mr. Heller earned his undergraduate degree from American University (B.S. Business Administration, Accounting Specialization, 2008).

Alex is licensed to practice law in Pennsylvania and New Jersey.  Alex is admitted to practice before the United States District Court for the Eastern District of Pennsylvania and the United States Court of Appeals for the Third Circuit.

## KRISTYN FIELDS

Kristyn Fields' practice is focused on antitrust litigation.  Ms. Fields is an Associate in the firm's New York office.

Prior to joining F&F, Ms. Fields interned for the Honorable Martin Marcus, New York Supreme Court, Bronx County.  As well, Ms. Fields participated in the Brooklyn Law Incubator & Policy Clinic providing pro bono counsel to emerging start-up companies.  While at Brooklyn Law School, Ms. Fields served as an Executive Articles Editor of the Brooklyn Journal of Corporate, Financial & Commercial Law.  Also, Ms. Fields was a member of the Moot Court Honor Society.

Ms. Fields earned her J.D. from Brooklyn Law School (2016).  Ms. Fields earned her undergraduate

27



degree from Boston College (B.A., Political Science, 2013).

Ms. Fields is licensed to practice law in New York.

## NICHOLAS P. STOCKTON

Nicholas Stockton's practice is focused on securities litigation. Mr. Stockton is a law clerk in the firm's New York office.

Prior to joining F&F, Mr. Stockton was a Volunteer Assistant Attorney General in the Office of the New York State Attorney General. Mr. Stockton gained further experience through internships for the Honorable Jean C. Hamilton, Senior United States District Judge, Eastern District of Missouri, and the Office of the Federal Public Defender, Southern District of Illinois. Prior to attending law school, Mr. Stockton spent almost a decade trading equities and futures.

Mr. Stockton earned his J.D. from Washington University School of Law (J.D., magna cum laude, 2016) and his undergraduate degree from Columbia University (B.A., History, cum laude, 2003).

Mr. Stockton is licensed to practice law in the state of New York.

## PATRICK J. COLLOPY

Patrick Collopy's practice is focused on employment litigation. Mr. Collopy is an Associate in the firm's New York office.

Prior to joining the firm, Mr. Collopy served as a legal intern at a New York law firm. Mr. Collopy gained experience in employment law while interning on Capital Hill at the Congressional Office of Compliance. Additionally, gained further litigation experience as a legal intern at the Kings County District Attorney's Office.

Mr. Collopy earned his J.D. from Brooklyn Law School (2016) and his undergraduate degree from Fordham University (B.A., History; Minor in Economics, 2009).

Mr. Collopy is licensed to practice law in New York.

## DILLON HAGIUS

Dillon Hagius's practice is focused on securities litigation.  Mr. Hagius is an Associate in the firm's New York office.

Prior to joining F&F, Mr. Hagius served as a judicial clerk in Maryland's 10th Judicial District.  At UCLA Law School, Mr. Hagius was a research assistant; an Empirical Legal Scholar; a staff editor on the UCLA Journal of International Law and Foreign Affairs and travelled to the Eastern Congo to research gender violence.  As well in law school, Mr. Hagius externed at the Securities and Exchange Commission



in the Division of Corporation Finance, Office of the Enforcement Liaison and the Office of International Affairs.

Mr. Hagius earned his J.D. from UCLA School of Law, Los Angeles, CA (J.D. 2016, Dean's Scholarship).  Mr. Hagius graduated from the University of Maryland, College Park (B.S. International Business with honors, 2013).

Mr. Hagius is barred in the states of New York, Maryland, California and the District of Columbia, and the United States District Court for the Northern District of California.

## JOSHUA NASSIR

Joshua Nassir's practice is focused on consumer litigation.  Mr. Nassir is an associate in the firm's California office.

Since joining the F&F team, Mr. Nassir has litigated numerous actions on behalf of consumers including, but not limited to, cases against Sun-Maid Growers of California; Innovation Ventures; LLC (5-hour ENERGY®); Dr Pepper Snapple Group, Inc.; Craft Brew Alliances, Inc. (Kona beer); and Skeeter Snacks, LLC.

Prior to Faruqi & Faruqi, Mr. Nassir worked with a prominent LA firm where he focused on litigation.

During law school, Mr. Nassir served as a full-time Judicial Extern for the Honorable Philip S. Gutierrez, United States District Court for the Central District of California.  As well, he was a staff editor for the UCLA School of Law Journal of Environmental Law & Policy and was heavily involved in the school's Moot Court and Mock Trial tournaments.

Mr. Nassir earned his J.D. from UCLA School of Law, 2017. Mr. Nassir received his undergraduate degree from UCLA (B.A. History, cum laude, 2014.)

Mr. Nassir is admitted to practice in California.

## JAMES MADISON KIM

James Madison Kim's practice is focused on securities litigation.  Mr. Kim is a law clerk (New York State Bar Admission pending) in the firm's New York office.

Prior to joining F&F, Mr. Kim served as a legal fellow at the New York City Mayor's Office of Media and Entertainment.

During law school, Mr. Kim served as a judicial intern for the Honorable Marilyn D. Go, U.S. District Court for the Eastern District of New York.  Mr. Kim also completed internships at the U.S Securities & Exchange Commission (SEC) and Environmental Protection Agency (EPA).



Prior to law school, Mr. Kim worked for several years at a large New York law firm as a legal assistant for the litigation and environmental practice groups.  Mr. Kim, on behalf of the firm, completed a secondment to Citibank's in-house legal department.

Mr. Kim earned his J.D. from Emory University School of Law, 2017.  Mr. Kim received his undergraduate degree from Dartmouth College (B.A., Spanish and Environmental Studies, 2011).

# TAB B

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| **JILLIAN IZZIO and HEATHER ZOELLER, behalf of themselves and all others similarly situated,**<br><br>    **Plaintiffs,**<br><br> **v.**<br><br>**CENTURY GOLF PARTNERS MANAGEMENT, L.P.,**<br><br>    **Defendant.** | **Case No.: 3: 14-cv-03194-P** |

**SUPPLEMENTAL DECLARATION OF BRIAN DEVERY REGARDING UPDATED
CALCULATIONS**

I, Brian Devery, declare as follows:

  1.  I am a Project Manager with Angeion Group ("Angeion"), located at 1801 Market Street, Suite 660, Philadelphia, PA 19103. I am over 21 years of age and am not a party to this action. I have personal knowledge of the facts set forth herein and, if called as a witness, could and would testify competently thereto.

  2.  I provide this declaration to supplement my prior declaration dated March 9, 2016 with additional information regarding costs of administration and calculations of Settlement Class member awards.  Angeion was retained by the parties, and appointed by the Court, to serve as Settlement Administrator and to, among other tasks, calculate and distribute distribution awards to Settlement Class members that opted-in to the Settlement Agreement.

3.      Prior to the first Fairness Hearing, Angeion provided counsel with an invoice to complete the administration and distribution of the settlement fund to Settlement Class members. The initial Estimate to Complete the administration and distribution of this matter was $38,844.56. Because the distribution of funds was delayed for more than two years, the pricing metrics used to calculate the costs of distribution have changed.  Additionally, while this matter was under review, Angeion has incurred additional fees and costs not originally contemplated in the initial invoice. Angeion has prepared a supplemental Estimate to Complete the administration and distribution in this matter in the amount of $3,464.23 making the total cost to administer the Settlement Agreement and distribute the Settlement Payments a total of $42,308.79.

4.      Angeion received from the parties information regarding the amended terms of the settlement (the "Enhanced Settlement"), and has recalculated the distribution payments to class members accordingly.  Of the 435 Settlement Class members, 256 opted-in to the Settlement Agreement.  The 256 opt-in class members will receive approximately 83.3% of the Revised Maximum Gross Settlement Amount, (i.e., the net settlement fund after deductions for attorneys' fees, service awards, expenses and costs of administration).  Per the original estimated payment calculations from March 2016, each Settlement Class member who worked at Fox Valley Club in Lancaster, New York ("Fox Valley"), Brierwood Country Club in Hamburg, New York ("Brierwood"), or Harbor Links Golf Club in Port Washington, New York ("Harbor Links") were to receive an award of approximately $2.88 per hour, and Settlement Class members who worked at Tan Tara Golf Club in North Tonawanda, New York ("Tan Tara") were to receive approximately $1.92 per hour.  Under the Enhanced Settlement, Settlement Class members from Fox Valley, Brierwood and Harbor Links will receive approximately $3.81 per hour, and Settlement Class members from Tan Tara will receive approximately $2.54 per hour.

5.     The average award to those Settlement Class members that opted-in to the Enhanced Settlement is $3,067 per class member.

6.     Approximately 52 Settlement Class members are to receive an award over $5,000.

7.     Notice was sent to 165 Harbor Links' workers.   86 of the 165 Harbor Links' workers, or 52%, opted into the Settlement Agreement.

8.     The average award to those Settlement Class members that worked at Harbor Links is $3,934 per class member.

9.     The Harbor Links' workers worked 41% of the total hours worked by all Settlement Class members.   Under the Settlement Agreement, Harbor Links employees were entitled to recover 43% of the total Settlement Payments.

10.    I declare under penalty of perjury pursuant to the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge and that this declaration was executed this 1st day of May 2018 at Oakdale, New York.

_____
Brian Devery

# TAB C

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| JILLIAN IZZIO and HEATHER ZOELLER, on behalf of themselves and all others similarly situated, | Case No.: 3:14-cv-03194-P |
| Plaintiffs, | |
| v. | |
| CENTURY GOLF PARTNERS MANAGEMENT, L.P., | |
| Defendant. | |
| KARA ASHBY, on behalf of herself and all others similarly situated, | Case No.: 3:15-CV-00861-P |
| Plaintiff, | |
| v. | |
| CENTURY GOLF PARTNERS MANAGEMENT, L.P. dba ARNOLD PALMER GOLF MANAGEMENT, | |
| Defendant. | |

**DECLARATION OF ADOLOFO PENA IN SUPPORT OF THE MOTION FOR CERTIFICATION OF THE SETTLEMENT CLASSES AND FINAL APPROVAL OF THE PROPOSED SETTLEMENT**

I, Adolofo Pena, declare under penalty of perjury that the following is true and correct:

1.      I have opted into the above-captioned matter.

2.      This declaration is respectfully submitted in support of the Motion for Certification of the Settlement Classes and Final Approval of the Proposed Settlement.

3.      I am glad this case was brought and that I had the opportunity to join it.

4.      I did not realize we were being treated unfairly prior to joining this lawsuit.

1

5.      I have spoken to the lawyers and I am aware that if we continue the case there is the possibility that we might receive additional money.  However, I think it would be better to receive the money now and I believe many of my colleagues feel that way.

6.      I would like the money from the settlement sooner rather than later.

7.      Most of my colleagues at Harbor Links lived paycheck to paycheck and Harbor Links was their only source of income.

8.      I believe receiving the money as soon as possible would be a great help to many of them.

9.      I have discussed the objection filed by Mr. Metzger and Ms. Brana with the lawyers and disagree with it.

10.     I believe the people at Harbor Links have been treated as fairly as everyone else.

11.     I have spoken with lawyers before and I appreciated how our lawyers answered all my questions and always responded.

12.     I think our lawyers should receive their one-quarter fee.

13.     If the Court approves the settlement, I hope there is no appeal so that we can get paid without delay.

Executed on April ⎵⎵, 2018 in Jackson Heights, New York.


_Adolfo Peña_
Adolofo Pena

2

# TAB D

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| JILLIAN IZZIO and HEATHER ZOELLER, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> CENTURY GOLF PARTNERS MANAGEMENT, L.P., <br><br> Defendant. | Case No.: 3:14-cv-03194-P |
| KARA ASHBY, on behalf of herself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> CENTURY GOLF PARTNERS MANAGEMENT, L.P. dba ARNOLD PALMER GOLF MANAGEMENT, <br><br> Defendant. | Case No.: 3:15-CV-00861-P |

**DECLARATION OF ALAN DURAN IN SUPPORT OF THE MOTION FOR
CERTIFICATION OF THE SETTLEMENT CLASSES AND FINAL APPROVAL OF
THE PROPOSED SETTLEMENT**

I, Alan Duran, declare under penalty of perjury that the following is true and correct:

1.      I have opted into the above-captioned matter.

2.      This declaration is respectfully submitted in support of the Motion for Certification

of the Settlement Classes and Final Approval of the Proposed Settlement.

3.      I am glad this case was brought and that I had the opportunity to join it.

4.      I did not realize we were being treated unfairly prior to joining this lawsuit.

1

5. I have spoken to the lawyers and I am aware that if we continue the case there is the possibility that we might receive additional money. However, I think it would be better to receive the money now and I believe many of my colleagues feel that way.

6. I would like the money from the settlement sooner rather than later.

7. Most of my colleagues at Harbor Links lived paycheck to paycheck and Harbor Links was their only source of income.

8. I believe receiving the money as soon as possible would be a great help to many of them.

9. I have discussed the objection filed by Mr. Metzger and Ms. Brana with the lawyers and disagree with it.

10. I believe the people at Harbor Links have been treated as fairly as everyone else.

11. I have spoken with lawyers before and I appreciated how our lawyers answered all my questions and always responded.

12. I think our lawyers should receive their one-quarter fee.

13. If the Court approves the settlement, I hope there is no appeal so that we can get paid without delay.

Executed on April 5, 2018 in Long Island City, New York.

_____
Alan Duran

2

# TAB E

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| JILLIAN IZZIO and HEATHER ZOELLER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CENTURY GOLF PARTNERS MANAGEMENT, L.P.,<br><br>Defendant. | Case No.: 3:14-cv-03194-P |
| KARA ASHBY, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CENTURY GOLF PARTNERS MANAGEMENT, L.P. dba ARNOLD PALMER GOLF MANAGEMENT,<br><br>Defendant. | Case No.: 3:15-CV-00861-P |

## DECLARATION OF ALLEN GONZALEZ IN SUPPORT OF THE MOTION FOR CERTIFICATION OF THE SETTLEMENT CLASSES AND FINAL APPROVAL OF THE PROPOSED SETTLEMENT

I, Allen Gonzalez, declare under penalty of perjury that the following is true and correct:

1.      I have opted into the above-captioned matter.

2.      This declaration is respectfully submitted in support of the Motion for Certification of the Settlement Classes and Final Approval of the Proposed Settlement.

3.      I am glad this case was brought and that I had the opportunity to join it.

4.      I did not realize we were being treated unfairly prior to joining this lawsuit.

1

5.      I have spoken to the lawyers and I am aware that if we continue the case there is the possibility that we might receive additional money.  However, I think it would be better to receive the money now and I believe many of my colleagues feel that way.

6.      I would like the money from the settlement sooner rather than later.

7.      I believe receiving the money as soon as possible would be a great help to many of my former colleagues at Harbor Links.

8.      I have discussed the objection filed by Mr. Metzger and Ms. Brana with the lawyers and disagree with it.

9.      I believe the people at Harbor Links have been treated as fairly as everyone else.

10.      I have spoken with lawyers before and I appreciated how our lawyers answered all my questions and always responded.

11.      I think our lawyers should receive their one-quarter fee.

12.      If the Court approves the settlement, I hope there is no appeal so that we can get paid without delay.

Executed on April __, 2018 in Hicksville, New York.


_____
Allen Gonzalez

2

139

# TAB F

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| JILLIAN IZZIO and HEATHER ZOELLER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CENTURY GOLF PARTNERS MANAGEMENT, L.P.,<br><br>Defendant. | Case No.: 3:14-cv-03194-P |
| KARA ASHBY, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CENTURY GOLF PARTNERS MANAGEMENT, L.P. dba ARNOLD PALMER GOLF MANAGEMENT,<br><br>Defendant. | Case No.: 3:15-CV-00861-P |

## DECLARATION OF AWEDRYN GONZALEZ IN SUPPORT OF THE MOTION FOR CERTIFICATION OF THE SETTLEMENT CLASSES AND FINAL APPROVAL OF THE PROPOSED SETTLEMENT

I, Awedryn Gonzalez, declare under penalty of perjury that the following is true and correct:

1. I have opted into the above-captioned matter.

2. This declaration is respectfully submitted in support of the Motion for Certification of the Settlement Classes and Final Approval of the Proposed Settlement.

3. I am glad this case was brought and that I had the opportunity to join it.

4. I did not realize we were being treated unfairly prior to joining this lawsuit.

1

5.      I have spoken to the lawyers and I am aware that if we continue the case there is the possibility that we might receive additional money.  However, I think it would be better to receive the money now and I believe many of my colleagues feel that way.

6.      I would like the money from the settlement sooner rather than later.

7.      I believe receiving the money as soon as possible would be a great help to many of my former colleagues at Harbor Links.

8.      I have discussed the objection filed by Mr. Metzger and Ms. Brana with the lawyers and disagree with it.

9.      I believe the people at Harbor Links have been treated as fairly as everyone else.

10.      I have spoken with lawyers before and I appreciated how our lawyers answered all my questions and always responded.

11.      I think our lawyers should receive their one-quarter fee.

12.      If the Court approves the settlement, I hope there is no appeal so that we can get paid without delay.

Executed on April __, 2018 in Hicksville, New York.


Awedryn Gonzalez

2

142

# TAB G

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| JILLIAN IZZIO and HEATHER ZOELLER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CENTURY GOLF PARTNERS MANAGEMENT, L.P.,<br><br>Defendant. | Case No.: 3:14-cv-03194-P |
| KARA ASHBY, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CENTURY GOLF PARTNERS MANAGEMENT, L.P. dba ARNOLD PALMER GOLF MANAGEMENT,<br><br>Defendant. | Case No.: 3:15-CV-00861-P |

## DECLARATION OF CAROL RODRIGUEZ IN SUPPORT OF THE MOTION FOR CERTIFICATION OF THE SETTLEMENT CLASSES AND FINAL APPROVAL OF THE PROPOSED SETTLEMENT

I, Carol Rodriguez, declare under penalty of perjury that the following is true and correct:

1.      I have opted into the above-captioned matter.

2.      This declaration is respectfully submitted in support of the Motion for Certification of the Settlement Classes and Final Approval of the Proposed Settlement.

3.      I am glad this case was brought and that I had the opportunity to join it.

4.      I did not realize we were being treated unfairly prior to joining this lawsuit.

1

5.      I have spoken to the lawyers and I am aware that if we continue the case there is the possibility that we might receive additional money.  However, I think it would be better to receive the money now and I believe many of my colleagues feel that way.

6.      I would like the money from the settlement sooner rather than later.

7.      Most of my colleagues at Harbor Links lived paycheck to paycheck and Harbor Links was their only source of income.

8.      I believe receiving the money as soon as possible would be a great help to many of them.

9.      I have discussed the objection filed by Mr. Metzger and Ms. Brana with the lawyers and disagree with it.

10.     I believe the people at Harbor Links have been treated as fairly as everyone else.

11.     I have spoken with lawyers before and I appreciated how our lawyers answered all my questions and always responded.

12.     I think our lawyers should receive their one-quarter fee.

13.     If the Court approves the settlement, I hope there is no appeal so that we can get paid without delay.

Executed on April 9, 2018 in Brooklyn, New York.

Carol Rodriguez

2

145

# TAB H

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| JILLIAN IZZIO and HEATHER ZOELLER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CENTURY GOLF PARTNERS MANAGEMENT, L.P.,<br><br>Defendant. | Case No.: 3:14-cv-03194-P |
| KARA ASHBY, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CENTURY GOLF PARTNERS MANAGEMENT, L.P. dba ARNOLD PALMER GOLF MANAGEMENT,<br><br>Defendant. | Case No.: 3:15-CV-00861-P |

**DECLARATION OF CESAR ALONZO IN SUPPORT OF THE MOTION FOR
CERTIFICATION OF THE SETTLEMENT CLASSES AND FINAL APPROVAL OF
THE PROPOSED SETTLEMENT**

I, Cesar Alonzo, declare under penalty of perjury that the following is true and correct:

1.      I have opted into the above-captioned matter.

2.      This declaration is respectfully submitted in support of the Motion for Certification

of the Settlement Classes and Final Approval of the Proposed Settlement.

3.      I am glad this case was brought and that I had the opportunity to join it.

4.      I did not realize we were being treated unfairly prior to joining this lawsuit.

1

5.      I have spoken to the lawyers and I am aware that if we continue the case there is the possibility that we might receive additional money.  However, I think it would be better to receive the money now and I believe many of my colleagues feel that way.

6.      I would like the money from the settlement sooner rather than later.

7.      Most of my colleagues at Harbor Links lived paycheck to paycheck and Harbor Links was their only source of income.

8.      I believe receiving the money as soon as possible would be a great help to many of them.

9.      I have discussed the objection filed by Mr. Metzger and Ms. Brana with the lawyers and disagree with it.

10.     I believe the people at Harbor Links have been treated as fairly as everyone else.

11.     I have spoken with lawyers before and I appreciated how our lawyers answered all my questions and always responded.

12.     I think our lawyers should receive their one-quarter fee.

13.     If the Court approves the settlement, I hope there is no appeal so that we can get paid without delay.

Executed on April 9, 2018 in Round Rock, Texas.

_____
Cesar Alonzo

2

# TAB I

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| JILLIAN IZZIO and HEATHER ZOELLER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CENTURY GOLF PARTNERS MANAGEMENT, L.P.,<br><br>Defendant. | Case No.: 3:14-cv-03194-P |
| KARA ASHBY, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CENTURY GOLF PARTNERS MANAGEMENT, L.P. dba ARNOLD PALMER GOLF MANAGEMENT,<br><br>Defendant. | Case No.: 3:15-CV-00861-P |

**DECLARATION OF EVELINA DE LEON IN SUPPORT OF THE MOTION FOR CERTIFICATION OF THE SETTLEMENT CLASSES AND FINAL APPROVAL OF THE PROPOSED SETTLEMENT**

I, Evelina De Leon, declare under penalty of perjury that the following is true and correct:

1.      I have opted into the above-captioned matter.

2.      This declaration is respectfully submitted in support of the Motion for Certification of the Settlement Classes and Final Approval of the Proposed Settlement.

3.      I am glad this case was brought and that I had the opportunity to join it.

4.      I did not realize we were being treated unfairly prior to joining this lawsuit.

1

5.    I have spoken to the lawyers and I am aware that if we continue the case there is the possibility that we might receive additional money. However, I think it would be better to receive the money now and I believe many of my colleagues feel that way.

6.    I would like the money from the settlement sooner rather than later.

7.    Most of my colleagues at Harbor Links lived paycheck to paycheck and Harbor Links was their only source of income.

8.    I believe receiving the money as soon as possible would be a great help to many of them.

9.    I have discussed the objection filed by Mr. Metzger and Ms. Brana with the lawyers and disagree with it.

10.    I believe the people at Harbor Links have been treated as fairly as everyone else.

11.    I have spoken with lawyers before and I appreciated how our lawyers answered all my questions and always responded.

12.    I think our lawyers should receive their one-quarter fee.

13.    If the Court approves the settlement, I hope there is no appeal so that we can get paid without delay.

Executed on April 11, 2018 in Hicksville, New York.

_____
Evelina De Leon

# TAB J

<div align="center">

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**

</div>

| | |
|---|---|
| JILLIAN IZZIO and HEATHER ZOELLER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CENTURY GOLF PARTNERS MANAGEMENT, L.P.,<br><br>Defendant. | Case No.: 3:14-cv-03194-P |
| KARA ASHBY, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CENTURY GOLF PARTNERS MANAGEMENT, L.P. dba ARNOLD PALMER GOLF MANAGEMENT,<br><br>Defendant. | Case No.: 3:15-CV-00861-P |

<div align="center">

**DECLARATION OF GREGORY SCARAZZINI IN SUPPORT OF THE MOTION FOR CERTIFICATION OF THE SETTLEMENT CLASSES AND FINAL APPROVAL OF THE PROPOSED SETTLEMENT**

</div>

I, Gregory Scarazzini, declare under penalty of perjury that the following is true and correct:

1.  I have opted into the above-captioned matter.

2.  This declaration is respectfully submitted in support of the Motion for Certification of the Settlement Classes and Final Approval of the Proposed Settlement.

3.  I am glad this case was brought and that I had the opportunity to join it.

4.  I did not realize we were being treated unfairly prior to joining this lawsuit.

<div align="center">153</div>

1

5.      I have spoken to the lawyers and I am aware that if we continue the case there is the possibility that we might receive additional money.  However, I think it would be better to receive the money now and I believe many of my colleagues feel that way.

6.      I would like the money from the settlement sooner rather than later.

7.      Most of my colleagues at Harbor Links lived paycheck to paycheck and Harbor Links was their only source of income.

8.      I believe receiving the money as soon as possible would be a great help to many of them.

9.      I have discussed the objection filed by Mr. Metzger and Ms. Brana with the lawyers and disagree with it.

10.     I believe the people at Harbor Links have been treated as fairly as everyone else.

11.     I have spoken with lawyers before and I appreciated how our lawyers answered all my questions and always responded.

12.     I think our lawyers should receive their one-quarter fee.

13.     If the Court approves the settlement, I hope there is no appeal so that we can get paid without delay.

Executed on April _5_, 2018 in East Meadow, New York.


_Gregory Scarazzini_
Gregory Scarazzini

# TAB K

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| JILLIAN IZZIO and HEATHER ZOELLER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CENTURY GOLF PARTNERS MANAGEMENT, L.P.,<br><br>Defendant. | Case No.: 3:14-cv-03194-P |
| KARA ASHBY, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CENTURY GOLF PARTNERS MANAGEMENT, L.P. dba ARNOLD PALMER GOLF MANAGEMENT,<br><br>Defendant. | Case No.: 3:15-CV-00861-P |

**DECLARATION OF INGRID RODRIGUEZ IN SUPPORT OF THE MOTION FOR CERTIFICATION OF THE SETTLEMENT CLASSES AND FINAL APPROVAL OF THE PROPOSED SETTLEMENT**

I, Ingrid Rodriguez, declare under penalty of perjury that the following is true and correct:

1.  I have opted into the above-captioned matter.

2.  This declaration is respectfully submitted in support of the Motion for Certification of the Settlement Classes and Final Approval of the Proposed Settlement.

3.  I am glad this case was brought and that I had the opportunity to join it.

4.  I did not realize we were being treated unfairly prior to joining this lawsuit.

1

5.      I have spoken to the lawyers and I am aware that if we continue the case there is the possibility that we might receive additional money.  However, I think it would be better to receive the money now and I believe many of my colleagues feel that way.

6.      I would like the money from the settlement sooner rather than later.

7.      Most of my colleagues at Harbor Links lived paycheck to paycheck and Harbor Links was their only source of income.

8.      I believe receiving the money as soon as possible would be a great help to many of them.

9.      I have discussed the objection filed by Mr. Metzger and Ms. Brana with the lawyers and disagree with it.

10.     I believe the people at Harbor Links have been treated as fairly as everyone else.

11.     I have spoken with lawyers before and I appreciated how our lawyers answered all my questions and always responded.

12.     I think our lawyers should receive their one-quarter fee.

13.     If the Court approves the settlement, I hope there is no appeal so that we can get paid without delay.

Executed on April 6, 2018 in Brooklyn, NY.


Ingrid Rodriguez

# TAB L

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| JILLIAN IZZIO and HEATHER ZOELLER, on behalf of themselves and all others similarly situated, | Case No.: 3:14-cv-03194-P |
| Plaintiffs, | |
| v. | |
| CENTURY GOLF PARTNERS MANAGEMENT, L.P., | |
| Defendant. | |
| KARA ASHBY, on behalf of herself and all others similarly situated, | Case No.: 3:15-CV-00861-P |
| Plaintiff, | |
| v. | |
| CENTURY GOLF PARTNERS MANAGEMENT, L.P. dba ARNOLD PALMER GOLF MANAGEMENT, | |
| Defendant. | |

## DECLARATION OF JACLYN KIERNAN IN SUPPORT OF THE MOTION FOR CERTIFICATION OF THE SETTLEMENT CLASSES AND FINAL APPROVAL OF THE PROPOSED SETTLEMENT

I, Jaclyn Kiernan, declare under penalty of perjury that the following is true and correct:

1. I have opted into the above-captioned matter.

2. This declaration is respectfully submitted in support of the Motion for Certification

of the Settlement Classes and Final Approval of the Proposed Settlement.

3. I am glad this case was brought and that I had the opportunity to join it.

4. I did not realize we were being treated unfairly prior to joining this lawsuit.

1

159

5.     I have spoken to the lawyers and I am aware that if we continue the case there is the possibility that we might receive additional money. However, I think it would be better to receive the money now and I believe many of my colleagues feel that way.

6.     I would like the money from the settlement sooner rather than later.

7.     I believe receiving the money as soon as possible would be a great help to many of my former colleagues at Harbor Links.

8.     I have discussed the objection filed by Mr. Metzger and Ms. Brana with the lawyers and disagree with it.

9.     I believe the people at Harbor Links have been treated as fairly as everyone else.

10.     I have spoken with lawyers before and I appreciated how our lawyers answered all my questions and always responded.

11.     I think our lawyers should receive their one-quarter fee.

12.     If the Court approves the settlement, I hope there is no appeal so that we can get paid without delay.

Executed on April 6 , 2018 in Levittown, New York.

_____
Jaclyn Kiernan

2

160

# TAB M

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| JILLIAN IZZIO and HEATHER ZOELLER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CENTURY GOLF PARTNERS MANAGEMENT, L.P.,<br><br>Defendant. | Case No.: 3:14-cv-03194-P |
| KARA ASHBY, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CENTURY GOLF PARTNERS MANAGEMENT, L.P. dba ARNOLD PALMER GOLF MANAGEMENT,<br><br>Defendant. | Case No.: 3:15-CV-00861-P |

## DECLARATION OF JACQUELINE CAVERO IN SUPPORT OF THE MOTION FOR CERTIFICATION OF THE SETTLEMENT CLASSES AND FINAL APPROVAL OF THE PROPOSED SETTLEMENT

I, Jacqueline Cavero, declare under penalty of perjury that the following is true and correct:

1.     I have opted into the above-captioned matter.

2.     This declaration is respectfully submitted in support of the Motion for Certification of the Settlement Classes and Final Approval of the Proposed Settlement.

3.     I am glad this case was brought and that I had the opportunity to join it.

1

4.      I have spoken to the lawyers and I am aware that if we continue the case there is the possibility that we might receive additional money.  However, I think it would be better to receive the money now and I believe many of my colleagues feel that way.

5.      I would like the money from the settlement sooner rather than later.

6.      Most of my colleagues at Harbor Links lived paycheck to paycheck and Harbor Links was their only source of income.

7.      I believe receiving the money as soon as possible would be a great help to many of them.

8.      I have discussed the objection filed by Mr. Metzger and Ms. Brana with the lawyers and disagree with it.

9.      I believe the people at Harbor Links have been treated as fairly as everyone else.

10.     I have spoken with lawyers before and I appreciated how our lawyers answered all my questions and always responded.

11.     I think our lawyers should receive their one-quarter fee.

12.     If the Court approves the settlement, I hope there is no appeal so that we can get paid without delay.

Executed on April 5, 2018 in Jackson Heights, New York.


_Jacqueline Cavero_
Jacqueline Cavero

2

# TAB N

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| JILLIAN IZZIO and HEATHER ZOELLER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CENTURY GOLF PARTNERS MANAGEMENT, L.P.,<br><br>Defendant. | Case No.: 3:14-cv-03194-P |
| KARA ASHBY, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CENTURY GOLF PARTNERS MANAGEMENT, L.P. dba ARNOLD PALMER GOLF MANAGEMENT,<br><br>Defendant. | Case No.: 3:15-CV-00861-P |

## DECLARATION OF KAREN LOPEZ IN SUPPORT OF THE MOTION FOR CERTIFICATION OF THE SETTLEMENT CLASSES AND FINAL APPROVAL OF THE PROPOSED SETTLEMENT

I, Karen Lopez, declare under penalty of perjury that the following is true and correct:

1.     I have opted into the above-captioned matter.

2.     This declaration is respectfully submitted in support of the Motion for Certification of the Settlement Classes and Final Approval of the Proposed Settlement.

3.     I am glad this case was brought and that I had the opportunity to join it.

4.     I did not realize we were being treated unfairly prior to joining this lawsuit.

1

5.  I have spoken to the lawyers and I am aware that if we continue the case there is the possibility that we might receive additional money.  However, I think it would be better to receive the money now and I believe many of my colleagues feel that way.

6.  I would like the money from the settlement sooner rather than later.

7.  Most of my colleagues at Harbor Links lived paycheck to paycheck and Harbor Links was their only source of income.

8.  I believe receiving the money as soon as possible would be a great help to many of them.

9.  I have discussed the objection filed by Mr. Metzger and Ms. Brana with the lawyers and disagree with it.

10.  I believe the people at Harbor Links have been treated as fairly as everyone else.

11.  I have spoken with lawyers before and I appreciated how our lawyers answered all my questions and always responded.

12.  I think our lawyers should receive their one-quarter fee.

13.  If the Court approves the settlement, I hope there is no appeal so that we can get paid without delay.

Executed on April 6, 2018 in Jackson Heights, New York.


Karen Lopez

2

# TAB O

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| JILLIAN IZZIO and HEATHER ZOELLER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CENTURY GOLF PARTNERS MANAGEMENT, L.P.,<br><br>Defendant. | Case No.: 3:14-cv-03194-P |
| KARA ASHBY, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CENTURY GOLF PARTNERS MANAGEMENT, L.P. dba ARNOLD PALMER GOLF MANAGEMENT,<br><br>Defendant. | Case No.: 3:15-CV-00861-P |

**DECLARATION OF MARIA PILLAR DIAZ IGLESIAS IN SUPPORT OF THE MOTION FOR CERTIFICATION OF THE SETTLEMENT CLASSES AND FINAL APPROVAL OF THE PROPOSED SETTLEMENT**

I, Maria Pilar Diaz Inglesias, declare under penalty of perjury that the following is true and correct:

1.      I have opted into the above-captioned matter.

2.      This declaration is respectfully submitted in support of the Motion for Certification

of the Settlement Classes and Final Approval of the Proposed Settlement.

3.      I am glad this case was brought and that I had the opportunity to join it.

4.      I did not realize we were being treated unfairly prior to joining this lawsuit.

1

5.      I have spoken to the lawyers and I am aware that if we continue the case there is the possibility that we might receive additional money.  However, I think it would be better to receive the money now and I believe many of my colleagues feel that way.

6.      I would like the money from the settlement sooner rather than later.

7.      Most of my colleagues at Harbor Links lived paycheck to paycheck and Harbor Links was their only source of income.

8.      I believe receiving the money as soon as possible would be a great help to many of them.

9.      I have discussed the objection filed by Mr. Metzger and Ms. Brana with the lawyers and disagree with it.

10.      I believe the people at Harbor Links have been treated as fairly as everyone else.

11.      I have spoken with lawyers before and I appreciated how our lawyers answered all my questions and always responded.

12.      I think our lawyers should receive their one-quarter fee.

13.      If the Court approves the settlement, I hope there is no appeal so that we can get paid without delay.

Executed on April 9, 2018 in Rosedale, New York.

Maria Pilar Diaz Inglesias

2

# TAB P

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| JILLIAN IZZIO and HEATHER ZOELLER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CENTURY GOLF PARTNERS MANAGEMENT, L.P.,<br><br>Defendant. | Case No.: 3:14-cv-03194-P |
| KARA ASHBY, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CENTURY GOLF PARTNERS MANAGEMENT, L.P. dba ARNOLD PALMER GOLF MANAGEMENT,<br><br>Defendant. | Case No.: 3:15-CV-00861-P |

## DECLARATION OF MERCEDES ROMERO IN SUPPORT OF THE MOTION FOR CERTIFICATION OF THE SETTLEMENT CLASSES AND FINAL APPROVAL OF THE PROPOSED SETTLEMENT

I, Mercedes Romero, declare under penalty of perjury that the following is true and correct:

1.      I have opted into the above-captioned matter.

2.      This declaration is respectfully submitted in support of the Motion for Certification of the Settlement Classes and Final Approval of the Proposed Settlement.

3.      I am glad this case was brought and that I had the opportunity to join it.

4.      I did not realize we were being treated unfairly prior to joining this lawsuit.

1

5.      I have spoken to the lawyers and I am aware that if we continue the case there is the possibility that we might receive additional money.  However, I think it would be better to receive the money now and I believe many of my colleagues feel that way.

6.      I would like the money from the settlement sooner rather than later.

7.      Most of my colleagues at Harbor Links lived paycheck to paycheck and Harbor Links was their only source of income.

8.      I believe receiving the money as soon as possible would be a great help to many of them.

9.      I have discussed the objection filed by Mr. Metzger and Ms. Brana with the lawyers and disagree with it.

10.     I believe the people at Harbor Links have been treated as fairly as everyone else.

11.     I have spoken with lawyers before and I appreciated how our lawyers answered all my questions and always responded.

12.     I think our lawyers should receive their one-quarter fee.

13.     If the Court approves the settlement, I hope there is no appeal so that we can get paid without delay.

Executed on April 10 2018 in Jackson Heights, New York.


_____
Mercedes Romero

2

# TAB Q

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| JILLIAN IZZIO and HEATHER ZOELLER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CENTURY GOLF PARTNERS MANAGEMENT, L.P.,<br><br>Defendant. | Case No.: 3:14-cv-03194-P |
| KARA ASHBY, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CENTURY GOLF PARTNERS MANAGEMENT, L.P. dba ARNOLD PALMER GOLF MANAGEMENT,<br><br>Defendant. | Case No.: 3:15-CV-00861-P |

## DECLARATION OF MICHAEL ESPINAL IN SUPPORT OF THE MOTION FOR CERTIFICATION OF THE SETTLEMENT CLASSES AND FINAL APPROVAL OF THE PROPOSED SETTLEMENT

I, Michael Espinal, declare under penalty of perjury that the following is true and correct:

1.     I have opted into the above-captioned matter.

2.     This declaration is respectfully submitted in support of the Motion for Certification of the Settlement Classes and Final Approval of the Proposed Settlement.

3.     I am glad this case was brought and that I had the opportunity to join it.

4.     I did not realize we were being treated unfairly prior to joining this lawsuit.

1

5.      I have spoken to the lawyers and I am aware that if we continue the case there is the possibility that we might receive additional money. However, I think it would be better to receive the money now and I believe many of my colleagues feel that way.

6.   ·   I would like the money from the settlement sooner rather than later.

7.      Most of my colleagues at Harbor Links lived paycheck to paycheck and Harbor Links was their only source of income.

8.      I believe receiving the money as soon as possible would be a great help to many of them.

9.      I have discussed the objection filed by Mr. Metzger and Ms. Brana with the lawyers and disagree with it.

10.     I believe the people at Harbor Links have been treated as fairly as everyone else.

11.     I have spoken with lawyers before and I appreciated how our lawyers answered all my questions and always responded.

12.     I think our lawyers should receive their one-quarter fee.

13.     If the Court approves the settlement, I hope there is no appeal so that we can get paid without delay.

Executed on April **12** 2018 in Copiague, New York.


_michael Espinal_
Michael Espinal

· 2

175

# TAB R

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| JILLIAN IZZIO and HEATHER ZOELLER, on behalf of themselves and all others similarly situated, | Case No.: 3:14-cv-03194-P |
| Plaintiffs, | |
| v. | |
| CENTURY GOLF PARTNERS MANAGEMENT, L.P., | |
| Defendant. | |
| KARA ASHBY, on behalf of herself and all others similarly situated, | Case No.: 3:15-CV-00861-P |
| Plaintiff, | |
| v. | |
| CENTURY GOLF PARTNERS MANAGEMENT, L.P. dba ARNOLD PALMER GOLF MANAGEMENT, | |
| Defendant. | |

## DECLARATION OF RAMON MEJIA MENDEZ IN SUPPORT OF THE MOTION FOR CERTIFICATION OF THE SETTLEMENT CLASSES AND FINAL APPROVAL OF THE PROPOSED SETTLEMENT

I, Ramon Mejia Mendez, declare under penalty of perjury that the following is true and correct:

1. I have opted into the above-captioned matter.

2. This declaration is respectfully submitted in support of the Motion for Certification of the Settlement Classes and Final Approval of the Proposed Settlement.

3. I am glad this case was brought and that I had the opportunity to join it.

4. I did not realize we were being treated unfairly prior to joining this lawsuit.

1

5.     I have spoken to the lawyers and I am aware that if we continue the case there is the possibility that we might receive additional money.  However, I think it would be better to receive the money now and I believe many of my colleagues feel that way.

6.     I would like the money from the settlement sooner rather than later.

7.     Most of my colleagues at Harbor Links lived paycheck to paycheck and Harbor Links was their only source of income.

8.     I believe receiving the money as soon as possible would be a great help to many of them.

9.     I have discussed the objection filed by Mr. Metzger and Ms. Brana with the lawyers and disagree with it.

10.     I believe the people at Harbor Links have been treated as fairly as everyone else.

11.     I have spoken with lawyers before and I appreciated how our lawyers answered all my questions and always responded.

12.     I think our lawyers should receive their one-quarter fee.

13.     If the Court approves the settlement, I hope there is no appeal so that we can get paid without delay.

Executed on April 9, 2018 in Hicksville, New York.

Ramon Mejia Mendez

2

178

# TAB S

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| JILLIAN IZZIO and HEATHER ZOELLER, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> CENTURY GOLF PARTNERS MANAGEMENT, L.P., <br><br> Defendant. | Case No.: 3:14-cv-03194-P |
| KARA ASHBY, on behalf of herself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> CENTURY GOLF PARTNERS MANAGEMENT, L.P. dba ARNOLD PALMER GOLF MANAGEMENT, <br><br> Defendant. | Case No.: 3:15-CV-00861-P |

## DECLARATION OF ROCIO CABRERA ORTIZ IN SUPPORT OF THE MOTION FOR CERTIFICATION OF THE SETTLEMENT CLASSES AND FINAL APPROVAL OF THE PROPOSED SETTLEMENT

I, Rocio Cabrera Ortiz, declare under penalty of perjury that the following is true and correct:

1.    I have opted into the above-captioned matter.

2.    This declaration is respectfully submitted in support of the Motion for Certification of the Settlement Classes and Final Approval of the Proposed Settlement.

3.    I am glad this case was brought and that I had the opportunity to join it.

4.    I did not realize we were being treated unfairly prior to joining this lawsuit.

1

5.      I have spoken to the lawyers and I am aware that if we continue the case there is the possibility that we might receive additional money.  However, I think it would be better to receive the money now and I believe many of my colleagues feel that way.

6.      I would like the money from the settlement sooner rather than later.

7.      Most of my colleagues at Harbor Links lived paycheck to paycheck and Harbor Links was their only source of income.

8.      I believe receiving the money as soon as possible would be a great help to many of them.

9.      I have discussed the objection filed by Mr. Metzger and Ms. Brana with the lawyers and disagree with it.

10.     I believe the people at Harbor Links have been treated as fairly as everyone else.

11.     I have spoken with lawyers before and I appreciated how our lawyers answered all my questions and always responded.

12.     I think our lawyers should receive their one-quarter fee.

13.     If the Court approves the settlement, I hope there is no appeal so that we can get paid without delay.

Executed on April 16, 2018 in Corona, New York.


_Rocio Cabrera Ortiz_
Rocio Cabrera Ortiz

2

# TAB T

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| JILLIAN IZZIO and HEATHER ZOELLER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CENTURY GOLF PARTNERS MANAGEMENT, L.P.,<br><br>Defendant. | Case No.: 3:14-cv-03194-P |
| KARA ASHBY, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CENTURY GOLF PARTNERS MANAGEMENT, L.P. dba ARNOLD PALMER GOLF MANAGEMENT,<br><br>Defendant. | Case No.: 3:15-CV-00861-P |

## DECLARATION OF RYAN SOMERVILLE IN SUPPORT OF THE MOTION FOR CERTIFICATION OF THE SETTLEMENT CLASSES AND FINAL APPROVAL OF THE PROPOSED SETTLEMENT

I, Ryan Somerville, declare under penalty of perjury that the following is true and correct:

1.     I have opted into the above-captioned matter.

2.     This declaration is respectfully submitted in support of the Motion for Certification of the Settlement Classes and Final Approval of the Proposed Settlement.

3.     I am glad this case was brought and that I had the opportunity to join it.

4.     I did not realize we were being treated unfairly prior to joining this lawsuit.

1

5.      I have spoken to the lawyers and I am aware that if we continue the case there is the possibility that we might receive additional money.  However, I think it would be better to receive the money now and I believe many of my colleagues feel that way.

6.      I would like the money from the settlement sooner rather than later.

7.      Most of my colleagues at Harbor Links lived paycheck to paycheck and Harbor Links was their only source of income.

8.      I believe receiving the money as soon as possible would be a great help to many of them.

9.      I have discussed the objection filed by Mr. Metzger and Ms. Brana with the lawyers and disagree with it.

10.     I believe the people at Harbor Links have been treated as fairly as everyone else.

11.     I have spoken with lawyers before and I appreciated how our lawyers answered all my questions and always responded.

12.     I think our lawyers should receive their one-quarter fee.

13.     If the Court approves the settlement, I hope there is no appeal so that we can get paid without delay.

Executed on April 11, 2018 in Huntington Station, NY.

Ryan Somerville

2

# TAB U

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| JILLIAN IZZIO and HEATHER ZOELLER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CENTURY GOLF PARTNERS MANAGEMENT, L.P.,<br><br>Defendant. | Case No.: 3:14-cv-03194-P |
| KARA ASHBY, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CENTURY GOLF PARTNERS MANAGEMENT, L.P. dba ARNOLD PALMER GOLF MANAGEMENT,<br><br>Defendant. | Case No.: 3:15-CV-00861-P |

### DECLARATION OF SHIRLEY LOPEZ IN SUPPORT OF THE MOTION FOR CERTIFICATION OF THE SETTLEMENT CLASSES AND FINAL APPROVAL OF THE PROPOSED SETTLEMENT

I, Shirley Lopez, declare under penalty of perjury that the following is true and correct:

1.      I have opted into the above-captioned matter.

2.      This declaration is respectfully submitted in support of the Motion for Certification of the Settlement Classes and Final Approval of the Proposed Settlement.

3.      I am glad this case was brought and that I had the opportunity to join it.

4.      I did not realize we were being treated unfairly prior to joining this lawsuit.

1

5.      I have spoken to the lawyers and I am aware that if we continue the case there is the possibility that we might receive additional money.  However, I think it would be better to receive the money now and I believe many of my colleagues feel that way.

6.      I would like the money from the settlement sooner rather than later.

7.      Most of my colleagues at Harbor Links lived paycheck to paycheck and Harbor Links was their only source of income.

8.      I believe receiving the money as soon as possible would be a great help to many of them.

9.      I have discussed the objection filed by Mr. Metzger and Ms. Brana with the lawyers and disagree with it.

10.     I believe the people at Harbor Links have been treated as fairly as everyone else.

11.     I have spoken with lawyers before and I appreciated how our lawyers answered all my questions and always responded.

12.     I think our lawyers should receive their one-quarter fee.

13.     If the Court approves the settlement, I hope there is no appeal so that we can get paid without delay.

Executed on April 9, 2018 in Jackson Heights, New York.


Shirley Lopez

2

187

# TAB V

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| JILLIAN IZZIO and HEATHER ZOELLER, on behalf of themselves and all others similarly situated, | Case No.: 3:14-cv-03194-P |
| Plaintiffs, | |
| v. | |
| CENTURY GOLF PARTNERS MANAGEMENT, L.P., | |
| Defendant. | |
| KARA ASHBY, on behalf of herself and all others similarly situated, | Case No.: 3:15-CV-00861-P |
| Plaintiff, | |
| v. | |
| CENTURY GOLF PARTNERS MANAGEMENT, L.P. dba ARNOLD PALMER GOLF MANAGEMENT, | |
| Defendant. | |

**DECLARATION OF TANIA DURAN IN SUPPORT OF THE MOTION FOR**
**CERTIFICATION OF THE SETTLEMENT CLASSES AND FINAL APPROVAL OF**
**THE PROPOSED SETTLEMENT**

I, Tania Duran, declare under penalty of perjury that the following is true and correct:

1.      I have opted into the above-captioned matter.

2.      This declaration is respectfully submitted in support of the Motion for Certification

of the Settlement Classes and Final Approval of the Proposed Settlement.

3.      I am glad this case was brought and that I had the opportunity to join it.

4.      I did not realize we were being treated unfairly prior to joining this lawsuit.

1

5.   I have spoken to the lawyers and I am aware that if we continue the case there is the possibility that we might receive additional money.  However, I think it would be better to receive the money now and I believe many of my colleagues feel that way.

6.   I would like the money from the settlement sooner rather than later.

7.   Most of my colleagues at Harbor Links lived paycheck to paycheck and Harbor Links was their only source of income.

8.   I believe receiving the money as soon as possible would be a great help to many of them.

9.   I have discussed the objection filed by Mr. Metzger and Ms. Brana with the lawyers and disagree with it.

10.   I believe the people at Harbor Links have been treated as fairly as everyone else.

11.   I have spoken with lawyers before and I appreciated how our lawyers answered all my questions and always responded.

12.   I think our lawyers should receive their one-quarter fee.

13.   If the Court approves the settlement, I hope there is no appeal so that we can get paid without delay.

Executed on April 5, 2018 in Long Island City, New York.


Tania Duran

2

# TAB W

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| JILLIAN IZZIO and HEATHER ZOELLER, on behalf of themselves and all others similarly situated, | Case No.: 3:14-cv-03194-P |
| Plaintiffs, | |
| v. | |
| CENTURY GOLF PARTNERS MANAGEMENT, L.P., | |
| Defendant. | |
| KARA ASHBY, on behalf of herself and all others similarly situated, | Case No.: 3:15-CV-00861-P |
| Plaintiff, | |
| v. | |
| CENTURY GOLF PARTNERS MANAGEMENT, L.P. dba ARNOLD PALMER GOLF MANAGEMENT, | |
| Defendant. | |

**DECLARATION OF WALTER ALONZO IN SUPPORT OF THE MOTION FOR CERTIFICATION OF THE SETTLEMENT CLASSES AND FINAL APPROVAL OF THE PROPOSED SETTLEMENT**

I, Walter Alonzo, declare under penalty of perjury that the following is true and correct:

1.      I have opted into the above-captioned matter.

2.      This declaration is respectfully submitted in support of the Motion for Certification of the Settlement Classes and Final Approval of the Proposed Settlement.

3.      I am glad this case was brought and that I had the opportunity to join it.

4.      I did not realize we were being treated unfairly prior to joining this lawsuit.

1

5.     I have spoken to the lawyers and I am aware that if we continue the case there is the possibility that we might receive additional money.  However, I think it would be better to receive the money now and I believe many of my colleagues feel that way.

6.     I would like the money from the settlement sooner rather than later.

7.     Most of my colleagues at Harbor Links lived paycheck to paycheck and Harbor Links was their only source of income.

8.     I believe receiving the money as soon as possible would be a great help to many of them.

9.     I have discussed the objection filed by Mr. Metzger and Ms. Brana with the lawyers and disagree with it.

10.     I believe the people at Harbor Links have been treated as fairly as everyone else.

11.     I have spoken with lawyers before and I appreciated how our lawyers answered all my questions and always responded.

12.     I think our lawyers should receive their one-quarter fee.

13.     If the Court approves the settlement, I hope there is no appeal so that we can get paid without delay.

Executed on April 9th, 2018 in Elmhurst, New York.


_____
Walter Alonzo

2

193

# TAB X

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| JILLIAN IZZIO and HEATHER ZOELLER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CENTURY GOLF PARTNERS MANAGEMENT, L.P.,<br><br>Defendant. | Case No.: 3:14-cv-03194-P |
| KARA ASHBY, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CENTURY GOLF PARTNERS MANAGEMENT, L.P. dba ARNOLD PALMER GOLF MANAGEMENT,<br><br>Defendant. | Case No.: 3:15-CV-00861-P |

## DECLARATION OF WILSON PORTILLA IN SUPPORT OF THE MOTION FOR CERTIFICATION OF THE SETTLEMENT CLASSES AND FINAL APPROVAL OF THE PROPOSED SETTLEMENT

I, Wilson Portilla, declare under penalty of perjury that the following is true and correct:

1. I have opted into the above-captioned matter.

2. This declaration is respectfully submitted in support of the Motion for Certification of the Settlement Classes and Final Approval of the Proposed Settlement.

3. I am glad this case was brought and that I had the opportunity to join it.

4. I did not realize we were being treated unfairly prior to joining this lawsuit.

1

5.    I have spoken to the lawyers and I am aware that if we continue the case there is the possibility that we might receive additional money.  However, I think it would be better to receive the money now and I believe many of my colleagues feel that way.

6.    I would like the money from the settlement sooner rather than later.

7.    Most of my colleagues at Harbor Links lived paycheck to paycheck and Harbor Links was their only source of income.

8.    I believe receiving the money as soon as possible would be a great help to many of them.

9.    I have discussed the objection filed by Mr. Metzger and Ms. Brana with the lawyers and disagree with it.

10.    I believe the people at Harbor Links have been treated as fairly as everyone else.

11.    I have spoken with lawyers before and I appreciated how our lawyers answered all my questions and always responded.

12.    I think our lawyers should receive their one-quarter fee.

13.    If the Court approves the settlement, I hope there is no appeal so that we can get paid without delay.

Executed on April 9, 2018 in Jackson Heights, New York.


_____
Wilson Portilla

2

196