**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| JILLIAN IZZIO, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| | § | |
| v. | § | Civil Action No. 3:14-cv-03194-M |
| | § | |
| | § | |
| CENTURY GOLF PARTNERS | § | |
| MANAGEMENT, L.P., | § | |
| | § | |
| Defendant. | § | |

**<u>ORDER</u>**

Plaintiffs Jillian Izzio and Heather Zoeller ("Plaintiffs") sued Defendant Century Golf

Partners Management for violations of the labor laws of the State of New York and the Fair

Labor Standards Act (the "FLSA").  Plaintiffs, Kara Ashby, Diane Gulla, Daniel Howard, Derik

Kane, Michael Overdorf, and Sara Owczarzak (collectively, "Proponents") now move for final

certification of a settlement class, final approval of a proposed settlement ("the Settlement"), and

the award of attorney's fees and costs to resolve the claims brought in this action and three

related actions.  [ECF No. 147].

On September 6, 2018, the Court held a preliminary hearing on class certification and the

Settlement.  Following the hearing, the Court issued an Order which conditionally certified

Plaintiffs' proposed state law settlement class and Fair Labor Standards Act ("FLSA") class.

[ECF No. 132 at 16].  The Court held a final approval hearing on the Settlement on January 31,

2019.  [ECF No. 152].  For the reasons stated below and on the record at the final approval

hearing, the Motion for Certification of the Settlement Class, Final Approval of the Enhanced

Settlement, and Award of Attorney's Fees and Costs [ECF No. 147] is **GRANTED**.

I.      **Background**

    a.  **General Background**

This is a wage-and-hour class action brought under New York law and the FSLA on behalf of banquet employees at four New York country clubs.  [ECF No. 1 at 3–4].  Plaintiffs claim (1) that Defendant failed to remit certain service charges to banquet staff in violation of New York law, (2) that Defendant did not reimburse banquet workers for the cost of their uniforms in violation of New York law, (3) that Defendant did not pay extra "spread of hours" wages in violation of New York law, and (4) that Defendant did not provide appropriate overtime pay in violation of the FSLA.  [*Id*. at 4–5].  The four country clubs involved are owned and/or operated by Defendant and include (1) Brierwood Country Club in Hamburg, New York ("Brierwood"), (2) Fox Valley Club in Lancaster, New York ("Fox Valley"), (3) Tan Tara Golf Club in North Tonawada, New York ("Tan Tara"), and (4) Harbor Links Golf Club in Port Washington, New York ("Harbor Links").  [ECF No. 110 at 2–3].  Plaintiffs were banquet employees at Brierwood and Fox Valley.  [ECF No. 1 ¶¶ 11, 12].  Objectors Anthony Metzger and Jullian Brana ("Objectors") were employees at Harbor Links.  [ECF No. 114 at 1].

Plaintiffs' main claim is that Defendant failed to remit services charges collected under banquet contracts at Brierwood, Fox Valley, and Harbor Links.[1]  The standard contract between these clubs and a patron renting the club for an event provided for a 20% "service charge" added to all food and beverage charges.  [*See* ECF No. 111, Hout Decl., Ex. 3 at 38, Ex. 4 at 44, Ex. 5 at 48].  Under New York law, no employer may "retain any part of a gratuity or of any charge purported to be a gratuity for an employee."  NYLL § 196-d.

---

[1] Proponents state that "[d]iscovery revealed that Tan Tara remitted service charges [to] its banquet staff members" and, thus, these plaintiffs only have overtime, spread of hours, and uniform claims.  [ECF No. 111, Hout Decl. ¶¶ 10, 11].

Proponents claim that, during the relevant period, two different legal standards apply to determine whether Defendant wrongly withheld service charges.  [ECF No. 110 at 13–14].  Prior to January 1, 2011, the governing legal standard was provided by *Samiento v. World Yacht Inc*. 10 N.Y.3d 70 (N.Y. 2008).  In *World Yacht*, the New York Court of Appeals held that a mandatory service charge may constitute a "charge purported to be a gratuity," within the meaning of § 196-d, "when it is shown [by the plaintiff] that employers represented or allowed their customers to believe that the charges were in fact gratuities for their employees."  *Id*. at 81. Whether "a mandatory charge or fee [was] purported to be a gratuity" was to be "weighed against the expectation of a reasonable customer."  *Id.* at 79.  After January 1, 2011, the New York State Department of Labor ("NYSDOL") published changed regulations which created a "rebuttable presumption" that any charge made in addition to charges for food, beverage and specified other material or services "is a charge purported to be a gratuity."  12 N.Y.C.R.R. § 146-2.18.

Prior to the change in the law, banquet contracts from Brierwood, Fox Valley, and Harbor Links contained language stating that "[a] 20% service charge . . . will be added to all food and beverage charges."  [ECF No. 111, Hout Decl., Ex. 3 at 38, Ex. 4 at 44, Ex. 5 at 48]. Objectors contend that these contracts, provided to the Court, were "cherry-picked" by Proponents in an attempt to demonstrate that contractual representations to customers were the same across the three facilities and that "there can be little doubt that [] the other undisclosed contracts would [] undermine certification."  [ECF No. 114 at 5].  Objectors, however, provided very few documents in support of this charge, despite the fact that they obtained substantial amounts of discovery in the *Metzger* Action.  [*See* ECF No. 114 at 12 ("Defendants produced over 30,000 documents in the Metzger Action . . . ."); *see also* ECF No. 115 at Ex. A (showing

3

examples of documents used at Harbor Links)].  Objectors, further, point to language in the Harbor Links contract that discloses a "GRAT RATE" of "20.00" to suggest that Harbor Links employees would more easily carry the burden of proof under *World Yacht*.

Following promulgation of the NYSDOL regulation creating the rebuttable presumption, it appears that the three clubs changed the language in their contracts to clearly disclose that the service fees were paid to the club and, thus, were not gratuities.  [*See* ECF No. 111, Hout Decl., Ex. 7 at 60, Ex. 8 at 64, Ex. 9 at 69].  Three contracts submitted by Proponents show that contracts at each of the three clubs disclosed that the service fees were "paid directly to the Course/Club" and that "the Service Charge is not paid directly to the particular server or servers who provided service . . . ."  [*Id*.].  It appears that this new language was adopted at Harbor Links in October 2012.  [ECF No. 119 at 4].  It also appears that the new language was not added at Brierwood and Fox Valley until one year later, in October 2013.  [*Id*.].

> **b.        Related Litigation**

Three other pending and related pieces of litigation are impacted by the proposed settlement.  The first was filed by Diane Law and Diane Gulla on behalf of banquet staff at the four country clubs in state court in New York (the "*Law* Action").  *See Law et al. v. CGPM/WMC Operating, LLC d/b/a Arnold Palmer Golf Mgmt.*, Index No. E150883/2013.  Four additional named plaintiffs subsequently joined the *Law* Action, and five of the six *Law* plaintiffs are among the Proponents who now join Plaintiffs in moving for certification and approval of the Settlement.  [ECF No. 110 at 1–2].

Next, on June 13, 2014, Anthony Metzger brought an action in the United States District Court for the Eastern District of New York, asserting claims on behalf of the Harbor Links banquet service workers (the "*Metzger* Action").  *See Metzger v. Century Golf Partners Mgmt.*,

*LP*, No. 14-cv-3747 (E.D.N.Y. June 13, 2014). Metzger objects to the proposed settlement in this action. [ECF No. 114 at 1]. The *Metzger* action is currently stayed pending the outcome of this proceeding. *Metzger v. Century Golf Partners Mgmt., L.P.*, No. 14-cv-3747 (E.D.N.Y. Apr. 16, 2015).

Finally, on September 10, 2014, Kara Ashby filed a complaint against Defendant in the United States District Court for the Western District of New York on behalf of herself and employees at the four country clubs, asserting the same claims as those advanced in this action (the "*Ashby* Action"). *See Ashby v. Century Golf Partners Mgmt. L.P., d/b/a Arnold Palmer Golf Mgmt.*, No. 14-cv-759 (W.D.N.Y. Sept. 10, 2014). On March 18, 2015, the *Ashby* Action was transferred to this Court, where it was consolidated with this action on April 21, 2015. [ECF No. 33 at 1]. Ashby is one of the Proponents moving for certification and approval of the Proposed Settlement.

### c.   Initial Certification of Settlement Class, Appeal, and Subsequent Negotiation

On June 4, 2015, Plaintiffs and Kara Ashby moved for preliminary approval of a class action settlement (the "Initial Settlement") to resolve the claims brought in this action and in the *Law*, *Metzger*, and *Ashby* Actions. [ECF Nos. 32, 33]. In the Initial Settlement, Defendant agreed to pay $1.2 million to settle the four actions. [ECF No. 33 at 7]. On March 16, 2016, the judge previously presiding over this action certified a settlement class and gave final approval to the Initial Settlement. [ECF No. 47 at 1]. Objectors appealed the decision granting certification and approval to the United States Court of Appeals for the Fifth Circuit. [ECF No. 49].

On December 7, 2016, the Fifth Circuit vacated and remanded the certification and approval, finding that the Court had "conducted no analysis, much less a rigorous analysis, of the Rule 23(a) factors" in certifying the class for settlement. [ECF No. 77 at 4]. The Fifth Circuit

5

noted the Objectors' contention that the commonality factor of Rule 23(a) was not satisfied, but the court did not comment on the merits of this contention. [*Id*. at 3]. The court also did not express any opinion regarding the fairness of the terms or structure of the Initial Settlement. The court merely vacated and remanded "for appropriate Rule 23 findings." [*Id.* at 4].

After remand, the parties participated in mediation and extensive settlement discussions. [ECF No. 102 at 1]. On May 1, 2018, Proponents again moved for certification of a settlement class including banquet employees of all four country clubs, for approval of an enhanced settlement, and for an award of attorney's fees and expenses. [ECF Nos. 109, 110]. On May 22, 2018, the Objectors again filed an objection to certification and approval of the proposed settlement. [ECF No. 114]. The Court held a preliminary hearing on certification and the settlement on September 6, 2018 [ECF No. 124], and entered an Order conditionally certifying the settlement classes on October 3, 2018. [ECF No. 132]. Proponents now move for final certification and approval [ECF No. 147], and Objectors again oppose the Settlement. [ECF Nos. 139, 150].

## II.    The Proposed Settlement

### a.    Settlement Structure

Proponents seek certification of two settlement classes: (1) a class consisting of Plaintiffs and all individuals who worked as hourly banquet service staff at any event held at the four country clubs from August 20, 2007 through March 5, 2015 (the "State Law Settlement Class"), and (2) a class consisting of Plaintiffs and all individuals who worked as hourly banquet staff at any event held at the four country clubs from September 5, 2011 through March 5, 2015, and who opted in to the Settlement pursuant to the FLSA (the "FLSA Settlement Class") (together with the State Law Settlement Class, the "Settlement Class"). [ECF No. 110 at 7–8].

6

Under the Settlement, Defendant will pay out a maximum of $1.425 million,[2] an increase from the Initial Settlement amount of $1.2 million.  [ECF No. 111, Hout Decl., Ex. 1 at 11].  Of the $1.425 million, 25%, or $356,250, is to be paid to Plaintiffs' counsel as attorney's fees.  [*Id.*, Hout Dec. ¶ 17].  Plaintiffs' counsel also seeks $45,000 in litigation costs and expenses and $45,206.98 in administration costs.  [ECF No. 148 at 29].  Finally, the eight Proponents seek a total of $39,000 in service awards to be divided among themselves.  [ECF No. 111, Hout Decl. ¶ 14].

The amount remaining after these costs and fees (the "Distribution Fund") is available for distribution to the Settlement Class.  90% of the Distribution Fund is to be divided by the total number of hours worked by all members of the Settlement Class who worked at Brierwood, Fox Valley, and Harbor Links, to arrive at a per-hour figure of $3.81.  [ECF No. 110 at 8].  Each participating class member who worked at these clubs will receive $3.81 per hour worked during the specified class periods.  [*Id.*].  The remaining 10% of the Distribution Fund will be divided by the total number of hours worked by class members at Tan Tara to arrive at an hourly figure of $2.54.  [*Id.* at 8–9].  Class members at Tan Tara will receive $2.54 for each hour worked during the specified class periods.  [*Id.*].  Proponents represent that "[t]he 90-10 split was negotiated by the parties in recognition that there were no service charge claims at the Tan Tara facility" because "[d]iscovery revealed that Tan Tara remitted service charges [to] its banquet staff members."  [*Id.* at 9; ECF No. 111, Hout Decl. ¶ 10].  Tan Tara plaintiffs, however, do have "spread of hours, uniform, and off-the-clock claims. . . ."  [ECF No. 110 at 9].

---

[2] Under the terms of the Settlement, any unclaimed awards will revert to Defendant.  [ECF No. 110 at 28].

### b.   Potential Value of Settled Claims

Following the preliminary hearing, at the request of the Court, Proponents made a submission detailing the potential value of the different claims of the employees of the four clubs and discussing how these values corresponded with the division of the settlement.  [ECF No. 125].  The potential value of the non-service charge claims are:

| Country Club | Maximum Value: Non-Service Charge Claims |
|---|---|
| Harbor Links | $48,900 |
| Brierwood | $29,700 |
| Fox Valley | $35,000 |
| Tan Tara | $152,900 |

Proponents state that the Settlement treats the non-service charge claims of employees from all four clubs in the same manner, with employees from each club receiving 93% of their total potential damage on these claims.  [ECF No. 148 at 17].  This high percentage payout reflects the fact that Proponents view the non-service charge claims as strong claims on which Plaintiffs are likely to prevail.  [ECF No. 125 at 1].

The potential value of the service charge claims are:

| Country Club | Maximum Value: Service Charge Claims |
|---|---|
| Harbor Links | $1,110,968.60 |
| Brierwood | $1,111,128.46 |
| Fox Valley | $918,366.11 |
| Tan Tara | -$0- |

Proponents note that the Settlement provides for "a gross recovery of 85% of all post-2011 service charge claims," which covers the period when there was a rebuttable presumption that service charges were owed to the employees under New York law.  [ECF No. 148 at 17].  The Settlement provides for a recovery of 37.5% of all potential service charge claims.  [*Id*.].

### III.    Class Certification

#### a.   Legal Standard

A settlement class must meet the requirements for class certification, just as if the case were to be litigated.  *Amchem v. Windsor*, 521 U.S. 591, 620 (1997).  In fact, the requirements of Rule 23 "demand undiluted, even heightened, attention in the settlement context . . . [because] a court asked to certify a settlement class will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold."  *Id*.

To certify a class, a party must first demonstrate that the proposed class meets the four threshold requirements specified in Rule 23(a)—numerosity, commonality, typicality, and adequacy of representation.  *Funeral Consumers Alliance, Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 345 (5th Cir. 2012).  The party must then demonstrate that the proposed class meets one of three categories specified in Rule 23(b).  *Id*.  Proponents here seek to certify the Settlement Class under Rule 23(b)(3), which requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action [be] superior to other available methods for fairly and efficiently adjudicating the controversy."  FED. R. CIV. P. 23(b)(3).  Courts have "great discretion in certifying and managing a class action." *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 624 (5th Cir. 1999).

The Court has issued an Order finding that the Settlement Class meets Rule 23's requirements and the Court has conditionally certified the Settlement Class.  [ECF No. 132 at

16].  The Court finds that nothing has changed between the issuance of the Conditional

Certification Order and this Order which would alter these conclusions.  For the reasons stated in

the Court's Conditional Certification Order, Rule 23's requirements are met and the Settlement

Class is certified for the purposes of the Settlement.

## IV.    Approval of Class Settlement

A court must review any "settlement, voluntary dismissal, or compromise" of the

"claims, issues, or defenses of a certified class."  FED. R. CIV. P. 23(e).  Rule 23(e) establishes

the following procedures for considering and implementing a class action settlement:

(1) The Court must direct notice in a reasonable manner to all class members who would
be bound by the proposal.

(2) If the proposal would bind class members, the Court may approve it only after a
hearing and on finding that it is fair, reasonable, and adequate.

(3) The parties seeking approval must file a statement identifying any agreement made in
connection with the proposal.

(4) If the class action was previously certified under Rule 23(b)(3), the Court may refuse
to approve a settlement unless it affords a new opportunity to request exclusion to
individual class members who had an earlier opportunity to request exclusion but did
not do so.

(5) Any class member may object to the proposal if it requires court approval and the
objection may be withdrawn only with the Court's approval.

*Id*.

### a.  Rule 23(e)(1): Notice Must be Directed in a Reasonable Manner to All Class
Members

On October 20, 2015, the Court entered a Preliminary Order of Approval of the Initial

Settlement.  [ECF No. 37 ¶¶ 1–5].  This Order authorized Proponents to direct notice of the

Initial Settlement to the Settlement Class.  [*Id*. at ¶ 6].  Following remand from the Fifth Circuit

and because the new Settlement increased the recovery of the Settlement Class, the Court

ordered that notice of the new Settlement "must be sent to those members of the State Law

[Settlement] Class who originally opted out of the class action, and to members of the FLSA

[Settlement] Class who did not originally opt into the class action."  [ECF No. 113 at 2].

Pursuant to the Court's Order, Plaintiff submitted an updated proposed notice and claim and

consent form on June 8, 2018.  [ECF No. 118].  The Court's Conditional Certification Order

approved the form of the supplemental notice and directed that the notice be distributed to the

potential class members described above within 45 days of the Court's Order.  [ECF No. 132 at

15–16].

### b.   Rule 23(e)(2): The Settlement Must be Fair, Reasonable, and Adequate

The Settlement would bind class members, so the Court must hold a hearing to consider

the Settlement and the Court must determine that it is fair, reasonable, and adequate.  FED. R.

CIV. P. 23(e)(2).  The Court has held several hearings on the Settlement, including a final

approval hearing on January 31, 2019.  [ECF Nos. 124, 152].

Courts look to the *Reed* factors to determine whether a proposed settlement is fair,

reasonable, and adequate.  *See Reed v. Gen. Motors Corp.*, 703 F.2d 170 (5th Cir. 1983).  The

*Reed* factors include: (1) evidence that the settlement was obtained by fraud or collusion; (2) the

complexity, expense, and likely duration of the litigation; (3) the stage of the litigation and

available discovery; (4) the probability of plaintiffs prevailing on the merits; (5) the range of

possible recovery and certainty of damages; and (6) the opinions of class counsel, class

representatives, and absent class members.  *Newby v. Enron Corp.*, 394 G.3d 296, 301 (5th Cir.

2004).

The Court has considered these factors and, for the reasons detailed below, finds that

each supports its conclusion that the Settlement is fair, reasonable, and adequate.

### i. Evidence that the Settlement was Obtained by Fraud or Collusion

First, the Court considers whether there is evidence that the Settlement was obtained by fraud or collusion.  Objectors argue that the Settlement is collusive because it was negotiated "without Objectors and their counsel."  [ECF No. 114 at 14].  This, Objectors argue, is because "the parties decided to continue settlement discussion without Objectors [after the mediation with Judge Kaplan] and reached an Amended Agreement without Objectors' input or approval." [*Id.*].

Proponents call these contentions "bizarre" and state that Objectors were included in the mediation with Judge Kaplan.  [ECF No. 119 at 5].  Proponents further note that the contention that Objectors were excluded from discussions after the mediation is belied by the record, given that Judge Kaplan filed a Supplemental ADR Summary stating that "additional time [was] required to finalize the revised class settlement proposal and *to confer with Objectors about the proposal*."  [*Id.* (citing ECF No. 103)].

Based on this record and further questioning at the fairness hearing, the Court concludes that the Settlement is the product of arms-length negotiations and was reached after several mediation sessions with well-respected mediators.  *See In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 948 (9th Cir. 2011) (noting that the "presence of a neutral mediator" is a factor "weighing in favor of a finding of non-collusiveness").  The Court finds that Objectors were included in negotiation of the Settlement and that there is no evidence of improper fraud or collusion.

### ii. Complexity, Expense, And Likely Duration of the Litigation

Next, the Court considers the complexity, expense, and likely duration of the litigation. Plaintiffs' claims raise complex legal and factual issues, including the question of whether the

service charges were "gratuities" within the meaning of NYLL § 196-d.  At a minimum, continued litigation would require significant time and expense associated with written discovery, depositions, the hiring and preparation of experts, motion practice, and trial. Settlement Class members, their Counsel, and likely witnesses are also located in New York, far from the Court, which would further increase the cost of continued proceedings.   Accordingly, the amount of time and expense that resolution of the litigation would require are both large.  A swift resolution of this dispute would avoid complex and protracted litigation, and this weighs in favor of approval.

### iii.   Stage of the Litigation and Available Discovery

Proponents state that the *Law* plaintiffs and their counsel engaged in substantial discovery, both formal and informal, concerning the four clubs.  [ECF No. 110 at 4].  The documents and interrogatory responses obtained, Proponents state, allowed them to evaluate the strengths and weaknesses of their case.  [*Id*.].  Proponents state that they also "interviewed over 250 [] Settlement Class Members from all [c]lubs, including over 100 Settlement Class Members from Harbor Links, in order to assess the merits of their claims."  [ECF No. 148 at 14].  This is clearly not a situation where attorneys were "groping in darkness" trying to reach a settlement without sufficient understanding of the case and this supports finding that the Settlement is fair, reasonable, and adequate.  *Schwartz v. TXU Corp.*, No. 3:02-cv-2243-K, 2015 WL 3148350, at *19 (N.D. Tex. Nov. 8, 2005) ("Unless Lead Counsel settled while 'groping in darkness' the lack of formal discovery will not hinder the settlement.") (quoting *Cotton v. Hinton*, 559 F.2d 1326, 1332 (5th Cir. 1977)).

#### iv.   Probability of Plaintiffs Prevailing on the Merits

Next, the Court considers the probability that Plaintiffs will prevail on the merits of their claims.  Proponents state that "continued litigation of Plaintiffs' service charge claims poses difficulties and risks for ultimately establishing liability (1) during the pre-January 2011 time period, (2) the time period between January 1, 2011 and when Defendant changed its banquet contract language, and (3) the period after Defendant changed its banquet contract language." [*Id*. at 32].  This is certainly true for the first and last periods identified above.  For claims in the first period, Plaintiffs bear the burden to prove that a reasonable patron would have thought that the service charges were gratuities.  *World Yacht*, 10 N.Y.3d at 79–81.  For claims in the third period, even though there is a rebuttable presumption that the charges were gratuities, the clubs changed the language of their contract to explicitly state that the charges were paid to the clubs, not to the staff.  Thus, Plaintiffs will have significant difficulty prevailing on their claims in the first and third periods, and this weighs in favor of approval.

Proponents, in their letter to the Court following the initial certification hearing, stated that the non-service charge claims "are considerably stronger and Plaintiffs have a higher likelihood of prevailing on these claims."  [ECF No. 125 at 1].  As noted above, however, these claims are significantly less valuable than the service charge claims.

The risks surrounding Plaintiffs' claims, particularly the service charge claims, weigh in favor of finding that the Settlement is fair, reasonable, and adequate.

#### v.   Range of Possible Recovery and Certainty of Damages

Next, the Court considers the range of possible recovery and the certainty of damages compared with the recovery obtained through the Settlement.  Proponents state that the Proposed Settlement "amounts to a total recovery of $1,425,000 for claims totaling $3,407,109.22."  [ECF

No. 148 at 18]. This includes recovery of 85% of all post-2011 service charge damages and 37.5% of all potential service charge damages. [*Id*. at 17]. With regard to their non-service charge claims, employees at all four clubs will recover 93% of total damages on these claims. [ECF No. 148 at 17]. Proponents claim that the Proposed Settlement would result in an average award of $2,900 per Settlement Class member, with 54 members receiving over $5,000. [*Id*. at 26].

Objectors counter that Harbor Links class members will receive, after attorney fees and costs, 32.8% of the total service charges collected at Harbor Links before the contract language changed. [ECF No. 114 at 21]. This, Objectors state, is an "extremely low settlement amount" and "is not justified." [*Id*. at 21–22]. Objectors argue that the "Harbor Links employees would easily meet [the *World Yacht*] burden of proof due to the express representations on the Harbor Links banquet contracts." [*Id.* at 20]. Objectors make this argument based on the fact that the words "GRAT RATE," and the percentage amount of the service charge, appear on the front page of the Harbor Links banquet contract, while the contracts at the other clubs only discuss a "service charge." [*Compare* ECF No. 111, Hout Decl., Ex. 5 at 47 *with* Ex. 3 at 38, Ex. 4 at 44]. This would allow the Harbor Links plaintiffs to more easily show that a reasonable patron would have viewed the service charge as a gratuity than employees at the other clubs.

However, it is not clear that claims of the employees at Harbor Links are of higher value or could be more easily proven than those of employees at Fox Valley and Brierwood. Although the value of the Harbor Links claims under the *World Yacht* standard may be higher, the Harbor Links claims arising after the 2011 change in New York law may be much lower. It appears that Harbor Links changed the language in its banquet contract to state that the service charge was paid directly to the Club in October 2012. [*Id*. Ex. 9 at 65]. This change of language is

extremely damaging to the employees' claims because it allows Defendant to overcome the rebuttable presumption and show that a reasonable patron would not have viewed the service charge as a gratuity.  It appears that Fox Valley and Brierwood did not make this same change to their contracts until well after the change at Harbor Links.  [*Id*. Ex. 7 at 56; Ex. 8 at 60].  Thus, while the Harbor Links employees may have a slightly easier time proving damage than those at the other clubs under the *World Yacht* standard, these employees' ability to prove damage after 2011 may be much more difficult.  Objectors' contention that the Harbor Links claims are of higher value than those of employees at Fox Valley and Brierwood is not demonstrably true.

Because the claims of the employees of the three clubs with service charges appear to be of similar value, and because the non-service charge claims are treated the same across the clubs, the division of the Settlement between employees of the four clubs is fair and reasonable. Further, the compensation received by the Settlement Class under the Settlement is reasonable given the total potential recovery and the risks associated with Plaintiffs' claims.  These conclusions weigh in favor of approval of the Settlement.

### vi.   Opinions of Class Counsel, Class Representatives, and Absent Class Members

Finally, the Court considers the response of Settlement Class members to the Settlement. Proponents point to class members' responses to the Initial Proposed Settlement as further indication that the Settlement is fair.  Proponents note that 256 out of 435 potential claimants opted into the Initial Settlement.  [ECF No. 110 at 35].  This would have resulted in 83.3% of the total available award money under the Initial Settlement being claimed.  [*Id*.].  Proponents also note that 22 members of the Class from Harbor Links have submitted declarations in support of the Proposed Settlement.  [ECF No. 111 at Exs. C–X].  Further, only two members of the

16

Settlement Class object to the Settlement.  The Court finds that the participation in the Initial Settlement, and the low number of Objectors to the Settlement, weigh in favor of finding that the Settlement is fair, adequate, and reasonable.

The Court finds, after consideration of the *Reed* factors, that the Settlement is fair, adequate, and reasonable and may be properly approved under Rule 23(e)(2).

### c.   Rule 23(e)(3): Parties Seeking Approval Must File a Statement Identifying Any Agreement Made in Connection with the Proposal

Rule 23(e)(3) requires "[t]he parties seeking approval [to] file a statement identifying any agreement made in connection with the proposal."  FED. R. CIV. P. 23(e)(3).  This requirement does not concern disclosure of the basic terms of the settlement; "[i]t aims instead to related undertakings that, although seemingly separate, may have influenced the terms of the settlement by trading away possible advantages for the class in return for advantages for others."  *Erica P. John Fund*, 2018 WL 1942227, at *5 (quoting *Slipchenko v. Brunel Energy, Inc.*, No. H-11-1465, 2015 WL 338358, at *6 (S.D. Tex. Jan. 23, 2015)).  "The spirit of [Rule 23(e)(3)] is to compel identification of any agreement or understanding," written or oral, "that might have affected the interests of class members by altering what they may be receiving or foregoing."  *Id*.

The Proponents have satisfied this requirement by filing the Settlement Agreement, [ECF No. 34, Hout Decl. at Ex. A], and the Addendum to Settlement Agreement and Release.  [ECF No. 111, Hout Decl. at Ex. 1].  These agreements identify certain service awards to be paid to Proponents in connection with the Settlement which are subject to Court approval.

### d.   Rule 23(e)(4): Additional Opt-Out Opportunity

Rule 23(e)(4) provides that "[i]f the class action was previously certified under Rule 23(b)(3), the court may refuse to approve a settlement unless it affords a new opportunity to

request exclusion to individual class members who had an earlier opportunity to request exclusion but did not do so." FED. R. CIV. P. 23(e)(4). Because the new Settlement provided an increased recovery to the Settlement Class, the Court ordered that "notice of th[e] Enhanced Settlement must be sent to those members of the State Law Class who originally opted out of the class action, and to members of the FLSA Class who did not originally opt into the class action." [ECF No. 113 at 2]. Proponents submitted a proposed notice [ECF No. 118] and the Court approved the notice and directed that it be sent to members of the State Law Settlement Class who originally opted out of this action and FLSA Settlement class members who did not originally opt in to this action. [ECF No. 132 at 15].

### e. Rule 23(e)(5): Class Member Objections

Finally, class members must be provided an opportunity to object to the Settlement. FED. R. CIV. P. 23(e)(5). The notice and supplemental notices sent to class members informed them of their right to object. [ECF No. 34 at 143–44; ECF No. 118-1 at 9–10]. As noted above, only two objectors continue to object to the Settlement. Objectors appeared and were heard, through their counsel, at the final approval hearing. [ECF No. 152].

## V. Attorney's Fees and Expenses of Plaintiffs' Counsel and Service Awards for Proponents

### a. Attorney's Fees

Plaintiffs' Counsel requests that the Court approve their attorney's fees. The Settlement calls for Plaintiffs' Counsel to receive 25% of the recovery. [ECF No. 148 at 4]. In awarding attorney's fees, "[t]he Court must scrutinize the agreed-to fees under the standards set forth in *Johnson*, and not merely ratify a pre-arranged compact." *Erica P. John Fund*, 2018 WL 1942227, at *10 (citing *Strong v. BellSouth Telecomm., Inc.*, 137 F.3d 844, 849 (5th Cir. 1988)).

The Court's analysis under *Johnson* must not be merely conclusory, but it is not necessary that

every factor be considered.  *Id*.  The *Johnson* factors include: (1) the time and labor required; (2)

the novelty and difficulty of the issues; (3) the skill required to perform the legal service

adequately; (4) the preclusion of other employment by the attorney due to the case; (5) the

customary fee for similar work in the community; (6) whether the fee is fixed or contingent; (7)

time limitations imposed by the client or the circumstances; (8) the amount involved and results

obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the

case; (11) the nature and length of the professional relationship with the client; and (12) the

awards in similar cases. *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–719 (5th

Cir. 1974).

### i.   Factor 1: Time and Labor Required

Plaintiffs' Counsel represents to the Court that they worked for 2020.5 hours on this

matter.  [ECF No. 149, Hout Dec. ¶ 34].  This case is almost five years old and there are more

than 150 docket entries.  There was an appeal to the Fifth Circuit and the action was remanded to

this Court.  Plaintiffs' Counsel also represents to the Court that they conducted over 250

interviews of Settlement Class members to investigate the case.  [*Id*. ¶ 8].  The Court concludes

that this case required a great deal of time and labor and that this supports finding that the

requested fees are reasonable.

### ii.   Factors Two and Three: The Novelty and Difficulty of the Issues and
### The Skill Required to Perform the Legal Service Adequately

This case involves more than 400 potential class members who worked at four different

country clubs.  The legal standard that applied to the central claims at issue—the service charge

claims—changed during the relevant period.  Further, courts have recognized that a hybrid action

19

which includes both an opt-out state law class and an opt-in FLSA class is complex.  *See*

*Sukhnandan v. Royal Health Care of Long Island LLC*, No. 12-cv-4216, 2014 WL 3778173, at

*10 (S.D.N.Y. July 31, 2014).  The Court finds that the issues presented in this action are

complex and require a high level of legal skill.  This supports finding that the requested fees are

reasonable.

### iii.  Factor Four: The Preclusion of Other Employment

Plaintiffs' Counsel spent 2020.5 hours working on this case.  [ECF No. 149, Hout Dec. ¶

34].  The Court finds that such work inevitably precluded other representations and that this

weighs in favor of approval.

### iv.  Factor Five and Factor Twelve: The Customary Fee for Similar Work in the Community and Awards in Similar Cases

The requested fee in this case is 25% of the Settlement amount.  Plaintiffs' Counsel

directs the Court to other hybrid FLSA and New York labor law actions where the fees awarded

were higher than the percentage requested here.  *See Tiro v. Public House Invs., LLC*, No. 11

Civ. 7679 (CM), 2013 WL 4830949, at **13, 16 (S.D.N.Y. Sept. 10, 2013) (awarding fees equal

to 33% of settlement fund in FLSA and NYLL action); *Frank v. Eastman Kodak Co.*, 228 F.R.D.

174, 189 (W.D.N.Y. 2005) (awarding fees of 40% in FLSA and NYLL action).  Based on these

cases and the Court's observation of other, similar cases, the Court finds that the requested 25%

is within the range of normal fee awards in actions of this type.

### v.  Factor Six: Whether the Fee is Fixed or Contingent

Here, the requested fee is entirely contingent.  Courts have recognized that a court should

consider the risk inherent in taking a case on contingency in determining whether the amount of

fees is appropriate.  *See Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 859–60 (E.D. La.

2007) ("Recognizing the 'contingent risk of nonpayment' in [class action] cases, courts have found that class counsel ought to be compensated . . . for risk of loss or nonpayment assumed by carrying through with the case.").  The Court finds that the risk assumed by Plaintiffs' Counsel in performing their work on contingency weighs in favor of approving the requested fees.

### vi.   Factor Seven: Time Limitations Imposed by the Client or the Circumstances

Plaintiffs' Counsel acknowledges that this case "did not impose unique time limitations or constraints beyond those attendant to any litigation."  [ECF No. 148 at 26].  However, the Court does note that Plaintiffs' Counsel is based in New York and that this action was litigated in this Court in Texas and before the Fifth Circuit in New Orleans.  Therefore, the case required Plaintiffs' Counsel to travel significant distances to appear in court.  This also weighs, perhaps only slightly, in favor of approving the requested fees.

### vii.   Factor Eight: The Amount Involved and the Results Obtained

The Fifth Circuit has called this factor the "most critical" factor.  *See Migis v. Pearle Vision, Inc.*, 135 F.3d 1041, 1047 (5th Cir. 1998).  Plaintiffs' Counsel has represented to the Court that the maximum possible recovery by the Settlement Class is estimated to be $3,407,109.22.  [ECF No. 148 at 18].  Recovery under the Settlement totals $1,425,000, before the deduction for costs and fees.  [*Id*.].  This results in an overall recovery of about 42% of total potential damages.  The Court has found that this is a fair and reasonable recovery based on the risks associated with Plaintiffs' claims.  Such a result further supports awarding the requested fees.

21

### viii.   Factor Nine: The Experience, Reputation, and Ability of the Attorneys

Based on a review of the firm resume of Plaintiffs' Counsel firm [ECF No. 149, Hout Dec. at Ex. 9] and the work of Plaintiffs' Counsel in this case, the Court finds that Plaintiffs' Counsel is experienced in prosecuting labor class actions such as this one and that this supports awarding the requested fees.

### ix.   Factor Ten: The Undesirability of the Case

A wage-and-hour class action, particularly one taken on contingency, presents logistical difficulties and significant risk to attorneys.  These actions often necessarily require a significant amount of investigation, and the risk that an attorney is uncompensated for investigating potential claims is great.  These facts weigh in favor of approving the requested fees.

### x.   Factor Eleven: Nature and Length of the Professional Relationship with Clients

Given that Plaintiffs' Counsel does not have a long-term relationship, outside of this action, with their clients here, this factor does not weigh strongly for or against awarding the requested fees.

### xi.   Conclusion

For the reasons stated above, the *Johnson* factors weigh strongly in favor of awarding the requested fees and the Court approves the requested fees of Plaintiffs' Counsel.

### b.   Administration Costs and Litigation Expenses

Plaintiffs' Counsel also seeks reimbursement for its costs and expenses of $45,000, discounted from their actual expenses of $47,547.47.  [*Id*.].  Expenses and administrative costs expended by class counsel are recoverable from a common fund in a class action settlement.

22

*Erica P John Fund*, 2018 WL 1942227, at *14. After review of the costs and expenses, and consideration of the length and complexity of these proceedings, the Court finds them reasonable. The requested costs and expenses of Plaintiffs' Counsel are approved.

Finally, Plaintiffs' Counsel asks that the Court approve $45,206.98 for the costs of administration of this action. This includes the costs of directing notice to the class and distributing funds. [ECF No. 148 at 29]. After considering the number of members of the Settlement Class and the logistics necessary to administer the Settlement, the Court finds that these costs of administration are reasonable. The requested costs of administration of $45,206.98 are approved.

### c. Service Awards

Finally, the Proponents request that the Court approve service awards for each of the Proponents. [ECF No. 148 at 20]. The awards will total $39,000 and will be distributed as follows: $10,000 to Diane Gulla, who filed the first case in New York state court; the four plaintiffs who joined Gulla when she amended her complaint are to receive $5,000 each; and the two Plaintiffs in this action and the plaintiff in the *Ashby* action are to receive $3,000 each. [*Id.*]. Proponents claim that these individuals participated with Plaintiffs' counsel in prosecuting the action, provided key information, traveled to Dallas to testify, sat for depositions, and attended mediation. [*Id.* at 22].

"Courts commonly permit payments to class members above those received in settlement by class members generally." *Slipchenko*, 2015 WL 338358, at *13 (quoting *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1089 (S.D. Tex. 2012)). After review of the proposed service awards and the contributions of Proponents to

23

achieving the Settlement on behalf of the Settlement Class, the Court finds that these awards are reasonable.  The service awards are approved.

## VI.    Conclusion

For the foregoing reasons, the Motion for Certification of the Settlement Class, Final Approval, and Award of Attorney's Fees and Costs is **GRANTED**.  **IT IS ORDERED** that:

1.  The Settlement Class is **CERTIFIED**;

2.  The Settlement is **APPROVED** in all respects;

3.  The request of Plaintiffs' Counsel for fees is **GRANTED** in the amount of $356,250;

4.  The request of Plaintiffs' Counsel for reimbursement of costs and expenses is **GRANTED** in the amount of $45,000;

5.  The request of Plaintiffs' Counsel for costs of administration is **GRANTED** in the amount of $45,206.98;

6.  The request for service awards for the following individuals is **GRANTED** in the following amounts:

| | |
|---|---|
| Diane Gulla | $10,000 |
| Daniel Howard | $5,000 |
| Sara Owczarzak | $5,000 |
| Derik Kane | $5,000 |
| Michael Overdorf | $5,000 |
| Kara Ashby | $3,000 |
| Jillian Izzio | $3,000 |
| Heather Zoeller | $3,000 |

The parties will take the necessary steps to implement the Settlement.  The Court will retain jurisdiction for purposes of enforcing the Settlement.

**SO ORDERED**.

February 13, 2019.

_____
BARBARA M. G. LYNN
CHIEF JUDGE